1

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP

2

WILLOW E. RADCLIFFE (200087)
SARAH R. HOLLOWAY (254134)

3

100 Pine Street, Suite 2600
San Francisco, CA  94111

4

Telephone:  415/288-4545
415/288-4534 (fax)

5

willowr@csgrr.com
sholloway@csgrr.com

6

Lead Counsel for Plaintiff

7

[Additional counsel appear on signature page.]

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11

| | |
|---|---|
| CHARLES WOZNIAK, Individually and on Behalf of All Others Similarly Situated, | No. 3:09-cv-03671-MMC |
| Plaintiff, | CLASS ACTION |
| vs. | AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| ALIGN TECHNOLOGY, INC., et al., | |
| Defendants. | JURY TRIAL DEMANDED |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

479879_1

1

# TABLE OF CONTENTS

2

Page

3    NATURE OF THE ACTION ...................................................................................1

4    Defendants Issued False and Misleading Statements About Align's Processing
          Capacity, Backlog and Sales Focus on New Revenue Cases ...................................2
5

6    Investors Begin to Learn the Truth ......................................................................7

7    JURISDICTION AND VENUE .............................................................................9

     THE PARTIES.....................................................................................................9
8

9    CONFIDENTIAL WITNESSES ...........................................................................11

10   DEFENDANTS' FRAUDULENT SCHEME ..........................................................15

11   BACKGROUND TO THE CLASS PERIOD ..........................................................15

12   The OrthoClear Settlement ...............................................................................16

13   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...............................18

     Defendants' January 30, 2007 False and Misleading Statements.......................18
14

15   Defendants' April 26, 2007 False and Misleading Statements..........................24

16   Defendants' July 25, 2007 False and Misleading Statements...........................27

17   Investors Begin to Learn the Truth ....................................................................31

18   ADDITIONAL SCIENTER ALLEGATIONS.........................................................33

19   Insider Sales .....................................................................................................39

20   LOSS CAUSATION/ECONOMIC LOSS ..............................................................41

21   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
          DOCTRINE..................................................................................................44

22   CLASS ACTION ALLEGATIONS .......................................................................45

23   NO SAFE HARBOR ...........................................................................................46

24   COUNT I ...........................................................................................................47

25   Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
          Against All Defendants................................................................................47
26

27   COUNT II ..........................................................................................................48

28   Insider Trading Violations of §10(b) and Rule 10b-5 Against Defendant Prescott ..........48

1

2                                                                                                    **Page**

3    COUNT III ..............................................................................................................................48

4            Violation of §20(a) of the Exchange Act Against All Defendants ...................................48

5    PRAYER FOR RELIEF ...........................................................................................................48

6    JURY DEMAND .......................................................................................................................49

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
          MMC

**NATURE OF THE ACTION**

1.      Lead plaintiff Plumbers and Pipefitters National Pension Fund brings this securities class action on behalf of itself and purchasers of the common stock of Align Technology, Inc. ("Align" or the "Company") between January 30, 2007 and October 24, 2007, inclusive (the "Class Period"), under the Securities Exchange Act of 1934 (the "Exchange Act"), against Align and its Chief Executive Officer ("CEO") Thomas M. Prescott ("Prescott").

2.      Defendant Align designs, manufactures and markets Invisalign, a proprietary method for treating malocclusion, or the misalignment of teeth.  Invisalign corrects malocclusion using a series of clear, removable appliances that gently and incrementally move teeth to a desired final position.

3.      The Invisalign process involves five basic steps:  (1) the doctor takes impressions and X-rays of the patient's teeth; (2) the doctor digitally sends the impressions, X-rays and treatment form to Align; (3) Align creates a simulated model of the aligner using its ClinCheck modeling process which takes approximately two weeks; (4) Align sends the ClinCheck simulation to the doctor for approval and/or modification; and (5) upon the doctor's approval of the simulation, Align begins manufacturing the aligners.  The delivery time from the time the ClinCheck model is approved to the time the doctor receives the aligners is typically two weeks.  The total cycle time from patient impressions to delivery is approximately 30 days.

4.      Prior to the Class Period, on October 13, 2006, Align entered into a settlement agreement with a competitor, OrthoClear, Inc. ("OrthoClear"), related to patent and trademark disputes between the parties.  Pursuant to the agreement, OrthoClear agreed to immediately discontinue all sales of removable dental aligners worldwide, to stop accepting new patients and to transfer and assign to Align all intellectual property rights with application to the treatment of malocclusion in exchange for a one time payment by Align to OrthoClear of $20 million.  In addition, Align agreed to make Invisalign treatment available to OrthoClear patients currently in treatment at no additional charge to the patients or doctors under the "Patients First Program" created by Align.  Align gave OrthoClear doctors two months, until December 15, 2006, to register their patients for the Patients First Program, and until March 30, 2007 to submit cases for those patients.

As of December 21, 2006, OrthoClear doctors had registered 30,500 patients for the program and had submitted cases for 16,200 of those patients.

**Defendants Issued False and Misleading Statements About Align's Processing Capacity, Backlog and Sales Focus on New Revenue Cases**

5.      On January 30, 2007, the start of the Class Period, Align issued a press release announcing its financial results for the fourth quarter and fiscal year 2006.  In the press release, defendant Prescott told investors that the Company had "resolved [its] legal disputes with OrthoClear and ***refocused [its] efforts*** on product development, customer service and market expansion."  Following the press release the same day, defendants held a conference call with analysts and investors.  During the conference call, defendant Prescott continued to reassure investors that Align was focused on "***driv[ing] the expansion of [its] customer base***" and that this "vision and strategic direction ***[wa]s clear to all employees***."  In addition, defendant Prescott assured investors that the Company had "***more than adequate capacity***" and would "***recover the one week delay*** currently impacting [its] normal cycle times for revenue cases and make even greater progress toward the Patients First cases."  As a result of defendants' January 30, 2007 reassurances, Align's stock price rose $2.92 per share, or 21%, to close at $16.69.

6.      Defendants knew their statements were false and misleading when made.  At the same time defendants were touting Align's "adequate capacity," defendants knew that the Company did ***not*** have enough trained ClinCheck technicians in place to handle the influx of Patients First cases from the former OrthoClear patients in addition to new revenue generating Invisalign cases.  As a result, Align experienced a significant backlog in its production, and ***all*** case shipments (both new revenue cases and Patients First cases) were significantly delayed during the Class Period.  According to percipient witnesses, the typical ClinCheck processing time for new Invisalign cases (*i.e.*, new revenue cases) doubled from two weeks to ***four weeks or longer***.  And the processing time for Patients First cases was even longer – anywhere from six weeks to several months.  Defendants closely tracked this information, including the number of new cases submitted, the number of cases currently in the ClinCheck process, the number of cases in manufacturing and the number of cases shipped, on a ***daily basis*** using salesforce.com and Manufacturing Executive System ("MES")

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-MMC                                                                                                          - 2 -

software.  Company insiders confirmed that the shipping delays for all cases began almost *immediately* after Align implemented the Patients First Program in October 2006 and continued throughout the Class Period.  Thus, contrary to defendant Prescott's assurances to the market, Align did not have "more than adequate capacity" and was not recovering from a mere "one week delay" in cycle time for new revenue cases.

7.  In addition, contrary to defendants' statements in Align's January 30, 2007 press release, Align's sales force was *not* "refocused" on generating new revenue cases, as defendants led investors to believe.  The Patients First Program required significant time and hand-holding of doctors on the part of Align's sales force.  As a result, Align sales representatives spent as much as *50%* of their time on Patients First cases and the resulting backlog during the Class Period.  Indeed, defendants admitted at the end of the Class Period that the sales force had "*moved their focus away from generating case growth*" in order to focus on "*managing backlog and turnaround and expediting of cases*" resulting from the Patients First Program.  According to Company insiders, Align's sales force, consisting of Territory Account Managers, regularly informed their Regional Business Managers about the influx of Patients First cases and the significant case backlog.  The sales force also updated the status of new case starts daily using salesforce.com, thereby informing defendants of the rapid decline in revenue case starts during the Class Period.

8.  On April 26, 2007, Align issued a press release announcing its financial results for the first quarter of 2007.  Following the press release, defendants held a conference call with investors and analysts.  During the conference call, defendant Prescott continued to tout Align's "*strong demand for new revenue cases*" and reassured investors that the sales teams' focus on generating new revenue cases "*ha[d]n't changed*."  Defendants also increased their case shipment guidance for 2007 from a range of 182,700 to 190,000 cases provided on January 30, 2007 to a range of 200,000 to 206,000 cases.  Moreover, defendants reassured investors that the Company was "*already seeing some improvement*" in its cycle times and that the "*bottleneck no longer exists*" for new revenue cases.  In response to defendants' April 26, 2007 false assurances, the Company's stock price rose $5.91 per share, or 33%, to close at $23.60.

9.      Just four days later, while the stock price was artificially inflated by defendants' false April 26, 2007 statements, defendant Prescott and other Company insiders began unloading large amounts of their personally held Align stock.  Defendant Prescott alone sold **200,000 shares** of his personally held Align stock, for proceeds of over **$4.6 million**, on April 30, 2007.  All told, Align insiders, including **six top executive officers** and **one director**[1] sold 364,925 shares of Align stock, for proceeds of **over $8.4 million**, in the days immediately following defendants' April 26, 2007 false and misleading statements.

10.     At the time of defendants' April 26, 2007 statements and the mass sell-off by Company insiders, defendants knew that Align was continuing to experience a significant backlog in its production and delivery times for **all** of its cases as a result of the influx of Patients First cases.  According to multiple witnesses, the ClinCheck processing time for new revenue cases had grown from two weeks to **four weeks or longer** in order for Align to process both new revenue cases and Patients First cases, and Patients First cases took more than **twice** that long to process.  Thus, contrary to defendants' statements, the "bottleneck" still existed.  Indeed, defendants later admitted at the end of the Class Period that "**virtually all of [Align's] customers were impacted by slower cycle times and backlogs**" during 2007 as a result of the Patients First Program.

11.     Further, in direct contrast to defendant Prescott's reassurances that Align's sales teams' focus on new revenue cases "ha[d]n't changed," its sales teams were **not** focused on new revenue cases.  Instead, Align's sales teams remained focused on managing the backlog and case load created by the influx of new Patients First cases, spending as much as **50%** of their time on Patients First cases during the first quarter of 2007.

12.     OrthoClear doctors were also not as "understanding" about the process as defendants led investors to believe.  According to percipient witnesses, doctors and patients were disgruntled

---

[1]       The selling officers and director were defendant Prescott, CEO; Hossein Arjomand ("Arjomand"), Vice President ("VP"), Research and Development; Eldon Bullington ("Bullington"), Chief Financial Officer ("CFO"); Len Hedge ("Hedge"), VP, Operations; Michael Henry ("Henry"), VP, Information Technology and Chief Information Officer; Gil Laks ("Laks"), VP, International; and David Collins ("Collins"), Director.

about having to repeat the record and treatment process in order to receive new Invisalign aligners to replace their OrthoClear aligners, which led to significant hand-holding on the part of Align's sales force.  Moreover, once registered, OrthoClear cases were treated as secondary to new revenue cases in processing because they did not generate any revenue for Align.  This led to numerous complaints from doctors, particularly those who used both OrthoClear and Invisalign products; as it was difficult for Align's sales force to explain why the same product took more than twice as long to produce just because the case originated from OrthoClear.  The breakdown in relationships between doctors and Align's sales force further hampered the sales forces' ability to generate new revenue case growth for Align.

13.     On July 25, 2007, Align issued a press release announcing its financial results for the second quarter of 2007 and *again* increased its guidance for 2007 case shipments from a range of 200,000 to 206,000 cases given on April 26, 2007 to a range of 206,000 to 209,000 cases.  Following the press release, defendants held a conference call with investors and analysts.  During the conference call, defendant Prescott continued to reassure investors that Align "*continue[d] to see expansion in [its] customer base*" and had "*solid demand at the consumer level.*"  In addition, defendants told analysts that the Company's "*backlog [wa]s rebalanced*" and that total cycle times for new revenue cases (from patient impressions to delivery) were within *one month or less*, and in some cases, as little as *one week*:

> *[W]e typically are back to our published delivery times* and we typically say it's about a month. . . .  *Literally, we've been able to turn around cases within a week.*  *So we're back to our normal availability* and when we need to, for our customer situation, we can move heaven and earth to get something done very quickly.

In response to defendants' July 25, 2007 positive reassurances and increased case shipment guidance, Align's stock price rose $1.85 per share, or 7%, to close at $27.69.

14.     Two days later, on July 27, 2007, while the stock price was artificially inflated as a result of defendants' false and misleading statements, defendant Prescott again began unloading his Align stock.  In the days following defendants' July 25, 2007 statements, defendant Prescott sold *200,300 shares* of his personally held Align stock, for proceeds of *over $5.4 million*.  Numerous other Align insiders sold as well.  All told, Align insiders, including *six top executive officers* and

1    *one director,*[2] sold 419,236 shares of Align stock, for proceeds of nearly ***$11.4 million***, in the days

2    immediately following defendants' July 25, 2007 false and misleading statements.  Notably, ***all*** of

3    Align's executive officers (except Sonia Clark, VP, Human Resources) sold significant amounts of

4    their personally held Align stock – some as much as ***100%*** of their holdings – during the Class

5    Period while the stock price was artificially inflated as a result of defendants' false and misleading

6    statements.

7         15.    At the same time defendants made their July 25, 2007 statements and defendant

8    Prescott was unloading his Align stock, defendants knew that Align continued to experience a

9    significant backlog in production and significantly delayed processing times for ***all*** its cases

10   throughout the second quarter of 2007 as a result of the additional Patients First cases.  According to

11   multiple percipient witnesses, the ClinCheck processing time for new revenue cases was still at least

12   four weeks or longer, putting the total cycle time at more than six weeks, not the one week to a

13   month that Prescott was telling investors.  And the processing time was significantly longer for

14   Patients First cases.

15        16.    In addition, Align's sales force continued to be focused on managing the backlog

16   created by the Patients First cases rather than on generating new revenue case growth, as defendants

17   led investors to believe, such that defendants' increased guidance of 206,000 to 209,000 case

18   shipments in 2007 had no reasonable basis.  Indeed, defendants admitted at the end of the Class

19   Period that they had ***instructed*** the sales teams to focus on the backlog:  "[E]ven in Q2 as [the sales

20   teams] were finishing handling off the ends of the Patients First cases and clearing backlog, that was

21   their activity.  ***We told them that was the priority***, to manage this churn at the doctor and patient

22   level."

23        17.    Moreover, doctors continued to complain about the backlog created by the

24   OrthoClear settlement.  According to Company insiders, doctors generally blamed Align for creating

25

26   [2]    The selling officers and director were defendant Prescott, CEO; Bullington, CFO; Dan Ellis
     ("Ellis"), VP, North America Sales; Roger E. George ("George"), General Counsel and VP, Legal
27   and Corporate Affairs; Hedge, VP Operations, Darrell Zoromski ("Zoromski"), VP Global
     Marketing and Chief Marketing Officer; and Collins, Director.

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                                        - 6 -

1   the situation and were frustrated at the length of time they had to wait to get their patients' aligners.

2   Align's Territory Account Managers bore the brunt of the doctors' criticism.  As a result, numerous

3   Territory Account Managers complained about the influx of OrthoClear cases and the significant

4   case backlogs to their Regional Business Managers regularly throughout 2007.  The breakdown in

5   relationships between doctors and Align's sales force further hampered Align's ability to generate

6   new revenue case growth.

7   **Investors Begin to Learn the Truth**

8          18.    Then, on October 24, 2007, defendants held a conference call with investors and

9   analysts to discuss Align's third quarter 2007 financial results.  On the conference call, defendants

10  admitted that Align's sales force had "***moved their focus away from generating case growth***" during

11  the Class Period in order to focus on "***managing backlog and turnaround and expediting of cases***."

12  Moreover, defendants admitted that because the sales teams "***weren't pushing as hard to get new***

13  ***case starts***," the Company would "***not have the pipeline of case receipts***" to meet defendants' prior

14  guidance.  Thus, defendants lowered their 2007 case shipment guidance from a range of 206,000 to

15  209,000 cases given on July 25, 2007 to a range of 202,000 to 204,000 cases.  In addition,

16  defendants admitted that Align was experiencing slower cycle times and significant backlogs during

17  the Class Period, and that "***virtually all of [Align's] customers were impacted by slower cycle times***

18  ***and backlogs***."

19         19.    In response to this announcement, the price of Align common stock fell $9.63 per

20  share, or approximately 34%, thereby damaging investors.  The following chart reveals the impact

21  that defendants' misrepresentations and disclosures had on Align's stock price:

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                                      - 7 -



1

**JURISDICTION AND VENUE**

2        20.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

3   Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

4   Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

5        21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

6   §1331 and §27 of the Exchange Act.

7        22.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C.

8   §1391(b).   Many of the acts charged herein, including the preparation and dissemination of

9   materially false and misleading information, occurred in substantial part in this District.

10       23.    In connection with the acts alleged in this Complaint, defendants, directly or

11  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

12  the mails, interstate telephone communications and the facilities of the national securities markets.

13                                    **THE PARTIES**

14       24.    Lead plaintiff Plumbers and Pipefitters National Pension Fund, as set forth in the

15  accompanying certification attached hereto and incorporated by reference herein, purchased the

16  common stock of Align at artificially inflated prices during the Class Period and has been damaged

17  thereby.

18       25.    Defendant Align is incorporated in Delaware and maintains its headquarters at 881

19  Martin Avenue, Santa Clara, CA 95050.   The Company designs, manufactures and markets the

20  Invisalign system for treating malocclusion, or the misalignment of teeth.   As of December 31, 2006,

21  Align had 1,253 employees: 672 in manufacturing and operations, 309 in sales and marketing, 115 in

22  research and development and 157 in general and administrative functions.   The Company had 487

23  employees in the U.S., 620 employees in Costa Rica, 116 employees in Europe and 30 employees in

24  other international regions.

25       26.    Defendant Prescott is, and was at all relevant times, President and CEO of Align.

26  Defendant Prescott has served as President and CEO of Align since March 2002.

27       27.    During the Class Period, defendant Prescott, as a senior executive officer of Align,

28  was privy to confidential and proprietary information concerning Align, its operations, finances,

1    financial condition and present and future business prospects.  Defendant Prescott also had access to

2    material adverse non-public information concerning Align, as discussed in detail below.  Because of

3    his position with Align, defendant Prescott had access to non-public information about its business,

4    finances, products, markets and present and future business prospects via access to internal corporate

5    documents, conversations and connections with other corporate officers and employees, attendance

6    at management and/or board of directors meetings and committees thereof and via reports and other

7    information provided to him in connection therewith.  Because of his possession of such

8    information, defendant Prescott knew or recklessly disregarded that the adverse facts specified

9    herein had not been disclosed to, and were being concealed from, the investing public.

10          28.     Defendants are liable as direct participants in the wrongs complained of herein.  In

11   addition, defendant Prescott, by reason of his status as a senior executive officer, was a "controlling

12   person" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause

13   the Company to engage in the unlawful conduct complained of herein.  Because of his position of

14   control, defendant Prescott was able to and did, directly or indirectly, control the conduct of Align's

15   business, including Align's CFO, Bullington, and other Company officers.

16          29.     Defendant Prescott, because of his position with the Company, controlled and/or

17   possessed the authority to control the contents of its reports, press releases and presentations to

18   securities analysts and through them, to the investing public.  Indeed, according to Align's January

19   2007 Disclosure Policy, Align's press releases could *only* be approved by and issued under the

20   supervision of Align's CEO, defendant Prescott, the CFO, the General Counsel or the Investor

21   Relations Officer.  Defendant Prescott was provided with copies of the Company's reports and press

22   releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability

23   and opportunity to prevent their issuance or cause them to be corrected.  Defendant Prescott also

24   made statements alleged herein to be misleading during Align's conference calls, or was present

25   when the statements were made, and had the ability and opportunity to prevent the statements from

26   being made or cause them to be corrected.  Thus, defendant Prescott had the opportunity to commit

27   the fraudulent acts alleged herein.

28

30.     As a senior executive officer and as a controlling person of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, defendant Prescott had a duty to promptly disseminate accurate and truthful information with respect to Align's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Align's common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## CONFIDENTIAL WITNESSES

31.     The allegations herein are supported by first-hand accounts of confidential witnesses ("CWs").  These witnesses are comprised of former Align employees employed during the Class Period.  The CWs provided facts from different departmental and geographic vantage points within the Company.

32.     CW1 was a Territory Account Manager (*i.e.* sales representative) for Align in Atlanta, Georgia from January 2003 to February 7, 2009.  CW1's job entailed selling Align's Invisalign products to general practitioner dentists and orthodontists and helping doctors become certified to offer Invisalign products to their patients.  CW1's job involved making cold calls as well as following up with doctors in his[3] territory who had called the Company's customer service department to inquire about the product.  CW1 worked with both Invisalign doctors in his territory as well as former OrthoClear doctors who had patients registered in the Patients First Program.  In addition, CW1 attended, via conference call, weekly meetings with his Regional Business Manager and other Territory Account Managers in the region and created and submitted weekly field reports to his Regional Business Manager.  CW1 also was experienced with and used Align's

---

[3]     The use of the words "he," "his," and "him" in connection with CWs is not meant to be gender specific and shall also be meant to pertain to the female gender.

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-MMC

1  salesforce.com software to track his daily sales metrics.  Thus, CW1 was in a position to have

2  knowledge of the facts attributed to him throughout this Complaint.

3        33.    CW2 was a Territory Account Manager for Align in Rancho Santa Margarita,

4  California from June 2002 to December 31, 2008.  CW2's job entailed selling Invisalign products to

5  general practitioner dentists and orthodontists and helping doctors become certified to offer

6  Invisalign products to their patients.  CW2 worked with Align doctors as well as former OrthoClear

7  doctors who had patients registered in the Patients First Program.  In addition, CW2 attended weekly

8  conference calls with his Regional Business Manager and other Territory Account Managers in his

9  region.  CW2 was also experienced with and used Align's salesforce.com software to track the sales

10 in his region during the Class Period and received breakdowns of his sales performance daily via e-

11 mail from Align's headquarters.  Thus, CW2 was in a position to have knowledge of the facts

12 attributed to him throughout this Complaint.

13       34.    CW3 was a Territory Account Manager for Align in Atlanta, Georgia from 2002 to

14 January 2009.  CW3's job entailed selling Invisalign products to general practitioner dentists and

15 orthodontists and following up on leads in his territory.  CW3 also worked with doctors to become

16 certified as Align providers, which involved attendance at a half-day training seminar.  In addition,

17 CW3 helped provide the doctors' offices with training and educational materials, demonstrated the

18 product and helped doctors navigate and operate the ClinCheck software system.  CW3 worked with

19 both Invisalign doctors and former OrthoClear doctors who had patients registered in the Patients

20 First Program.  In addition, CW3 was experienced with and used Align's salesforce.com software to

21 track his daily sales metrics.  CW3 also attended weekly meetings with his Regional Business

22 Manager and other Territory Account Managers, and submitted his weekly sales information to his

23 Regional Business Manager.  Thus, CW3 was in a position to have knowledge of the facts attributed

24 to him throughout this Complaint.

25       35.    CW4 was a Territory Account Manager at Align in the San Francisco Bay Area,

26 California from October 2003 to April 2008.  CW4's job entailed selling Invisalign products to

27 general practitioner dentists and orthodontists and helping doctors become certified to sell Invisalign

28 products.  CW4 also had regular contact with existing Invisalign-certified doctors, which included

1   providing educational and training materials and demonstrating the ClinCheck software.  CW4

2   worked with both Invisalign doctors and former OrthoClear doctors who had patients registered in

3   the Patients First Program.  In addition, CW4 was experienced with and used Align's salesforce.com

4   software to track his daily sales metrics and monitor missing record reports daily.  CW4 also

5   attended weekly meetings   with his Regional Business Manager and other Territory Account

6   Managers in the region every Monday during the Class Period, as well as national sales meetings

7   which took place in January.  Thus, CW4 was in a position to have knowledge of the facts attributed

8   to him throughout this Complaint.

9        36.     CW5 was a Regional Business Manager at Align in Bothell, Washington from 1999

10  to October 2007.  Pursuant to this position, CW5 oversaw a staff of 12 Territory Account Managers

11  and one Staff Trainer.  CW5 spent most of his time traveling throughout the region and making sales

12  calls with his Territory Account Managers.  The Territory Account Managers in CW5's region

13  worked with both Invisalign doctors and former OrthoClear doctors who had patients registered in

14  the Patients First Program.  CW5 was also responsible for assigning sales quotas to his Territory

15  Account Managers.  In addition, CW5 attended monthly and quarterly meetings attended by all of

16  the other Regional Business Managers and the Sales Directors from various parts of the country

17  during the Class Period.  CW5 also attended weekly conference calls with the other Regional

18  Business Managers and conducted weekly meetings on Mondays with the Territory Account

19  Managers in his territory.  CW5 kept track of daily sales metrics (including new cases generated and

20  cases shipped as well as the dollar amount) for each Territory Account Manager in his region using

21  Align's salesforce.com software.  Thus, CW5 was in a position to have knowledge of the facts

22  attributed to him throughout this Complaint.

23       37.     CW6 was a Cost Accounting Manager at Align in Santa Clara, California from May

24  2005 to May 2009.  CW6 worked within Align's finance department and was responsible for the cost

25  accounting for manufacturing operations, including employee costs and overhead, in Costa Rica,

26  Juarez, Mexico and to a lesser extent, Santa Clara, California.  CW6's job also included financial

27  planning and analysis for manufacturing, in terms of ensuring that manufacturing was prepared for

28  the Invisalign cases generated by the sales organization.  CW6 attended monthly financial reviews

1   and monthly manufacturing meetings. CW6 was also aware of and familiar with Align's monthly

2   Executive Management Committee meetings. In addition, CW6 was experienced with and used

3   Align's MES software to track the number of cases shipped daily, and received an e-mail, along with

4   others on the distribution list, including defendant Prescott, with the sales and shipment metrics on a

5   daily basis. CW6 also received monthly sales projections, including the forecasts for case

6   shipments, via e-mail in an Excel spreadsheet. Thus, CW6 was in a position to have knowledge of

7   the facts attributed to him throughout this Complaint.

8        38.    CW7 was a US Controller at Align in Santa Clara, California from October 2006 to

9   July 2008. As a Controller, CW7 oversaw the accounts payable, accounts receivable, payroll,

10  revenue and general ledger departments. CW7 had 16 individuals reporting to him, who prepared

11  and consolidated the financials worldwide on a quarterly basis, including income statements and

12  balance sheets. CW7 attended monthly meetings during the Class Period to review Align's monthly

13  financials, along with Align CFO Bullington and several other Align executives. CW7 believed that

14  CFO Bullington informed defendant Prescott about the content of these meetings. Thus, CW7 was

15  in a position to have knowledge of the facts attributed to him throughout this Complaint.

16       39.    CW8 was a Senior Manager of Business Intelligence at Align in Santa Clara,

17  California from August 2006 to January 2009. Align's Business Intelligence group was part of its

18  information technology department. CW8 was responsible for maintaining Align's internal reports

19  and reporting systems as well as creating additional reports upon request. CW8 explained that the

20  Company's Senior Manager of Sales Operations provided him with parameters for the reports, such

21  as specific revenue breakdowns by sales person or by region, and that most of the reports he created

22  were made available to the approximately 100-person core sales team at Align. The reports CW8

23  created were maintained in Microsoft SharePoint and were made available to the sales department

24  through an intranet. CW8 indicated that VP of Sales Ellis, who reported directly to defendant

25  Prescott, had access to all of the data in these reports. In addition to the sales reports, CW8 also

26  received special requests or requests for customized reports every quarter at Align, especially within

27  the last two weeks of a quarter. CW8 stated that these reports usually focused on sales or marketing

28  data. Once the sales or marketing individuals analyzed these reports, CW8 believed the data was

1   presented to Align's executives, including defendant Prescott.  Based on the reports that existed

2   during the Class Period, Align executives, including defendant Prescott, should have been aware of

3   Align's revenues, new case starts and case shipments on a regular basis throughout the Class Period

4   according to CW8.  Thus, CW8 was in a position to have knowledge of the facts attributed to him

5   throughout this Complaint.

6                    **DEFENDANTS' FRAUDULENT SCHEME**

7          40.     Defendants are liable as participants in a fraudulent scheme and course of conduct

8   that operated as a fraud or deceit on purchasers of Align's common stock by disseminating

9   materially false and misleading statements and/or concealing material adverse facts.  The scheme:

10  (i) deceived the investing public regarding Align's business, operations and management and the

11  intrinsic value of Align's stock; (ii) enabled defendant Prescott and other officers and a director to

12  collectively sell 948,157 shares of their personally held Align common stock for gross proceeds in

13  excess of $22.8 million; and (iii) caused lead plaintiff and members of the class to purchase Align

14  common stock at artificially inflated prices and be damaged thereby.

15                    **BACKGROUND TO THE CLASS PERIOD**

16         41.     Align was incorporated in Delaware in April 1997.  The Company designs,

17  manufactures and markets the Invisalign system, a proprietary method for treating malocclusion, or

18  the misalignment of teeth.  Invisalign corrects malocclusion using a series of clear, removable

19  appliances that gently and incrementally move teeth to a desired final position.

20         42.     According to Align's 2006 Form 10-K, the Invisalign process involves several steps.

21  First, the doctor takes impressions and X-rays of the patient's teeth.  Then, the doctor digitally sends

22  the impressions, X-rays and a treatment form outlining the desired results to Align's simulation

23  modeling center.  Using its ClinCheck modeling process, Align uses the impressions, X-rays and

24  treatment form to create a simulated model for the aligners.  ClinCheck is an internally developed

25  computer modeling program that allows dental professionals to diagnose and plan treatments for

26  their patients.  Align uses ClinCheck to develop a customized, three-dimensional treatment plan that

27  simulates appropriate tooth movement in a series of two-week increments.  ClinCheck allows the

28  dental professional to view this three-dimensional simulation with a high degree of magnification

1  and from any angle, and enables the dental professional to project tooth movement with a high level

2  of accuracy.  According to percipient witnesses, the ClinCheck processing time, before the Patients

3  First Program was implemented, was typically two weeks once impressions were received.  During

4  the Class Period, Align's ClinCheck operations were located in its San Jose, Costa Rica facility.

5       43.     Once complete, Align digitally sends the ClinCheck simulation to the doctor for

6  approval.  The doctor may immediately approve the projected treatment, or may provide Align with

7  feedback for modifications.  Align then reflects any requested adjustments in a modified simulation.

8  Upon approval of the ClinCheck simulation, Align uses the data underlying the simulation, in

9  conjunction with stereolithography technology, to manufacture the aligner molds.  According to

10 Company insiders, manufacturing begins within minutes of the doctor's approval.  During the Class

11 Period, Align used a third party contractor in Juarez, Mexico to manufacture the molds and aligners.

12 According to percipient witnesses, the standard delivery time (from the time ClinCheck is approved

13 to the time the doctor receives the aligners) before the Patients First Program was implemented was

14 typically two weeks, putting the total cycle time at approximately 30 days.

15 **The OrthoClear Settlement**

16      44.     In 2004, former Align co-founder and CEO Zia Chishti ("Chishti"), who departed

17 from the Company in 2002, started a competing company, OrthoClear.  Like Align, OrthoClear

18 designed, manufactured and marketed clear, removable aligners, very similar to Invisalign, to treat

19 malocclusion.  In addition to producing a competing product, OrthoClear also recruited several

20 members of Align's sales force to work for OrthoClear.

21      45.     In February 2005, Align filed a state action against OrthoClear, Chishti and certain

22 OrthoClear executives for unlawful use of Align's intellectual property, among other claims.  In

23 response, OrthoClear filed a multi-claim cross-complaint against Align, defendant Prescott and other

24 Align executives alleging breach of contract, libel, slander and unfair competition, among other

25 claims.  Align then filed two federal actions against OrthoClear in July 2005 and July 2006 for

26 violations of the Federal Lanham Act including unfair competition, trademark infringement and false

27 advertising.  Finally, in January 2006, Align filed a federal patent infringement action against

28 OrthoClear and filed a formal complaint with the United States International Trade Commission

1    against OrthoClear seeking to halt the importation into the United States of infringing aligners

2    manufactured by OrthoClear in Pakistan in violation of Align's patents and other intellectual

3    property rights.

4          46.     On October 13, 2006, Align parties and OrthoClear parties entered into a formal

5    settlement agreement to end all pending litigation between the parties.  Under the terms of the

6    agreement, OrthoClear agreed to immediately discontinue all design, manufacture, marketing and

7    sales of removable dental aligners worldwide, to stop accepting new patient cases for treatment, and

8    to transfer and assign to Align all intellectual property rights with application to the treatment of

9    malocclusion in exchange for a one time payment by Align to OrthoClear of $20 million.  In

10   addition, Align agreed to make Invisalign treatment available to all OrthoClear patients existing as of

11   September 27, 2006 at *no additional charge* to the patient, the doctor or OrthoClear under its

12   Patients First Program.  Doctors who wished to take advantage of the program were required to

13   register their OrthoClear patients with Align by December 15, 2006 and submit cases for their

14   OrthoClear patients by March 30, 2007. As of December 21, 2006, doctors had registered 30,500

15   OrthoClear patients for the Patients First Program and had submitted cases for 16,200 of those

16   registered patients.

17         47.     At Align, the processing and manufacturing of Patients First cases were identical to

18   that of new Invisalign cases.  In other words, the Patients First Program's case submission process

19   required doctors to provide Align with the same information that doctors provide for new Invisalign

20   cases (*i.e.,* full X-rays, impressions and treatment forms), and the aligners for Patients First cases

21   were processed and manufactured in the same manner as new Invisalign cases.  Align, however, did

22   not have the manufacturing and processing capacity to handle the additional Patients First cases.

23   Align's purported solution was to delay treatment for the OrthoClear patients in order to allow it to

24   provide timely treatment to paying customers and prevent a bottleneck in processing new revenue

25   cases.  Thus, on December 21, 2006, Align issued a press release announcing that processing for

26   Patients First cases may take 12 to 16 weeks, while processing for new Invisalign cases may be

27   temporarily delayed by only approximately 10 days.  Align also announced that it had hired 100 new

28   ClinCheck technicians to handle the additional case load.  Align admitted in its 2006 Form 10-K,

1  however, that it takes at least three to four months of training before these specialized technicians are

2  able to process cases.  Thus, even if the additional technicians were hired in November or December

3  2006, they would not be able to begin processing the backlog of additional cases until February or

4  March 2007 at the earliest.

5      48.    Despite Align's reported attempts to increase its capacity, analysts remained

6  concerned about the impact of the Patients First Program on Align.  For example, on December 21,

7  2006, Roth Capital Partners reported that its "primary concern" was "Align's ability to provide

8  enough manufacturing capacity to supply the increased level of demand." Jefferies & Company, Inc.

9  similarly reported on December 21, 2006 that:  "[it] remain[ed] concerned about the ongoing

10  transition and disruption in converting doctors to Invisalign (many we have spoken to are aggravated

11  by the transition process)."

12              **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

13  **Defendants' January 30, 2007 False and Misleading Statements**

14      49.    On January 30, 2007, the first day of the Class Period, Align issued a press release

15  announcing its financial results for the fourth quarter and year end 2006.   In the press release,

16  defendant Prescott assured investors that the Company had "resolved [its] legal disputes with

17  OrthoClear and *refocused [its] efforts*" on expanding its customer base and revenue case growth:[4]

18      2006 was eventful and productive. . . .   We resolved our legal disputes with
       OrthoClear and *refocused our efforts on product development, customer service*
19      *and market expansion*. Overall, we shipped a record number of cases and our base
       of doctors grew tremendously. *We expect 2007 to be the year we restage growth,*
20      *introduce products that meet the unique needs of the Orthodontists and GPs and*
       *continue our path to profitability*.

21      50.    Following the press release, defendants held an earnings conference call with analysts

22  and investors to discuss the Company's earnings and operations.  During the conference call,

23  defendant Prescott continued to reassure investors that Align was focused on "*driv[ing] the*

24  *expansion of [its] customer base*":

25

26  _____

27  [4]      False and misleading statements in quotations are in bold.

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                              - 18 -

1   Our goals in 2007 are straightforward – *first, we're going to generate meaningful*
2   *top line growth* and continue the path to profitability using that momentum to regain
    the kind of growth we believe is possible – around 40% per year.

3   *         *         *

4   *Fourth, we are going to continue to drive the expansion of our customer base*
5   *while incrementally increasing our demand creation and brand building efforts.*

6   *         *         *

7   And fifth, we are going to complete the shipment of all Patients First cases by the
    end of Q2 and ensure those patients and their doctors get the great service, support,
8   and results they're looking for when they started their treatment.

9   We are all very excited and enthused about 2007 and beyond.  Our vision *and*
    *strategic direction is clear to all employees*.  Our priorities drive most of our activity
10  and our focus is on ensuring great execution.

11      51.     With regard to Align's production capacity, defendant Prescott told investors that new

12  revenue cases had been delayed by only "*one week*" and that Align was "*right on track*" to recover

13  this short delay:

14      We are right on track with expectations for ending production capacity and as this
        comes online, we will *recover the one week delay* currently impacting our normal
15      cycle times for revenue cases and make even greater progress towards the Patients
        First cases.

16      52.     Defendant Prescott also continued to tout the efforts of Align's sales force in

17  obtaining new revenue case growth:

18      The volume growth in Q4 was driven by a *tremendous sales effort* while at the same
        time we helped doctors with patients in OrthoClear treatment get their cases
19      registered and started.  While we still have many doctors and patients waiting to get
        started, *overall we are pleased with the progress*. . . .

20      *         *         *

21  *This [sales] team* is excited about the new year and *is working with our customers*
22  *to help them get the best smiles for their patients as they take their practices to the*
    *next level.  The are positioned to generate significant top line growth in 2007.*

23      53.     With regard to the Company's 2007 case shipment guidance, CFO Bullington, with

24  defendant Prescott present, added:

25      For the full year of 2007, we expect revenues to increase 16% to 24% to
26      approximately $240 million to $255 million.  *Case shipments are expected to*
        *increase in the range of 22% to 27% to 182,700 to 190,000 cases*.

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                                      - 19 -

1   According to Align's January 2007 Disclosure Policy, Bullington was an "'Authorized

2   Spokesperson' to speak on behalf of Align."

3       54.   When questioned about Align's 2007 guidance for case volume in light of the

4   increased volume from non-revenue Patients First cases, defendant Prescott reassured investors that

5   Align "*ha[d] seen very solid demand*" for its revenue cases:

6       [I]n our press release in late December . . . we explicitly described that because of the
        ***strong incoming case flow*** which we typically don't talk about because it's [a]
7       revenue event for us, it was putting more pressure on our ability to get at the pile of
        Patients First cases. ***So we have seen very solid demand*** as we laid out in that press
8       release. We think that is a good thing, obviously. ***And our goal is to ensure that
        that continues***.

9       55.   Defendant Prescott, in response to analysts' questions about Align's capacity to

10  handle the additional Patients First cases, also assured investors that Align had "***more than adequate

11  capacity***":

12      [ANALYST]: And then on the capacity side, can you just spell out for us, I know
13      you talked about this some, where are you building out capacity right now? And will
        there, because of the Patients First Program, be excess capacity therefore leftover
14      perhaps in the second half of the year? And just generally where are you on a
        capacity front?

15
        TOM PRESCOTT:    The constraint – so we manage capacity all over the business.
16      We have not ever had to deal with a situation where we've tended to drop almost a
        quarter's worth of volume in – and when you do that you find the bottleneck. ***Our
17      bottleneck was strictly in Costa Rica. And it was with the available capacity of
        treatment technicians, dental technicians that have to be trained for about three
18      months or so before we can have them working on cases unsupervised or in
        normal supervision***.

19
        So it literally took us roughly three months to start deploying the first waves of those.
20      ***We have made very good progress I think.*** In our comments we described where we
        were. ***We have more than adequate capacity through the rest of the system***. And
21      we don't expect so much to have capacity left over once we polished off the pile;
        we've kind of chosen a path through this that will intersect with our view of
22      expanding demand and volume. And these are not enormously expensive resources.
        So we don't expect to see this in terms of gross margin overhang in general or
23      anything like that but ***we're trying to find our way through the need to staff up for
        Patients First and intersecting with the expected growth in volume and receipts as
24      the year progresses***. So again, it is kind of a linear programming problem here but
        ***we think we are on track to find that balance***.

25      56.   On the January 30, 2007 conference call, analysts also questioned defendants about

26  the total case cycle time for delivering aligners. In response, defendant Prescott and Align CFO

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                          - 20 -

Bullington told the analysts that the total cycle time was only **30 days** (*i.e.* approximately two weeks for ClinCheck processing and two weeks for manufacturing and delivery):

> [ANALYST]:  Then, following up on the cases submission data, obviously they were fairly strong in Q4.  Can you just give us a reminder of what the leadtimes realizing revenues from those numbers have been historically, or what you have seen internally?
>
> ELDON BULLINGTON:     We have been, on average – **case cycle time in our business has been 30 or so days**.  What you heard us mention here is with the Patients First Program and balancing and allocating our capacity, because we are constrained in the first quarter.  We have talked about that pushing out for a period of time by about a week, and then backing back down.
>
> TOM PRESCOTT:     Real quick, just to remind you, the biggest part of that 30 days has typically been the time for the doctor to approve ClinCheck.  **The rest of the cycle for us has roughly been two weeks.**

57.     In response to defendants' January 30, 2007 statements, shares of the Company's stock rose $2.92 per share, or 21%, to close at $16.69 per share.

58.     Defendants' January 30, 2007 positive statements and reassurances were false and misleading and failed to disclose material information about Align's business.  Defendants knew, as outlined in ¶¶93-113, that Align was experiencing a significant backlog in its production and significantly increased production and delivery times for *all* its cases almost immediately after the Patients First Program began.  According to two former Territory Account Managers at Align, CW1 and CW2, Align was unprepared to handle the additional OrthoClear cases and underestimated the number of OrthoClear cases it would assume as part of the settlement.  CW2 indicated that Align expected between 10,000 and 15,000 patients to enroll in the Patients First Program, but the number was substantially higher (OrthoClear doctors initially registered over 30,000 patients and submitted over 16,000 cases by the start of the Class Period).  As another former Territory Account Manager, CW3, put it, once the settlement was announced, everyone was in panic mode.

59.     The typical total cycle time for Invisalign, from the time the doctor takes the patient's impressions to delivery of the aligners, before the Patients First Program was implemented, was approximately 30 days.  According to CW3, the ClinCheck modeling simulation typically takes two weeks to process, and the manufacturing and delivery time (from the time ClinCheck is approved to the time the doctor receives the aligner) typically takes another two weeks.

1    60.    According to CW1, CW2 and CW3, however, the influx of Patients First cases
2    caused a significant bottleneck and backlog in processing and production.  CW2 reported that a large
3    part of the delay was in the ClinCheck process.  According to CW2, and contrary to defendants'
4    assurances of "more than adequate capacity," the Company did ***not*** have enough trained ClinCheck
5    technicians in place during the Class Period to handle the new revenue cases and the Patients First
6    cases.  Indeed, Align did not even hire additional ClinCheck technicians, who take three to four
7    months to train, until November or December 2006.  Thus, the technicians could not have been fully
8    trained and able to process cases until February or March 2007 at the earliest.

9    61.    As a result, Align experienced a significant backlog in its production and ***all*** case
10   shipments (both Patients First cases and new revenue cases) were significantly delayed during the
11   Class Period.  CW3 reported that the typical ClinCheck processing time for new revenue cases
12   doubled from two weeks to ***four weeks or longer*** in 2007.  Moreover, because Patients First cases
13   were not generating revenue for Align, the ClinCheck processing time for those cases was even
14   longer, anywhere from six weeks to several months.  CW1 confirmed that processing delays for ***all***
15   cases began almost ***immediately*** after the Patients First Program got under way.

16   62.    In addition, Align's sales teams were ***not*** "refocused" on generating new revenue
17   cases, as defendants told investors.  As a result of the influx of new OrthoClear patients, the sales
18   teams were forced to focus on non-revenue Patients First cases and the resulting backlog instead of
19   generating new case growth.  The Patients First Program required existing OrthoClear patients to go
20   back to their doctors to get all new records (*i.e.*, impressions, X-rays and treatment plans) – no
21   matter where they were in their course treatment – in order to receive the new Invisalign aligners.
22   According to CW1 and CW3, both patients and doctors were upset about having to repeat this
23   process.  CW3 reported that this led to a lot of explaining and hand-holding with Patients First
24   doctors on the part of Align's sales force.  As a result, Align's sales representatives spent between
25   ***20% to 50%*** of their time on Patients First cases during the Class Period.  Another former Territory
26   Account Manager, CW4, corroborated these facts, stating that the Patients First Program required ***a***
27   ***lot*** of follow-up time with the Patients First doctors.  Indeed, defendant Prescott later admitted on
28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                                      - 22 -

1   October 24, 2007 that the sales teams "*moved their focus away from generating case growth*" in

2   order to focus on "*managing backlog and turnaround and expediting of cases*."

3       63.   The OrthoClear settlement and resulting backlog also deteriorated the relationship

4   between Align's sales force and doctors, further hampering the sales force's ability to generate new

5   revenue case sales.  According to Align's 2006 Form 10-K, the Company was "focus[ed] on

6   increasing utilization rates" among existing doctors in order to generate revenue case growth.

7   Align's utilization rate is equal to the number of cases shipped divided by the number of doctors

8   cases were shipped to.  In other words, Align's sales force generated new revenue case growth in

9   large part by selling additional Invisalign cases to doctors with whom they already had a

10  relationship, including many doctors using OrthoClear products.

11      64.   According to a former Regional Business Manager at Align, CW5, the OrthoClear

12  settlement resulted in some bad blood between Align and the doctors who had been using

13  OrthoClear products.  In addition, CW3 reported that Align made OrthoClear doctors jump through

14  hoops in order to get their patients registered on time for the Patients First Program with a

15  complicated submission process and an especially short time period in which to register their

16  patients (right before Christmas 2006) and submit all-new records.  CW3 believed that Align was

17  punishing these doctors for switching from Align to OrthoClear in the first place.  According to

18  CW2, Align expected significantly less doctors to complete the submission process than ultimately

19  did.

20      65.   Once registered, Patients First cases were treated by Align as secondary to new

21  revenue cases.  According to CW4, this led to numerous complaints from doctors, particularly those

22  who used both OrthoClear and Invisalign products (which, according to defendants, was the

23  "majority" of OrthoClear doctors), as it was difficult for Align to explain why the same product took

24  significantly longer to produce just because the case originated with OrthoClear.  Consequently,

25  CW4 reported that numerous Territory Account Managers complained about the influx of

26  OrthoClear cases and the significant case backlogs to their Regional Business Managers regularly

27  throughout 2007; complaints that were generated from the doctors Align was relying on for new case

28  growth.

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-MMC

**Defendants' April 26, 2007 False and Misleading Statements**

66.     On April 26, 2007, Align issued a press release announcing its financial results for the first quarter of 2007, the period ended March 31, 2007.  Defendant Prescott, commenting on the results, touted Align's "*solid growth in volume*":

> *We are pleased that we are off to a strong start in 2007*. . . .  Improved operating performance yielded a welcome return to profitability, and *our solid growth in volume and revenue on an increasing base of customers is very gratifying*. We are committed to evolving our products to meet the specific needs of our Orthodontists and GP Dentists, which is key to generating and sustaining our top line growth.

67.     Following the press release, defendants held a conference call with investors and analysts. During the conference call, defendant Prescott continued to tout Align's "*strong demand for new revenue cases*":

> *Our key goals for 2007 and beyond are to generate strong, topline growth and now extend profitability to continue to expand our customer base, while fine-tuning our demand creation and brand building efforts*, to develop and deploy GP-specific and ortho-specific product platforms, to evolve our manufacturing platform, enterprise systems and core processes, and to complete shipment of all Patients First Program cases.
>
> *                    *                    *
>
> During the first quarter, our operations team did an outstanding job of ramping up capacity to address the volume of Patients First program cases *as well as strong demand for new revenue cases*. . . .
>
> *                    *                    *
>
> As a result of the Patients First program cases and *stronger than anticipated incoming case receipts in Q4 and in Q1*, manufacturing capacity was constrained in our treatment facility in Costa Rica.  Increased demand is definitely a good problem to have, but in this situation, it is a problem that has stretched our cycle times over the past five months, and as we predicted at the end of 2006, created a backlog of cases.  *Now that we have brought additional capacity online and the majority of Patients First cases have shipped, we expect to get our cycle times back towards normal by the end of Q2*.
>
> So as we reduce our cycle times and get back in the balance with incoming case receipt volumes, *we will see a benefit to case volume, revenue, and most importantly, to customer satisfaction*. . . .
>
> *                    *                    *
>
> Let me reiterate that *we are very pleased* with our progress to date on key strategic initiatives, as well as our Q1 performance.  I'm proud of the efforts and impact made by the Align team.  *We are completely focused on our goals for the year and will continue to execute our plan for even greater impact in the future*.

68.     During the April 26, 2007 conference call, CFO Bullington, in the presence of defendant Prescott, also told investors that Align had increased its 2007 guidance for case shipments:

> [F]or the full year 2007, we expect revenues to increase 30 to 35% to [$]268 [million] to $278 million for the full year. ***Case shipments are expected to increase 33 to 37% to a range of 200,000 to 206,000 cases***.

69.     Given the backlog created by the Patients First Program, analysts also questioned defendants on the focus of Align's sales teams. Defendant Prescott, however, falsely reassured the analysts that "***nothing really has changed***" with regard to the sales teams' continued focus on new revenue cases:

> [ANALYST]:  Are your sales people making – or are they spending more of their time with your current contract than getting new accounts?
>
> TOM PRESCOTT:  ***No, it's a very consistent approach. We haven't changed. We've optimized coverage as we look at in 2007, but we're – they have a very specific game plan about how they are to go about covering their territory and taking care of their existing accounts and building new practices.  So nothing really has changed there. It's just things are settling down.  We're getting back to business and good execution is occurring.***

70.     With regard to Align's ClinCheck processing capacity, defendant Prescott reassured investors that there were "***no issues***" and ***no*** "***bottleneck***" in Align's capacity to process new revenue cases:

> [W]e're pretty much finished with the expansion by probably the middle – a little past the middle of Q1, we had gotten the head count we needed in place and they were all coming online.  ***As we speak today, our head count has expanded.  It's stable and they're cranking.***  So, we have – what I would say is Costa Rica – that expansion and that capacity expansion is permanent and it's in place and it's online. And so, we have ***no issues there*** and ***that bottleneck no longer exists***, other than the fact we're still chipping away at the roughly 8,000 cases that remained of the [P]atients [F]irst cases, along with compression of the backlog – reducing that and getting our cycle times reduced.  That's going to take us the better part of Q2.

71.     In response to defendants' positive reassurances, the Company's stock price rose $5.91 per share, or 33%, to close at $23.60 per share.

72.     Shortly thereafter, on April 30, 2007, while Align's stock price was artificially inflated due to defendants' false and misleading statements, defendant Prescott ***sold 200,000 shares*** of his personally held Align stock, for proceeds of ***over $4.6 million***.  Defendant Prescott knew when he sold his Align shares that the Company was continuing to experience a significant backlog in its processing and delayed delivery times for ***all*** of its cases as a result of the influx of Patients First

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-MMC
- 25 -

1   cases, and that Align's sales force was focused on handling Patients First cases and the resulting

2   backlog rather than generating new revenue case growth.  Numerous other Align insiders sold as

3   well.  All told, Align insiders, including *six top executive officers* (Arjomand, VP, Research and

4   Development; Bullington, CFO; Hedge, VP, Operations; Henry, VP, Information Technology and

5   Chief Information Officer; Laks, VP, International; and defendant Prescott) and *one director*

6   (Collins) sold *364,925 shares* of Align stock, for proceeds of *over $8.4 million*, in the days

7   immediately following defendants' April 26, 2007 false and misleading statements.

8          73.    For the reasons outlined in ¶¶58-65, defendants' April 26, 2007 statements were false

9   and misleading and failed to disclose material information about Align's business.  Defendants knew

10  that Align was continuing to experience a significant backlog in its processing and delayed delivery

11  times for *all* of its cases as a result of the influx of Patients First cases.  According to CW1, Align

12  was not prepared, from a production standpoint, to take on all of the registered Patients First cases in

13  addition to new revenue cases.  Nonetheless, by the end of April 2007, according to Align's Order

14  and Aligner Shipment Report for Patients First cases, attached hereto as Exhibit A,[5] Align had

15  already processed and shipped 521,680 Patients First aligners to OrthoClear doctors.  Contrary to

16  defendants' statements that there were *"no issues"* and *no "bottleneck"* in processing new revenue

17  cases, Align's focus on processing Patients First cases created a significant bottleneck and slowdown

18  in ClinCheck processing for new revenue cases.  According to CW3, the typical ClinCheck

19  processing time for new revenue cases doubled from two weeks to *four weeks or longer* in 2007 in

20  order to process both new cases and Patients First cases, pushing the processing time to far more

21  than the 30 days defendants were telling the market.  And some Patient First cases took nearly *twice*

22  that long to process, upwards of several months.  Indeed, defendant Prescott later admitted on

23

24

25  [5]      Defendant Align submitted the Order and Aligner Shipment Report for Patients First attached
    as Exhibit A to this Complaint as "Exhibit A" to the Declaration of Lance Aldrich in Support of
26  Defendant Align Technology, Inc's Motion for Summary Judgment in *Weber v. Align Technology,
    Inc.*, No 5:07-CV-535 (NAM)(GJD) in the United States District Court, Northern District of New
27  York.

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                          - 26 -

1   October 24, 2007 that "***virtually all of [Align's] customers were impacted by slower cycle times and***

2   ***backlogs***" during 2007 as a result of the Patients First Program.

3         74.    In addition, Align's sales teams were ***not*** focused on new revenue cases as defendants

4   led investors to believe. Instead, Align's sales teams remained focused on managing the backlog and

5   case load created by the influx of new Patients First cases. According to CW3, Align's sales

6   representatives were forced to spend between ***20% to 50%*** of their time on Patients First cases

7   during the Class Period – the opposite of what defendants told investors on April 26, 2007, namely

8   that the sales teams' focus on generating new revenue cases "***ha[d]n't changed***."

9         75.    Moreover, doctors were not as "understand[ing]" about the backlog and significant

10   delivery delays as defendants publicly suggested. According to CW1, many Patients First doctors

11   and patients were disgruntled about having to repeat the record and treatment process, which led to

12   significant hand-holding on the part of Align's sales force. In addition, according to CW1 and CW4,

13   OrthoClear cases were treated as secondary to new revenue cases because they did not generate any

14   revenue for Align. This led to numerous complaints from doctors, particularly those who used both

15   OrthoClear and Invisalign products, and it was difficult for Align's sales force to explain why the

16   same product took significantly longer to produce just because the case originated with OrthoClear.

17   Consequently, CW4 reported that numerous Territory Account Managers complained about the

18   Patients First backlog to Align's Regional Business Managers regularly throughout 2007. The

19   breakdown in relationships between Patients First doctors and Align's sales force further hampered

20   the sales forces' ability to generate new revenue case growth.

21   **Defendants' July 25, 2007 False and Misleading Statements**

22         76.    On July 25, 2007, Align issued a press release announcing its financial results for the

23   second quarter of 2007, the period ended June 30, 2007. Defendant Prescott, commenting on the

24   announcement, told investors that:

25            Our second quarter results were outstanding by any measure and we are very pleased
              to deliver our second consecutive record quarter. . . . ***Consumer demand and***

26            ***physician interest in the Invisalign system continue to expand, enabling case and***
              ***revenue growth and increased profitability.*** Beyond our financial results, we

27            continue to make progress on new product and technology development, and other
              key strategic objectives.

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                                                             - 27 -

77.     Following the press release, defendants held a conference call with investors and analysts.  During the conference call, defendant Prescott continued to reassure investors that Align "*continue[d] to see expansion in [its] customer base*" and had "*solid demand at the consumer level*":

> *We've made significant progress in all areas*.  And as I had mentioned in my opening comments, we have now completed the Patients First cases and demonstrated our ability to scale our manufacturing platform to handle surges in volume.
>
> *        *        *
>
> *We continue to see expansion in our customer base*, both newly trained and repeat submitters, as well as progress in utilization growth for orthos, GPs, and international, *as well as solid demand at the consumer level*.

78.     In addition, Align CFO Bullington told investors on the July 25, 2007 conference call that overall case shipments (including Patients First cases) were expected to decrease in Q3 as compared to Q2, as a result of the additional Patients First cases shipped in Q2.  Bullington, however, reassured investors that Align would nonetheless achieve an increased number of new revenue case shipments in Q3 over Q2 and announced an increase in Align's 2007 case shipment guidance, from a range of 200,000 to 206,000 cases given on April 26, 2007 to a range of 206,000 to 209,000 cases:

> As I said on the last earnings call, Q3 case shipments were expected to be down slightly from Q2 shipments.  This is due primarily to the effect of working through the case backlog and reduction in lead times in Q2 that I discussed a moment ago.  If we subtract the approximately 4,000 cases of backlog shipped in Q2, we get a baseline of approximately 51,000 cases, which can be used to provide a more apples-to-apples comparison for our Q3 outlook. . . .
>
> All right, given these factors, our outlook for Q3 and fiscal 2007 are as follows.  For Q3, we expect case shipments to be in the range of 53,000 to 54,000 cases.  While that is down slightly from Q2 on an absolute basis, it is up slightly from Q2 using the 51,000 case baseline that I mentioned previously.  On a year-over-year comparison, Q3 case shipments are expected to increase in the range of 48 to 51%. . . .
>
> *        *        *
>
> *Case shipments year-over-year are expected to increase 37 to 39% to 206,000 to 209,000 cases.*

79.     On the July 25, 2007 conference call, analysts openly questioned defendants about Align's backlog of potential new revenue cases.  While defendants declined to disclose information

on the number of new submitting doctors, as they had done in the past, CFO Bullington, in defendant

Prescott's presence, nonetheless reassured the analysts that the Company's "***backlog [wa]s***

***rebalanced***":

> [ANALYST]: . . .  And in the past you've given a number on the new submitting
> doctor or the number of submitting doctors in the quarter and I don't think you gave
> that this quarter.  How has that trended, just so we get an idea of potential backlog?
>
> ELDON BULLINGTON:      Taylor . . . this is Eldon.  We provided that for three
> quarters and the reason why we did was while the Patients First conversion was
> going on we wanted to make sure, operating in a backlog position, that you have
> some insight into the flow into the business.  The reason why we've stopped doing
> that is because the Patients First program is over, ***our backlog is rebalanced,*** so we'll
> stick to a ship sight indicator.  But basically the evolution where you see the number
> of docs shipped to evolving is indicative of the flow entering the business.

80.     On the same July 25, 2007 conference call, with regard to Align's production and

delivery times, defendant Prescott reassured investors that total cycle times were within ***one month***

(*i.e.*, two weeks for ClinCheck processing and two weeks for production) ***or less***:

> ***[W]e typically are back to our published delivery times and we typically say it's***
> ***about a month***.   And the biggest determinate in that is how quickly the doctor
> interacts with getting the case posted, getting it – the records into us and [approving]
> [C]lin[C]heck.  ***Literally, we've been able to turn around cases within a week.  So***
> ***we're back to our normal availability and when we need to, for our customer***
> ***situation, we can move heaven and earth to get something done very quickly***.

81.     In response to defendants' positive reassurances and increased case shipment

guidance, shares of the Company's stock rose $1.85 per share, or approximately 7%, to close at

$27.69 per share.

82.     Two days later, on July 27, 2007, defendant Prescott again took advantage of Align's

artificially inflated stock price from defendants' false and misleading statements and began selling

***200,300 shares*** of his personally held Align stock for proceeds of ***over $5.4 million***.  Defendant

Prescott knew when he sold his Align shares that the Company was continuing to experience a

significant backlog in its processing and delayed delivery times for ***all*** of its cases as a result of the

influx of Patients First cases, and that Align's sales force was focused on handling Patients First

cases and the resulting backlog rather than generating new revenue case growth.  Numerous other

Align insiders sold as well.  All told, Align insiders, including ***six top executive officers*** (Bullington,

CFO; Ellis, VP, North America Sales; George, General Counsel and VP, Legal and Corporate

1   Affairs; Hedge, VP, Operations; Zoromski, VP, Global Marketing and Chief Marketing Officer; and

2   defendant Prescott) and **one director** (Collins), sold **419,236 shares** of Align stock, for proceeds of

3   nearly **$11.4 million**, in the days immediately following defendants' July 25, 2007 statements.

4       83.    For the reasons outlined in ¶¶58-65, 73-75, defendants' July 25, 2007 positive

5   statements, reassurances and projected case starts were false and misleading and failed to disclose

6   material information about Align's business, including:

7       (a)    Throughout the second quarter of 2007, Align continued to experience a

8   significant backlog in production and significantly increased processing times for **all** its cases as a

9   result of the additional Patients First cases.  According to CW3, the ClinCheck processing time

10  increased significantly from two weeks to at least **four weeks or longer** for new revenue cases, and

11  significantly longer for Patients First cases, throughout the Class Period, pushing the processing time

12  to far more than the one month defendants were telling the market.  The cycle times were so delayed

13  that in May 2007, former OrthoClear patients filed a class action lawsuit against Align for breach of

14  contract, claiming that Align breached its contract with OrthoClear doctors and patients pursuant to

15  the OrthoClear settlement by delaying delivery of new aligners by as much as **seven months**.

16      (b)    Align's sales force continued to be focused on managing the backlog created

17  by the Patients First cases rather than on generating new case growth, as defendants led investors to

18  believe, such that defendants' increased guidance of 206,000 to 209,000 case shipments in 2007 had

19  no reasonable basis.  Indeed, defendant Prescott later admitted on October 24, 2007 that he had

20  **instructed** the sales teams to focus on the backlog during the Class Period:  "**[E]ven in Q2** as [the

21  sales teams] were finishing handling off the ends of the Patients First cases and clearing backlog,

22  **that [i.e. clearing the backlog] was their activity.  We told them that was the priority,** to manage

23  this churn at the doctor and patient level."

24      (c)    The breakdown in relationships between doctors and Align's sales force was

25  hampering Align's ability to generate new revenue case growth.  Doctors continued to complain

26  about the backlog created by the OrthoClear settlement throughout the Class Period.  According to

27  CW2, doctors generally blamed Align for creating the situation and were frustrated at the length of

28  time they had to wait to get their patients' aligners.  Align's Territory Account Managers bore the

1   brunt of the doctors' criticism.  As a result, CW4 reported that numerous Territory Account

2   Managers complained about the influx of OrthoClear cases and the significant case backlogs to their

3   Regional Business Managers regularly throughout 2007; complaints that were generated from the

4   doctors Align was relying on for new case growth.

5   **Investors Begin to Learn the Truth**

6          84.    On October 24, 2007, Align issued a press release announcing its financial results for

7   the third quarter of 2007 and lowering its 2007 case shipment guidance from a range of 206,000 to

8   209,000 cases previously given to investors on July 25, 2007 to a range of 202,000 to 204,000 cases.

9   Defendants held a conference call that day with investors and analysts to discuss the results.  On the

10  conference call, defendant Prescott admitted that Align had ***shifted the focus of its sales force*** to

11  managing non-revenue Patients First cases and backlog rather than generating new revenue case

12  growth and, as a result, case shipments would be lower than defendants' prior guidance:

13         ***In our efforts to ensure customer satisfaction in Q2 by completing the Patients
           First Program and clearing the backlog, we did not focus enough effort on filling
14         the pipeline for new case starts***.  We are addressing these issues and are now seeing
           growth in new case receipts. We expect further progress and anticipate growth in
15         receipts through the remainder of 2007.

16         ***Q4 case shipment volume will be lower than our prior outlook***, which is largely
           related to the new case receipt shortfall we experienced during the last several weeks
17         of Q3. However, the trajectory of case receipts has picked up pace as we return to
           normal levels, and we remain confident in our long-term outlook.

18
           85.    CFO Bullington further elaborated on the conference call that the Company would
19
    "***not have the pipeline of case receipts*** to meet the level of expected Q4 case shipments provided on
20
    [Align's] last earnings call":
21
           Now let me turn to our outlook for the fourth quarter and full year. . . .  As Tom
22         described in his earlier comments, ***our baseline entering into Q4 was lower because
           the number of new case starts received during the latter part of Q3 did not ramp as
23         quickly as expected***.  Q4 has historically been a stronger quarter and while the
           current rate of new case starts has picked up, ***we will not have the pipeline of case
24         receipts to meet the level of expected Q4 case shipments provided on our last
           earnings call***.
25
           86.    When questioned by analysts, defendant Prescott further disclosed that the sales
26
    teams had "***moved their focus away from generating case growth***":
27
           [ANALYST]: So, first question.  Tom, can you just go through the sequential
28         weakness that you saw relative to your expectations?  I think you commented that

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                                    - 31 -

1    sales staff, et cetera, was busy with the Patients First Program through the second
     quarter. Maybe you could spell that out a little bit for us and just let us know, do you
2    think, was this a patient issue? A practice issue? A sales issue? Help us out there.

3    [TOM PRESCOTT]:  The simplest way to answer the questions is all of the above.
     We had the normal seasonality that we expected and based on our run rates in Q2,
4    thought we could drive through a little bit better – didn't.

5    ***Secondly, I think as I described, sales force, after focusing for about three quarters
     on managing backlog and turnaround and expediting of cases, moved their focus
6    away from generating case growth in a lot of practices where they were waiting on
     cases.***  And we didn't see it as clearly and we didn't get our foot back on that gas at
7    the timeframe we needed. That contributed as well.

8                                    *        *        *

9    ***[E]ven in Q2 as they were finishing handling off the ends of the Patients First
     cases and clearing backlog, that was their activity. We told them that was the
10   priority, to manage this churn at the doctor and patient level.***  And our goal was to
     minimize [the] impact on our customers or docs. And we really couldn't shift gears
11   on that until we finished the Patients First shipments and got cycle times back to a
     normalized mode.
12
     So I don't know that we could have shifted gears much faster.
13
14   87.    In addition, defendant Prescott admitted that the backlog created by the Patients First

15   Program impacted "***virtually all of [Align's] customers***" and that the Company's sales teams

16   "***weren't pushing as hard to get new case starts***" during the Class Period:

17   [I]n many practices – and the roughly 4,000 to 5,000 practices that had Patients First
     cases were affected, but ***virtually all of our customers were impacted by slower
18   cycle times and backlogs. So this effect of having people waiting on cases was a
     very broad effect for our entire customer base***. And even for some of our most
19   loyal customers that had five volumes, they were just as impacted as everybody else.

     ***So in many of those practices they weren't pushing as hard to get new case starts.
20   And the reps – the field teams weren't driving for that same goal***. That has been
     clearly corrected and we have confidence that our efforts are paying off and will
21   continue to pay off.

22   88.    In response to this announcement, the price of Align common stock fell $9.63 per

23   share, or approximately 34%, to close at $19.07 per share, on unusually heavy trading volume.

24   89.    That same day, October 24, 2007, CFO Bullington announced his resignation from

25   the Company.

26   90.    The market for Align common stock was open, well-developed and efficient at all

27   relevant times. As a result of these materially false and misleading statements and omissions, Align

28   common stock traded at artificially inflated prices during the Class Period. Lead plaintiff and other

1    members of the class purchased or otherwise acquired Align common stock relying upon the

2    integrity of the market price of Align common stock and market information relating to Align, and

3    have been damaged thereby.

4        91.    During the Class Period, defendants materially misled the investing public, thereby

5    inflating the price of Align's common stock, by publicly issuing false and misleading statements and

6    omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not

7    false and misleading.  Said statements and omissions were materially false and misleading in that

8    they failed to disclose material adverse information and misrepresented the truth about the Company,

9    its business and operations, as alleged herein.

10        92.    At all relevant times, the material misrepresentations and omissions particularized in

11   this Complaint directly or proximately caused, or were a substantial contributing cause of, the

12   damages sustained by lead plaintiff and other members of the class.  As described herein, during the

13   Class Period, defendants made or caused to be made a series of materially false or misleading

14   statements about Align's business, prospects and operations.  These material misstatements and

15   omissions had the cause and effect of creating in the market an unrealistically positive assessment of

16   Align and its business, prospects and operations, thus causing the Company's common stock to be

17   overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading

18   statements during the Class Period resulted in lead plaintiff and other members of the class

19   purchasing the Company's common stock at artificially inflated prices, thus causing the damages

20   complained of herein.

21                        **ADDITIONAL SCIENTER ALLEGATIONS**

22        93.    As alleged herein, defendants acted with scienter in that defendants knew that the

23   public documents and statements issued or disseminated in the name of Align were materially false

24   and misleading; knew that such statements or documents would be issued or disseminated to the

25   investing public; and knowingly and substantially participated or acquiesced in the issuance or

26   dissemination of such statements or documents as primary violations of the federal securities laws.

27   As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                          - 33 -

1   the true facts regarding Align, their control over, and/or receipt and/or modification of Align's

2   allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

3          94.    Defendants knew exactly how many new cases were sold, how many cases were in

4   ClinCheck, how many cases were in manufacturing and how many cases were shipped on a ***daily***

5   ***basis***.  According to CW4, Align very closely tracked new case sales on a daily basis during the

6   Class Period using a program called salesforce.com.  Territory Account Managers input information

7   into salesforce.com every morning regarding the number of calls they had made the day before, the

8   doctors (by name) they had visited and what specifically took place during the call (such as a

9   demonstration or a discussion).  The Territory Account Managers also monitored missing record

10  reports every morning in salesforce.com because missing records could delay the ClinCheck process.

11  CW1 corroborated the use of salesforce.com to track new revenue case sales daily.

12         95.    According to CW3, salesforce.com also contained a case report that listed all of the

13  cases in the pipeline, including, but not limited to, cases submitted, cases currently in the ClinCheck

14  process, cases in manufacturing and cases shipped by product type.  CW3 indicated that this report

15  was available to ***everyone*** within the sales organization, to varying degrees, ***at all times***.  CW3 also

16  reported that the information about cases was input into salesforce.com by employees in the

17  corporate office at least daily.  According to CW2, the Territory Account Managers then received

18  breakdowns of their sales performance daily via e-mail from Company headquarters, which was

19  contained in a PDF file.

20         96.    In addition to salesforce.com reports, Align also created numerous other sales reports

21  during the Class Period to track data such as the number of new cases or revenue by geographic

22  region.  According to a former Senior Manager of Business Intelligence at Align, CW8, these sales

23  reports were available in Microsoft SharePoint and were made available to the sales department

24  through an intranet.  CW8 indicated that VP of Sales Ellis, who reported directly to defendant

25  Prescott, had access to all of the data in these reports.  In addition to the sales reports, CW8 also

26  received special requests or requests for customized reports every quarter at Align, especially within

27  the last two weeks of a quarter.  CW8 stated that these reports usually focused on sales or marketing

28  data.  Once the sales or marketing individuals analyzed these customized reports, CW8 believed the

1    data was presented to Align's executives, including defendant Prescott. Based on the various sales

2    reports that existed during the Class Period, Align executives, including defendant Prescott, should

3    have known of the revenues, new case starts and case shipments on a regular basis throughout the

4    Class Period according to CW8.

5            97.    According to a former Cost Accounting Manager at Align, CW6, Align also tracked

6    the different types of cases (the different types of Align cases as well as OrthoClear cases) by part

7    number during the Class Period. Thus, it was apparent how many new revenue cases and how many

8    Patients First cases shipped each day. CW6 reported that the shipments were tracked in Align's

9    MES program, which was automatically updated when cases shipped. Align's MES generated daily

10   metrics that included the number of cases shipped by product, where the case originated (the U.S. or

11   overseas) and whether it had been shipped to a general practice dentist or orthodontist. The MES

12   then automatically sent an e-mail with the metrics on a daily basis to the Company's chief

13   executives, directors and managers, including CW6, and defendant Prescott and CFO Bullington.

14   Pursuant to these daily metrics, CW6 stated that defendant Prescott and other high level managers

15   would have known before October 24, 2007 that the Company would not be able to meet its

16   forecasts for new case shipments.

17           98.    Align also tracked the number of Patients First cases that were ordered and shipped

18   on a monthly basis in its Order and Aligner Shipment Report for Patients First. *See* Exhibit A.

19   According to this report, Align processed and shipped the vast majority of the Patients First cases, to

20   the detriment of its new revenue cases, by the end of April 2007. At least 521,680 Patients First

21   cases were shipped to former OrthoClear doctors by the end of April 2007 and 580,099 by mid-July

22   2007. Lance Aldrich, Align's Director of Production Systems, has declared under penalty of perjury

23   on behalf of Align that "[i]t is the regular practice of Align that this information be entered and

24   maintained in [Align's] enterprise computing systems, which include a web-based interface used by

25   dentists, an ERP (enterprise resources planning) computer system used to manage billing and other

26   business processes, and an MES (manufacturing execution system) used to manage design and

27   production of Invisalign products."

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                          - 35 -

99.     In addition, according to CW1, CW2, CW3 and CW4, Territory Account Managers submitted weekly field reports to their Regional Business Managers and attended weekly conference calls with their Regional Business Managers every Monday during the Class Period.  During these group meetings, the Territory Account Managers and Regional Business Managers would discuss sales strategies and contacts for the week ahead.  They would also go over the number of cases and/or contacts submitted for that region.  Directors and/or VPs for Sales would also attend these calls.  According to CW4, Territory Account Managers complained about the influx of the OrthoClear cases to the Regional Business Managers pretty regularly throughout 2007 as a result of the complaints the sales force were receiving from doctors.  CW3 confirmed that Territory Account Managers voiced concerns about the increased workload in 2007 to their managers.

100.    According to CW5, the Regional Business Managers also held weekly conference calls, as well as monthly and quarterly meetings attended by all of the other Regional Business Managers and the Sales Directors from various parts of the country during the Class Period.  The monthly meetings were usually held over the phone and focused on discussing the sales teams' performance by region and whether the regions were keeping pace with their sales targets.  The quarterly meetings were typically held at a Marriott hotel in downtown San Jose or at the Company's Santa Clara, California headquarters and involved discussion of the top performing Territory Account Managers in their region and new sales tactics or strategies employed by their Territory Account Managers.  VP of Sales Ellis – who reported directly to defendant Prescott and was a member of Align's executive team – attended these monthly and quarterly meetings.

101.    According to CW6, Align also held monthly financial reviews and monthly manufacturing meetings during the Class Period.  The monthly financial reviews were held toward the end of the first week of the month and included discussion of financial results from the previous month, including the revenue and case shipments generated in the previous month and for the quarter to date.  The meeting was conducted by Align CFO Bullington and attendees included all of Bullington's direct reports, including the Controllers and managers and representatives from the Financial Planning and Analysis team.  During the meeting, each individual in attendance gave a presentation about his or her department and typically went over income statements for his or her

1    area of responsibility.   Based on his attendance at the meetings, CW6 understood that CFO

2    Bullington reported the substance of these meetings to defendant Prescott.

3         102.    The monthly manufacturing meetings were typically held on the second Friday of the

4    month in Santa Clara and lasted about two and a half to three hours.   The purpose of these meetings

5    was to review operational issues at the Juarez, Mexico and Costa Rica facilities, as well as discuss

6    finances related to manufacturing and a review of the production and shipping numbers.   Attendees

7    included managers from each facility, including the general managers of the facilities, the VP of

8    Manufacturing, and other managers who oversaw quality, purchasing, shipping and receiving.   At

9    the meeting, the general managers would present reports that broke down the manufacturing

10   numbers by department.

11        103.    According to CW6, Align held monthly Executive Management Committee meetings

12   during the second week of the month during the Class period to discuss sales data and forecasts.   The

13   committee was referred to internally as the EMC group.   The meetings were conducted by defendant

14   Prescott and attendees included Align's top executives and VPs from across the Company, including

15   the Corporate Controllers and the VPs of Sales, Marketing, Manufacturing and Human Resources.

16        104.    In addition, defendants reviewed Align's financials on a monthly basis.   According to

17   a former Controller at Align, CW7, the Company held a monthly meeting at the beginning of each

18   month during the Class Period to review the financials from the previous month.   CW7 attended the

19   meeting, along with CFO Bullington, the Corporate Controller, the Senior Director of Finance, the

20   Cost Accounting Manager, the Senior Director of Internal Audit and several senior financial analyst

21   managers.   Based on his attendance at the meetings, CW7 understood that CFO Bullington informed

22   defendant Prescott about the content of these meetings.

23        105.    Defendants also knew that the Territory Account Managers were focused on

24   managing non-revenue Patients First cases and the resulting backlog rather than generating new

25   revenue case growth during the Class Period.   Indeed, defendant Prescott admitted on October 24,

26   2007 that: "In our efforts to ensure customer satisfaction in Q2 by completing the Patients First

27   Program and clearing the backlog, ***we did not focus enough effort on filling the pipeline for new***

28   ***case starts***."   Defendant Prescott also admitted that the sales teams "***weren't pushing as hard to get***

1    *new case starts. **And the reps – the field teams weren't driving for that same goal.***"  Moreover,

2    defendant Prescott admitted that he and other Align executives had ***instructed*** the sales teams to

3    focus on Patients First cases and clearing the backlog:  "[E]ven in Q2 as they were finishing

4    handling off the ends of the Patients First cases and clearing backlog, ***that was their activity***.  ***We***

5    ***told them that was the priority***, to manage this churn at the doctor and patient level."

6           106.    In addition, defendants knew that the Patients First Program would cause a

7    deterioration in the sales force's relationship with doctors, further hampering the sales force's ability

8    to generate new revenue case growth during the Class Period.  According to CW2, shortly after

9    Align and OrthoClear reached a settlement in October 2006, the Regional Business Managers told

10   the Territory Account Managers during their weekly Monday meetings to prepare to receive

11   complaints from the doctors in their territories as a result of the settlement.  In addition, Align

12   closely tracked doctor and patient complaints during the Class Period.  According to CW4, Territory

13   Account Managers input information into salesforce.com daily regarding such discussions with

14   doctors in their territories.   Align also kept a record of customer complaints in its customer

15   communication records.  Lance Aldrich, Align's Director of Production Systems, who attests to

16   familiarity with Align's procedures for record keeping, has declared under penalty of perjury on

17   behalf of Align that "Align's customer communication records reflect information regarding patient

18   cases that is recorded by Align's customer support personnel.  It is the regular practice of Align's

19   customer support personnel to enter information regarding ***every communication*** they have with a

20   patient or doctor at or near the time of communication."

21          107.    Further, defendant Prescott, the CEO of Align, can be presumed to have knowledge

22   of adverse facts affecting the Company's core business.  The sale and shipment of new revenue cases

23   is Align's core revenue generating business.  As defendants admitted in the Company's 2006 Form

24   10-K, "[t]he vast majority of [Align's] revenue is generated from the sale of full Invisalign treatment

25   and Invisalign Express treatment."  Thus, as CEO of the Company, defendant Prescott can be

26   presumed to have knowledge of the adverse facts outlined in ¶¶58-65, 73-75, 83 affecting the sale

27   and shipment of Align's new revenue cases during the Class Period.

28

**Insider Sales**

108.    Defendants were further motivated to engage in this course of conduct in order to allow defendant Prescott and other Company insiders to collectively sell ***948,157*** shares of their personally held Align common stock for gross proceeds in excess of ***$22.8 million*** during the Class Period.  The insider trading is set forth in detail in the chart attached as Exhibit B to this Complaint.

109.    Defendant Prescott sold significant amounts of his personally held Align stock during the Class Period while in possession of material, non-public information about Align.  As set forth in ¶¶58-65, 73-75, 83, 93-113, defendant Prescott knew, and failed to disclose, at the time he sold his Align stock that: (i) Align was experiencing a significant backlog and delay in delivery times on all its cases; (ii) Align's sales force had shifted its focus to managing Patients First cases and the resulting backlog rather than generating new revenue case growth; and (iii) Align was receiving numerous complaints from doctors due to its Patients First Program throughout the Class Period, further hampering the sales force's ability to generate new revenue case growth.

110.    Defendant Prescott's insider sales, as well as the sales of other Align insiders, were suspicious in both timing and amount and provide additional indicia of scienter.  Defendant Prescott sold ***400,300 shares*** (***76%*** of his holdings) for proceeds of ***over $10 million*** during the Class Period, while Align's stock price was artificially inflated as a result of defendants' false and misleading statements and material omissions.  Other Align executives sold significant amounts as well:

- Hossein Arjomand, VP, Research and Development, sold 37,996 shares (***99%*** of his holdings) for proceeds of over $878,000;

- Eldon Bullington, CFO and VP, Finance, sold 124,800 shares (***97%*** of his holdings) for proceeds of over $3.1 million;

- David Collins, Director, sold 46,000 shares (***72%*** of his holdings) for proceeds of over $1.2 million;

- Dan Ellis, VP, North America Sales, sold 50,000 shares (***93%*** of his holdings) for proceeds of nearly $1.4 million;

- Roger E. George, General Counsel and VP, Legal and Corporate Affairs, sold 48,398 shares (***99%*** of his holdings) for proceeds of over $1 million;

1    • Len Hedge, VP, Operations, sold 49,887 shares (*52%* of his holdings) for proceeds of

2    nearly $1.3 million;

3    • Michael Henry, VP, Information Technology and Chief Information Officer, sold

4    52,584 shares (*100%* of his holdings) for proceeds of over $1 million;

5    • Gil Laks, VP, International, sold 58,998 shares (*97%* of his holdings) for proceeds of

6    nearly $1.2 million; and

7    • Darrell Zoromski, VP, Global Marketing and Chief Marketing Officer, sold 79,194

8    shares (*100%* of his holdings) for proceeds of over $1.6 million.

9    Indeed, *all* of Align's executive officers (except Sonia Clark, VP, Human Resources) sold significant

10   amounts of their personally held Align stock – some as much as *100%* of their holdings – during the

11   Class Period.  While options are not stock holdings and should not be included in the insiders

12   retained holdings, even including options, the percentages and amounts sold are highly suspicious,

13   especially when considered with the suspicious timing of the sales.  *See* Exhibit B.

14       111.    The timing of defendant Prescott's (and other Align executives') insider sales was

15   also highly suspicious, as they were timed to take maximum advantage of the artificial price inflation

16   caused by defendants' misrepresentations and while Align stock was trading at or near record highs.

17   The vast majority of the insiders' sales, including *all* of defendant Prescott's sales, were made in the

18   days immediately following defendants' false and misleading statements.  For example, defendant

19   Prescott sold *200,000 shares*, for proceeds of *over $4.6 million*, on April 30, 2007, just *four days*

20   after defendants' April 26, 2007 misrepresentations.  Defendant Prescott then sold an additional

21   *200,300 shares*, for proceeds of *over $5.4 million*, between July 27, 2007 and August 7, 2007 –

22   starting just *two days* after defendants' July 25, 2007 misrepresentations.  Notably, these were

23   defendant Prescott's *only* sales during the Class Period.  All told, Align insiders sold 364,925 shares

24   for proceeds of nearly *$8.5 million* and 419,236 shares for proceeds of nearly *$11.4 million* (*i.e.*, the

25   bulk of the insider sales during the Class Period) in the days immediately following defendants'

26   April 26, 2007 and July 25, 2007 misrepresentations, respectively.

27       112.    In addition, defendant Prescott's Class Period sales did not follow a regular trading

28   pattern.  Prior to these sales, defendant Prescott had sold Align stock only once since July 2004,

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-
MMC                                                                                        - 40 -

1   when he sold 142,600 shares on November 22, 2006.  Even then, Prescott's sales were intentionally

2   timed with the stock price increase resulting from Align's announcement of the OrthoClear

3   settlement in October 2006.  Other Align insiders' sales also did not follow regular trading patterns.

4   For example, Bullington, George and Laks also sold only once prior to their Class Period sales since

5   mid-2004, and, like defendant Prescott, those sales were timed with the stock price increase resulting

6   from the OrthoClear settlement.  Other selling insiders, including Arjomand, Collins, Ellis, Henry

7   and Zoromski, had **no** sales in the past several years prior to their Class Period sales.

8          113.    Prior to the Class Period, on February 20, 2004, defendant Prescott adopted a trading

9   plan pursuant to Rule 10b5-1 of the Exchange Act through which he sold his personally owned

10  Align stock.  During the Class Period, however, defendant Prescott ***diverted from his trading plan*** in

11  order to unload his Align stock at the most beneficial times when the stock was most artificially

12  inflated.  Defendant Prescott had a duty to shareholders to abstain from trading while in possession

13  of material, non-public information or disclose such information prior to trading – a duty defendant

14  Prescott breached.  Notably, ***none*** of defendant Prescott's, or any other Align insiders' Class Period

15  sales were made pursuant to a Rule 10b5-1 trading plan.

16                              **LOSS CAUSATION/ECONOMIC LOSS**

17         114.    During the Class Period, as detailed herein, defendants engaged in a scheme to

18  deceive the market and a course of conduct that artificially inflated the prices of Align common

19  stock and operated as a fraud or deceit on Class Period purchasers of Align common stock by failing

20  to disclose to investors that the Company had shifted the focus of its sales force to managing backlog

21  rather than generating new case growth and was experiencing significant backlogs and processing

22  delays for new revenue cases.  When defendants alerted investors to Align's previously concealed

23  problems on October 24, 2007, as detailed in ¶¶84-88, the price of Align common stock fell

24  precipitously from $28.70 to $19.07 (or approximately 34%) as the prior artificial inflation came out.

25  As a result of their purchases of Align common stock during the Class Period, lead plaintiff and the

26  other class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

115.    By reassuring the market that Align had more than adequate capacity to handle the additional Patients First Program cases and generate revenue, that Align had recovered from a mere one week delay in cycle times for new revenue cases and did not have a bottleneck or backlog in processing for new revenue cases, that Align's sales force was focused on generating new revenue case growth, and that Align would achieve 206,000 to 209,000 case shipments in 2007, when defendants knew that the Company: (i) was experiencing a significant backlog and delay in delivery times on all its cases as a result of the Patients First Program; (ii) had shifted the focus of its sales force to managing Patients First cases and the backlog rather than generating new case growth; and (iii) was receiving numerous complaints from doctors due to its Patients First Program throughout the Class Period, further hampering the sales force's ability to generate new revenue case growth, defendants presented a misleading picture of Align's business and prospects.  As a direct result of defendants' false and misleading statements, Align's stock price increased 21%, to close at $16.69, on January 30, 2007, increased 33%, to close at $23.60, on April 26, 2007 and increased 7%, to close at $27.69, on July 25, 2007.  Defendants' false and misleading statements had the intended effect and caused Align common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $28.70 per share.

116.    On October 24, 2007, defendants admitted that, contrary to their prior Class Period assurances, Align's sales force had "moved their focus away from generating case growth" during the Class Period in order to focus on "managing backlog and turnaround and expediting of cases" as a result of the Patients First Program.  Defendants further disclosed that the sales teams "weren't pushing as hard to get new case starts" and "did not focus enough effort on filling the pipeline for new case starts," and, as a result, case shipment volume would be lower than defendants' prior guidance.  Thus, defendants lowered the Company's 2007 case shipment guidance from a range of 206,000 to 209,000 cases previously given on July 25, 2007 to a range of 202,000 to 204,000 cases. In addition, defendants admitted that Align was experiencing slower cycle times and significant backlogs during the Class Period, and that "virtually all of [Align's] customers were impacted by [the] slower cycle times and backlogs."

117.    The market recognized that Align's slower case starts and reduction in 2007 case shipment guidance were related to the Company's sales force shifting its focus away from new cast starts to focus on the Patients First Program during the Class Period.  For example, Mad Money's host Jim Cramer reported the next day, October 25, 2007, that "[t]here is something wrong with this stock, it raised two consecutive quarters then dropped it the next and the CFO resigned to coincide with the revision[,] raising eyebrows."  On October 25, 2007, Roth Capital Partners also reported that: "In our opinion, the rationale for slower case starts at the end of 3Q came down to two primary factors," "the company's drive to complete the Patients First Program in 2Q may have shifted the sales force's focus away from new starts."  On defendants' disclosures, analysts, such as Barrington Research downgraded their recommendations for Align stock.

118.    As a direct result of defendants' disclosure on October 24, 2007, the price of Align common stock fell precipitously, by $9.63 per share, or 33%.  This drop removed the inflation from the price of Align common stock, causing real economic loss to investors who had purchased Align common stock during the Class Period.  The timing and magnitude of the price decline in Align common stock negates any inference that the loss suffered by lead plaintiff and the other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The following chart illustrates the effect of defendants' fraud on Align's stock price, compared to Align's three main competitors, Danaher Corp., 3M Company and Dentsply International, Inc., listed in its 2006 Form 10-K:

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-MMC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

18       119.    At all relevant times, the market for Align common stock was an efficient market for

19   the following reasons, among others:

20               (a)      Align common stock met the requirements for listing, and was listed and

21   actively traded on the NASDAQ, a highly efficient and automated market;

22               (b)      as a regulated issuer, Align filed periodic public reports with the SEC and the

23   NASDAQ;

24               (c)      Align regularly communicated with public investors via established market

25   communication mechanisms, including through regular disseminations of press releases on the

26   national circuits of major newswire services and through other wide-ranging public disclosures, such

27   as communications with the financial press and other similar reporting services; and

28

1        (d)     Align was followed by several securities analysts employed by major

2  brokerage firms who wrote reports which were distributed to the sales force and certain customers of

3  their respective brokerage firms.  Each of these reports was publicly available and entered the public

4  marketplace.

5        120.    As a result of the foregoing, the market for Align common stock promptly digested

6  current information regarding Align from all publicly available sources and reflected such

7  information in the prices of the stock.  Under these circumstances, all purchasers of Align common

8  stock during the Class Period suffered similar injury through their purchase of Align common stock

9  at artificially inflated prices, and a presumption of reliance applies.

10                      **CLASS ACTION ALLEGATIONS**

11        121.    Lead plaintiff brings this action as a class action pursuant to Federal Rule of Civil

12  Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common

13  stock of Align between January 30, 2007 and October 24, 2007, inclusive, and who were damaged

14  thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the

15  Company, at all relevant times, members of their immediate families and their legal representatives,

16  heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17        122.    The members of the Class are so numerous that joinder of all members is

18  impracticable.  Throughout the Class Period, Align common stock was actively traded on the

19  NASDAQ.  While the exact number of Class members is unknown to lead plaintiff at this time and

20  can only be ascertained through appropriate discovery, lead plaintiff believes that there are hundreds

21  or thousands of members in the proposed Class.  Record owners and other members of the Class

22  may be identified from records maintained by Align or its transfer agent and may be notified of the

23  pendency of this action by mail, using the form of notice similar to that customarily used in

24  securities class actions.

25        123.    Lead plaintiff's claims are typical of the claims of the members of the Class as all

26  members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

27  law complained of herein.

28

1    124.    Lead plaintiff will fairly and adequately protect the interests of the members of the

2   Class and has retained counsel competent and experienced in class action and securities litigation.

3    125.    Common questions of law and fact exist as to all members of the Class and

4   predominate over any questions solely affecting individual members of the Class.  Among the

5   questions of law and fact common to the Class are:

6          (a)    whether the federal securities laws were violated by defendants' acts as

7   alleged herein;

8          (b)    whether statements made by defendants to the investing public during the

9   Class Period misrepresented material facts about the business and operations of Align;

10          (c)    whether the price of Align common stock was artificially inflated during the

11   Class Period; and

12          (d)    to what extent the members of the Class have sustained damages and the

13   proper measure of damages.

14    126.    A class action is superior to all other available methods for the fair and efficient

15   adjudication of this controversy since joinder of all members of the Class is impracticable.

16   Furthermore, as the damages suffered by individual Class members may be relatively small, the

17   expense and burden of individual litigation make it impossible for members of the Class to

18   individually redress the wrongs done to them.  There will be no difficulty in the management of this

19   action as a class action.

20                              **NO SAFE HARBOR**

21    127.    The statutory safe harbor provided for forward-looking statements under certain

22   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

23   Many of the specific statements pleaded herein were not identified as "forward-looking statements"

24   when made.  To the extent there were any forward-looking statements, there were no meaningful

25   cautionary statements identifying important factors that could cause actual results to differ materially

26   from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

27   statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

28   liable for those false forward-looking statements because at the time each of those forward-looking

1   statements was made, the particular speaker knew that the particular forward-looking statement was

2   false, and/or the forward-looking statement was authorized and/or approved by an executive officer

3   of Align who knew that those statements were false when made.

### COUNT I

**Violation of §10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

128.    Lead plaintiff repeats and realleges each and every allegation contained above as if
fully set forth herein.

129.    During the Class Period, defendants disseminated or approved the materially false
and misleading statements specified above, which they knew or deliberately disregarded were
misleading in that they contained misrepresentations and failed to disclose material facts necessary
in order to make the statements made, in light of the circumstances under which they were made, not
misleading.

130.    Defendants (a) employed devices, schemes and artifices to defraud, (b) made untrue
statements of material fact and/or omitted to state material facts necessary to make the statements
made not misleading, and (c) engaged in acts, practices and a course of business that operated as a
fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

131.    Lead plaintiff and the Class have suffered damages in that, in reliance on the integrity
of the market, they paid artificially inflated prices for Align common stock.  Lead plaintiff and the
Class would not have purchased Align common stock at the prices they paid, or at all, if they had
been aware that the market prices had been artificially and falsely inflated by defendants' misleading
statements.

132.    As a direct and proximate result of defendants' wrongful conduct, lead plaintiff and
the other members of the Class suffered damages in connection with their purchases of Align
common stock during the Class Period.

**COUNT II**

**Insider Trading Violations of §10(b) and Rule 10b-5**
**Against Defendant Prescott**

133.     Lead plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

134.     Defendant Prescott violated §10(b) of the Exchange Act and Rule 10b-5 in that he is liable for making false and misleading statements and failing to disclose material known to him about Align.  Defendant Prescott, while in possession of material non-public information about the Company's true financial and business condition, sold millions of dollars worth of Align stock at artificially inflated prices, as set forth in ¶¶109-113.

**COUNT III**

**Violation of §20(a) of the Exchange Act**
**Against All Defendants**

135.     Lead plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.     Defendant Prescott acted as a controlling person of Align within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of his position as CEO of Align, and his ownership of Align stock, defendant Prescott had the power and authority to cause Align and its officers and employees to engage in the wrongful conduct complained of herein.  Align controlled defendant Prescott and the Company's other officers and employees, including CFO Bullington.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, lead plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying lead plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of lead plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1    C.      Awarding lead plaintiff and the Class their reasonable costs and expenses incurred in

2    this action, including counsel fees and expert fees; and

3    D.      Such other and further relief as the Court may deem just and proper.

4                                    **JURY DEMAND**

5    137.    Lead plaintiff hereby demands a trial by jury.

6    DATED:  January 29, 2010                COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
7                                            WILLOW E. RADCLIFFE
                                             SARAH R. HOLLOWAY
8

9                                                      s/ Willow E. Radcliffe
10                                             WILLOW E. RADCLIFFE

11                                           100 Pine Street, Suite 2600
                                             San Francisco, CA  94111
12                                           Telephone:  415/288-4545
                                             415/288-4534 (fax)
13
                                             Lead Counsel for Plaintiff
14
                                             O'DONOGHUE & O'DONOGHUE LLP
15                                           LOUIS P. MALONE
                                             4748 Wisconsin Avenue, N.W.
16                                           Washington, DC  20016
                                             Telephone:  202/362-0041
17                                           202/362-2640 (fax)

18                                           Additional Counsel for Plaintiff

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-MMC                                                                - 49 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ALIGN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _1st_ day of _OCTOBER_, 2009.

PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUND

By: _____

Its: _____

- 2 -

ALIGN

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/19/2007 | 76,400 | $26.09 |
| 07/20/2007 | 42,300 | $26.05 |
| 08/16/2007 | 20,700 | $24.49 |
| 08/17/2007 | 2,700 | $25.48 |
| 08/24/2007 | 48,300 | $23.45 |

1
<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on January 29, 2010, I electronically filed the foregoing with the Clerk

3  of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7       I further certify that I caused this document to be forwarded to the following Designated

8  Internet Site at:  http://securities.stanford.edu.

9       I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on January 29, 2010.

11
                                        s/ Willow E. Radcliffe
12                                      WILLOW E. RADCLIFFE

13                                      COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
14                                      100 Pine Street, 26th Floor
                                        San Francisco, CA  94111
15                                      Telephone:  415/288-4545
                                        415/288-4534 (fax)
16

17                                      E-mail:willowr@csgrr.com

18

19

20

21

22

23

24

25

26

27

28

479879_1

# Mailing Information for a Case 3:09-cv-03671-MMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Molly Allison Arico**
  marico@wsgr.com

- **Douglas John Clark**
  dclark@wsgr.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Caz Hashemi**
  CHASHEMI@WSGR.COM,vmendoza@wsgr.com

- **Katherine Leigh Henderson**
  khenderson@wsgr.com,mmsmith@wsgr.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,jdecena@csgrr.com,khuang@csgrr.com,SHolloway@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)