**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHARLES WOZNIAK, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

  v.

ALIGN TECHNOLOGY, INC., THOMAS M.
PRESCOTT,

        Defendants.
_____/

No. C-09-3671 MMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT WITH LEAVE
TO AMEND**

     Before the Court is defendants Align Technology, Inc. ("Align") and Thomas
Prescott's ("Prescott") motion, filed on March 26, 2010,  to dismiss plaintiff's First Amended
Complaint ("FAC").  Lead plaintiff Plumbers and Pipefitters National Pension Fund,
individually and on behalf of all others similarly situated, has filed opposition, to which
defendants have replied.  After reviewing the papers filed in support of and in opposition to
the motion, the Court rules as follows.[1]

## BACKGROUND

     In the FAC, plaintiff alleges that Align, a company that "designs, manufactures, and
markets" Invisalign, a series of clear, removable teeth aligners, and Prescott, Align's Chief
Executive Officer, participated in a "fraudulent scheme and course of conduct that operated

_____

[1]  On July 7, 2010, the Court vacated the hearing on defendants' motion.

as a fraud or deceit on purchasers of Align's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts" between January 30, 2007 and October 24, 2007 (the "Class Period").  (See FAC ¶¶  1, 2, 40.)

Specifically, plaintiff alleges that, as the result of a pre-Class Period settlement with a competitor, OrthoClear, "Align agreed to make Invisalign treatment available to OrthoClear patients currently in treatment at no additional charge to the patients or doctors under the 'Patients First Program' created by Align" (see FAC ¶ 4); that Align "did not have enough trained ClinCheck technicians in place to handle the influx of Patients First cases from the former OrthoClear patients in addition to new revenue generating Invisalign cases" (see FAC ¶ 6 (emphasis omitted)); and that, as a result of the additional cases and staff shortage, "Align experienced a significant backlog in its production, and all case shipments (both new revenue cases and Patients First cases) were significantly delayed during the Class Period" (see id. (emphasis omitted)) beyond the usual "total cycle time from patient impressions to delivery [of] approximately 30 days" (see FAC ¶ 3).[2]

Plaintiff alleges Align's failure to disclose the significant backlog rendered statements in three press releases and accompanying conference calls, on January 30, 2007, April 26, 2007, and July 25, 2007, respectively, knowingly misleading.  (See FAC ¶¶ 5, 8, 13, 15.)  Thereafter, according to the FAC, the truth about Align's backlog emerged by way of Align's October 24, 2007 announcement that it expected to ship in 2007 approximately 4000 to 5000 cases fewer than its previous expectation of 206,000 to 209,000 cases, due to Align's "mov[ing] [its] focus away from generating case growth" to "managing backlog" (see FAC ¶ 18), resulting in Align's stock price falling $9.63, or approximately 34% (see FAC ¶ 88).

Based on said allegations, the FAC asserts three causes of action:  (1) violation of

---

[2]  As alleged in the FAC, "total cycle time" refers to the process by which Align produces Invisalign, beginning with the doctor's taking impressions and X-rays of a patient's teeth, from which a "simulated model" is created by Align's "ClinCheck modeling process which takes approximately two weeks," followed by the doctor's approval of the simulation, and, lastly, manufacture of the product, which, from approval to delivery, also takes "typically two weeks."  (See FAC ¶ 3.)

§ 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, against both defendants; (2) insider trading violations of § 10(b) and Rule 10b-5 against Prescott; and (3) violation of § 20(a) of the Exchange Act against both defendants.  (See FAC ¶¶ 128-136.)

## LEGAL STANDARD

"Dismissal under Rule 12(b)(6) can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party.  See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "Factual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct. at 1950.

## DISCUSSION

**I.    Section 10(b)**

To allege a § 10(b) and Rule 10b-5 claim, a plaintiff must allege "(1) a material misrepresentation (or omission), (2) scienter, i.e. a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance . . . (5) economic loss, and (5) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).  Claims brought under § 10(b) and Rule 10b-5 must meet the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 9(b) ("In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud."); Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985) (applying Rule 9(b) to § 10(b) and Rule 10b-5 claim).  "In a

1  securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the

2  circumstances of the alleged fraud so that the defendant can prepare an adequate

3  answer." Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995).  To provide sufficient

4  notice, a plaintiff, in addition to alleging the "time, place and nature of the alleged fraudulent

5  activities," must "plead evidentiary facts" sufficient to establish any allegedly false

6  statement "was untrue or misleading when made."  See id. (emphasis omitted).

7      Further, such plaintiff must meet the heightened pleading requirements of the

8  Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, which

9  requires the plaintiff to "specify each statement alleged to have been misleading [and] the

10  reason or reasons why the statement is misleading." See § 78u-4(b)(1).  Additionally, the

11  complaint must "state with particularity facts giving rise to a strong inference that the

12  defendant acted with the required state of mind." § 78u-4(b)(2).  To the extent an allegation

13  is based on information and belief, the plaintiff must allege "with particularity all facts on

14  which that belief is formed."  Id.  In so doing, the plaintiff must "reveal the sources of [his]

15  information."  In re Daou Sys., Inc., 411 F.3d 1006, 1015 (9th Cir. 2005) (internal quotation

16  and citation omitted).

17      **A.      Material Misrepresentations/Omissions**

18      Plaintiff alleges various statements in Align's January, April, and July 2007 press

19  releases and accompanying conference calls were misleading because, contrary to

20  defendants' positive statements about Align's performance, Align's revenue growth and

21  overall progress were negatively impacted by the backlog created by the Patients First

22  Program.  (See FAC ¶¶ 49-83.)  As discussed below, the FAC fails to provide a sufficient

23  basis, however, to support its allegations that each identified statement is false or

24  misleading and that defendants failed to disclose the information they are alleged to have

25  omitted.

26      **1.      Statements of Belief and Optimism**

27      "'Vague, generalized, and unspecific assertions' of corporate optimism or statements

28  of 'mere puffing' cannot state actionable material misstatements of fact under federal

4

securities laws." In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F. Supp. 2d 1069, 1086 (N.D. Cal. 2005) (quoting Glen Holly Entm't v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003)).  "Although projections and general statements of optimism may trigger liability under federal securities laws, statements that are so vague or amorphous that no reasonable investor could rely on them are not actionable."  In re Syntex Corp. Sec. Litig., 855 F. Supp. 1086, 1096 (N.D. Cal. 1994) (internal citation omitted), aff'd, 95 F.3d 922 (9th Cir. 1996).  "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."  In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010).

The "mere puffery" rule has been interpreted to include "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years.'"  See Cornerstone, 355 F. Supp. 2d at 1087 (finding defendant's "claims of 'industry leading' growth, growth that 'positions us beautifully,' 'measurable progress,' 'continuing improvements,' 'accomplishments we have achieved,' expressions of pride in [our] staff, 'outstanding retail results,' and other similar comments all constitute vague, unspecific assertions of corporate optimism"); Syntex Corp., 855 F. Supp. at 1095 (holding as non-actionable puffery the phrases "'we're doing well and I think we have a great future,' '[b]usiness will be good this year . . . , [w]e expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first . . . ,' 'everything is clicking [for the 1990s] . . . , new products are coming in a wave, not in a trickle . . . , old products are doing very well,' and that 'I am optimistic about [our] performance during this decade'")).

Here, a large portion of the statements identified by plaintiff constitute such puffery. Specifically, plaintiff alleges that in the January 2007 press release and conference call, defendant Prescott stated:  "[w]e . . . refocused our efforts on product development, customer service, and market expansion" (see FAC ¶ 49); "[o]ur vision and strategic direction is clear to all employees" (see FAC ¶ 50); "[t]he volume growth in Q4 was driven by a tremendous sales effort" (see FAC ¶ 52); "we are pleased with the progress" on

"help[ing] doctors and patients in OrthoClear treatment [to] get their cases registered and started," and Align's sales team "is working with our customers to help them get the best smiles for their patients as they take their practices to the next level . . . [and] are positioned to generate significant top line growth in 2007" (see FAC ¶ 52); Align has "strong incoming case flow . . . , we have seen very solid demand . . . [a]nd our goal is to ensure that continues" (see FAC ¶ 54); and "[w]e have made very good progress I think," and "we're trying to find our way through the need to staff up for Patients First and intersecting with the expected growth in volume and receipts as the year progresses[;] . . . we think we are on track to find that balance" (see FAC ¶ 55).

Similarly, plaintiff alleges that in the April 2007 press release and conference call, Prescott stated: "[w]e are pleased that we are off to a strong start in 2007[;] . . . our solid growth in volume and revenue on an increasing base of customers is very gratifying" (see FAC ¶ 66); and "we are very pleased with our progress to date[;] . . . [w]e are completely focused on our goals for the year" (see FAC ¶ 67).

The FAC further alleges that Prescott misled investors in the July 25, 2007 conference call by stating:  "We've made significant progress in all areas" (see FAC ¶ 77); and "[w]e continue to see expansion in our customer base . . . as well as solid demand at the consumer level" (see id.).

The above-quoted statements are generalized statements of optimism that constitute "non-actionable puffing."  See Syntex Corp., 855 F. Supp. at 1095.  In particular, "refocused [ ] efforts" (see FAC ¶ 49), "vision and strategic direction" (see FAC ¶ 50), "tremendous sales effort," (see FAC ¶ 52), "pleased with the progress" (see id.), "positioned to generate significant top line growth" (see id.), "very solid demand" (see FAC ¶ 54), "good progress" (see FAC ¶ 55), "on track to find . . . balance" (see id.), "off to a strong start in 2007" (see FAC ¶ 66), "solid growth in volume and revenue" (see id.), "very pleased with . . . progress" (see id.), "completely focused on our goals" (see id.), "significant progress in all areas" (see FAC ¶ 77), and "solid demand" (see id.) are, in essence, "feel good monikers," i.e., statements on which investors do not rely when valuing corporations.  See Cutera, 610

1    F.3d at 1111.  Accordingly, the above statements constitute puffery.

2         A projection of optimism, or puffery, may nonetheless be an "actionable, 'factual'

3    misstatement under § 10(b) if (1) the statement is not actually believed, (2) there is no

4    reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending

5    seriously to undermine the statement's accuracy."  Kaplan v. Rose, 49 F.3d 1363, 1375

6    (9th Cir. 1994).

7         Here, relying on information alleged to have been provided by five confidential

8    witnesses, "CW1," "CW2," "CW3," "CW4," and "CW5," plaintiff contends Prescott did not

9    believe his optimistic projections and/or was aware of undisclosed facts that would have

10   undermined the statements' accuracy.  Confidential witnesses may be used to support

11   allegations only if such "sources are described with sufficient particularity to support the

12   probability that a person in the position occupied by the source would possess the

13   information alleged and the complaint contains adequate corroborating details."  See Daou,

14   411 F.3d at 1015.

15        In the FAC, CW1, CW2, CW3, and CW4 are alleged to have been former Align

16   Territory Account Managers and CW5 is alleged to have been a former Align Regional

17   Business Manager.  (See FAC ¶¶ 31-36.)  According to the FAC, CW1 reported that Align

18   was "unprepared to handle the additional OrthoClear cases and underestimated the

19   number of OrthoClear cases it would assume as part of the settlement," and that

20   "processing delays for all cases began almost immediately after the Patients First Program

21   got under way" (see FAC ¶¶ 58, 61 (emphasis omitted)); CW2 reported that the "influx of

22   Patients First cases caused significant bottleneck and backlog in processing and

23   production," and that Align "did not have enough trained ClinCheck technicians in place

24   during the Class Period to handle the new revenue cases and the Patients First cases"

25   (see FAC ¶ 60 (emphasis omitted)); CW3 reported that "typical ClinCheck processing time

26   for new revenue cases doubled from two weeks to four weeks or longer in 2007" (see FAC

27   ¶ 61), and that as a result of Patients First cases, "Align sales representatives spent

28   between 20% - 50% of their time on Patients First cases during the Class Period" (see FAC

¶ 62); CW4 reported that Patients First cases were treated "secondary to new revenue cases," that "this led to complaints from doctors," and that sales representatives "regularly" complained about "the influx of OrthoClear cases and the significant case backlogs" (see FAC ¶ 65); and, lastly, CW5 reported that "the OrthoClear settlement resulted in bad blood between Align and doctors who had been using OrthoClear products"  (see FAC ¶ 64).[3]

The above allegations, even assuming the confidential witnesses have sufficient knowledge upon which to base them, see Daou, 411 F.3d at 1015, do not suffice to demonstrate defendants' lack of belief in or lack of a reasonable basis for what they were asserting, nor do they demonstrate defendants' knowledge of undisclosed facts seriously undermining the statements' accuracy.  In particular, the confidential witnesses' reports of a processing backlog, heavier workload for sales representatives, and/or attendant customer feedback (see, e.g., FAC ¶¶ 58, 60, 62, 83) do not contradict defendants' generalized statements as to Align's growth, progress, consumer demand, or physician interest (see FAC ¶¶ 49, 50, 52, 54, 55, 66, 67, 76, 77).

Accordingly, plaintiff's allegations as to such statements fail to meet the pleading requirements of Rule 9(b) and the PSLRA.

## 2.     Forward-Looking Statements

A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)).  Under the PSLRA, a person may not be held liable for a forward-looking statement, provided the statement is (1) "identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in

---

[3]  The FAC also refers, in conclusory fashion, to a "rapid decline in revenue case starts during the Class Period," which, plaintiff asserts, contradicts defendants' claim of "strong demand."  (See FAC ¶ 7.)  Such "decline," however, is alleged without factual support.

the forward-looking statement" or (2) "immaterial."  15 U.S.C. § 78u-5(c)(1)(A).  On the

other hand, if such statement is not identified as forward-looking and/or is unaccompanied

by meaningful cautionary language, such statement falls outside the safe harbor if the

plaintiff can show it "was made with actual knowledge by [the speaker] that the statement

was false or misleading."  Id. at § 78u-5(c)(1)(B); see Provenz v. Miller, 102 F.3d 1478,

1487 (9th Cir. 1996) ("A projection is a factual misstatement if (1) the statement is not

actually believed, (2) there is no reasonably basis for the belief, or (3) the speaker is aware

of undisclosed facts tending seriously to undermine the statement's accuracy." (emphasis,

internal quotation and citation omitted)).

Here, plaintiff bases his claims on a number of forward looking statements.  In

particular, the FAC alleges that during the January 30, 2007 conference call, Eldon

Bullington ("Bullington"), Align's CFO, stated, "[f]or the full year of 2007, . . . [c]ase

shipments are expected to increase in the range of 22% to 27% to 182,700 to 190,000

cases" (see FAC ¶ 53); that, during the April 26, 2007 conference call, Bullington stated,

"[c]ase shipments are expected to increase 33% to 37% to a range of 200,000 to 206,000

cases" (see FAC ¶ 68); and that, during the July 25, 2007 conference call, Bullington

stated, "[c]ase shipments year-over-year are expected to increase 37% to 39% to 206,000

to 209,000 cases" (see FAC ¶ 78.)

Additionally, plaintiff relies on statements made by Prescott.  In that regard, the FAC

alleges that, in the January 30, 2007 press release, Prescott stated, "[w]e expect 2007 to

be the year we restage growth, introduce products that meet the unique needs of the

Orthodontists and GPs [general practitioners] and continue our path to profitability" (see

FAC ¶ 49); that, during the January 30, 2007 conference call, Prescott stated, "[o]ur goals

in 2007 are straightforward–first, we're going to generate meaningful top line growth . . .

[and] we are going to continue to drive the expansion of our customer base while

incrementally increasing our demand creation and brand building efforts" (see FAC ¶ 50);

and that, during the April 27, 2007 conference call, Prescott stated the following:  "[o]ur key

goals for 2007 and beyond are to generate strong, topline growth and now extend

9

1   profitability to continue to expand our customer base, while fine tuning our demand creation

2   and brand building efforts," "we expect to get our cycle times back towards normal by the

3   end of Q2," "as we reduce our cycle times, . . . we will see a benefit to case volume,

4   revenue, and most importantly, to customer satisfaction," and "[we] will continue to execute

5   our plan for even greater impact in the future" (see FAC ¶ 67).

6   The above-listed statements qualify as forward-looking. See 15 U.S.C.

7   § 78u-5(i)(1)(A)-(C) (defining "forward-looking statement" as, inter alia, "a statement

8   containing a projection of . . . financial items," "a statement of [ ] plans and objectives," and

9   "a statement of future economic performance"). Further, the statements, when made, were

10  (1) identified as forward-looking and (2) accompanied by meaningful cautionary statements.

11  See 15 U.S.C. § 78u-5(c)(1)(A). For example, the January 2007 press release stated:

> This news release . . . contain[s] forward-looking statements, including
> Align's anticipated financial results and certain business metrics for the
> first quarter and full year of 2007, including anticipated percentage of
> revenue by channel, case shipments and average selling prices, and
> statements by Mr. Prescott regarding . . . anticipated return to profitability
> in fiscal 2007. . . . Readers are cautioned that these forward-looking
> statements are only predictions and are subject to risks, uncertainties and
> assumptions that are difficult to predict. . . . [A]ctual results may differ
> materially and adversely from those expressed in any forward-looking
> statement. Factors that might cause such a difference include . . . risks
> relating to Align's ability to sustain or increase profitability or revenue
> growth in future periods while controlling expenses, including expenses
> related to the OrthoClear settlement, customer demand for Invisalign,
> acceptance of Invisalign by consumers and dental professionals, [and]
> Align's third party manufacturing processes and personnel . . . .

20  (See Arico Decl. Ex. 6 at 4; see also id. Ex. 4 (Apr. 2007 press release), Ex. 5 (Jul. 2007

21  press release), Ex. 12 (Jan. 2007 call tr.), Ex. 13 (Apr. 2007 call tr.), Ex. 14 (Jul. 2007 call

22  tr.).)[4] The January 2007 press release also incorporated by reference Align's Form 10-Q

23  ───────────────

24      [4] Defendants request the Court take judicial notice of the above-referenced exhibits
    to the Declaration of Molly Arico. Plaintiff does not object to the Court's taking judicial notice
25  of Exhibits 12, 13, and 14, but does object to the Court's taking judicial notice of exhibits 4,
    5, and 6. As plaintiff refers to the challenged exhibits throughout the FAC, however, (see
26  FAC ¶ 5, 7, 8, 13, 49, 66, 76), those exhibits likewise are subject to judicial notice, see U.S.
    v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (holding court may consider "documents
27  incorporated by reference in the complaint"). In considering said exhibits for the limited
    purpose of determining the context in which the allegedly misleading statements were
28  made, however, the Court has not accepted, for the truth of the matters asserted, any non-
    cautionary statements of fact contained therein.

1    for the period ending September 30, 2006, which filing cautioned:

2         As a result [of the OrthoClear settlement], we will receive no revenue for
          any additional cases we start under [the Patients First] program while
3         incurring significant expenses as well as increased demands on our sales
          and customer service representatives and our manufacturing processes. .
4         . . We may have difficulty managing the deployment of this program,
          including the internal allocation of personnel and resources potentially
5         resulting in production delays.  Any such difficulty could cause us to lose
          existing customers, face potential customer disputes or limit the number of
6         new customers who purchase our products or services . . . .

7    (See Arico Decl. Ex. 1, at 39)[5]; No. C 05-2146 SBA, In re Tibco Software, Inc., No. C 05-

8    2146 SBA, 2006 WL 1469654, at *27 (N.D. Cal. May 25, 2006) (considering, as part of

9    cautionary statements, Form 10-Q incorporated by reference in press release).  These

10   cautionary statements identified the risks plaintiff alleges ultimately materialized,

11   specifically, the risk of a backlog created by the OrthoClear settlement and resulting effects

12   on sales.

13        Consequently, defendants' projections and other forward-looking statements fall

14   within the PSLRA's safe harbor.

15              **3.    Omissions**

16        Plaintiff alleges the remainder of the statements in the three press releases and the

17   accompanying conference calls were misleading because defendants failed to disclose that

18   "Align was experiencing a significant backlog in its production and significantly increased

19   production and delivery times for all of its cases almost immediately after the Patients First

20   Program began" (see FAC ¶ 58 (emphasis omitted); see also FAC ¶¶ 73, 83(a)), that

21

22   ─────────────────────
          [5] Plaintiff objects to the Court's taking judicial notice of Exhibit 1, Align's Form 10-Q
23   signed November 7, 2006, as it is not referenced in the FAC.  Plaintiff, however, does not
     challenge the authenticity of the document, nor does plaintiff dispute that it was filed with
24   the SEC or that its contents were made public.  The Court may take judicial notice of SEC
     filings "for the fact that these documents . . . were publicly-filed and for the fact that the
25   statements made were made to the public on the dates specified."  See Shurkin v. Golden
     State Vintners Inc., 471 F. Supp. 2d 998, 1011 (N.D. Cal. 2006), aff'd, 303 F. App'x 431
26   (9th Cir. 2008).  Moreover, while Exhibit 1 was filed two months prior to the beginning of the
     Class Period, it constitutes part of the "total mix of information" available to investors,
27   see TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), and, as noted-above,
     was incorporated in class-period statements; consequently, the exhibit is relevant to the
28   Court's analysis herein, see  Tibco, 2006 WL 1469654, at *27 (considering pre-class period
     Form 10-Q cautionary statements incorporated in class-period Form 8-K).

                                              11

"Align's sales force continued to be focused on managing the backlog . . . , [and] [t]he breakdown in relationships between doctors and Align's sales force was hampering Align's ability to generate new revenue case growth" (see FAC ¶ 83(b), (c)).  In support thereof, plaintiff alleges:  "[a]ccording to CW2, . . . [Align] did not have enough trained ClinCheck technicians in place," (see FAC ¶ 60 (emphasis omitted); "CW3 reported that the typical ClinCheck processing time for new revenue cases doubled from two weeks to four weeks or longer in 2007" and "ClinCheck processing time for [Patients First] cases was even longer, anywhere from six weeks to several months" (see FAC ¶ 61 (emphasis omitted)); "CW1 confirmed that processing delays for all cases began almost immediately after the Patients First Program got under way" (see id. (emphasis omitted)); "[t]he Patients First Program required existing OrthoClear patients to go back to their doctors to get all new records . . . , no matter where they were in their course of treatment" and "CW3 reported that this led to a lot of explaining and hand-holding with Patients First doctors on the part of Align's sales force," requiring "Align's sales representatives [to] spen[d] between 20% to 50% of their time on Patients First cases during the Class Period" (see FAC ¶ 62); "[a]ccording to . . . CW5, the OrthoClear settlement resulted in some bad blood between Align and the doctors who had been using OrthoClear products" (see FAC ¶ 64); and "CW4 reported that numerous Territory Account Managers complained about the influx of OrthoClear cases and the significant case backlogs to their Regional Business Managers regularly throughout 2007; complaints that were generated from doctors Align was relying on for new case growth" (see FAC ¶ 65).

"To be actionable under the securities laws, an omission must be misleading." Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002).  "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  Id.  "Silence, absent a duty to disclose, is not misleading."  Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988).

Here, plaintiff alleges, omission of the above-described circumstances rendered the following statements by Prescott in the January 30, 2007 conference call misleading: "we

12

will recover the one week delay currently impacting our normal cycle times" (see FAC ¶ 51); "[o]ur bottleneck was strictly in Costa Rica . . . [a]nd it was with the available capacity of treatment technicians, dental technicians that have to be trained for about three months or so before we can have them working on cases unsupervised or in normal supervision" (see FAC ¶ 55); "[w]e have more than adequate capacity through the rest of the system" (see id.); "we're trying to find our way through the need to staff up for Patients First and intersecting with the expected growth in volume and receipts as the year progresses . . . but we think we are on track to find that balance (see id.).  Plaintiff further alleges that during the January 30, 2007 conference call, in response to an analyst's request for "a reminder of what the leadtimes [sic] realizing revenues from those numbers have been historically," Bullington's statement that "on average—case cycle time in our business has been 30 or so days," and Prescott's statement that "the biggest part of that 30 days has typically been the time for the doctor to approve ClinCheck[;] [t]he rest of the cycle for us has roughly been two weeks,"  likewise were misleading in light of the alleged omissions. (See FAC ¶ 56.)

Similarly, plaintiff alleges the following statements by Prescott during the April 26, 2007 conference call were misleading in light of the alleged omissions: "[d]uring the first quarter, our operations team did an outstanding job of ramping up capacity to address the volume of Patients First cases as well as strong demand for new revenue cases" (see FAC ¶ 67); "[a]s a result of the Patients First cases and stronger than anticipated incoming case receipts in Q4 and Q1, manufacturing capacity was constrained in our treatment facility in Costa Rica[;] . . . we have brought additional capacity online and the majority of Patients First cases have shipped" (see id.); "[a]s we speak today, our head count has expanded[;] [i]t's stable and they're cranking, . . . [a]nd so, we have no issues there and that bottleneck no longer exists" (see FAC ¶ 70); and, in response to an analyst's question about whether Align's "sales people . . . are . . .  spending more of their time with your current contract than getting new accounts," Prescott's answer, "[n]o, it's a very consistent approach[;] [w]e haven't changed[;] [w]e've optimized coverage as we look at in 2007, but . . . they have a

very specific game plan about how they are to go about covering their territory and taking

care of their existing accounts and building new practices[;] [s]o nothing really has changed

there[;] [i]t's just things are settling down[;] [w]e're getting back to business and good

execution is occurring" (see FAC ¶ 69).

Lastly, plaintiff alleges that the following statements by Prescott on July 25, 2007

were misleading in light of the alleged omissions:  in Align's press release, "[c]onsumer

demand and physician interest in the Invisalign system continue to expand, enabling case

and revenue growth and increased profitability" (see FAC ¶ 76); and, in the accompanying

conference call,  "[w]e continue to see expansion in our customer base . . . as well as solid

demand at the consumer level" (see FAC ¶ 77), "our backlog is rebalanced" (see FAC

¶ 79), and "[w]e typically are back to our published delivery times and we typically say it's

about a month[;] . . . [l]iterally, we've been able to turn around cases within a week[;] [s]o

we're back to our normal availability and when we need to, for our customer situation, we

can move heaven and earth to get something done very quickly" (see FAC ¶ 80).

Again, the Court will assume, arguendo, a sufficient basis for the information

provided by the confidential witnesses.  Plaintiff, however, fails to show how the above

statements were misleading in light of the alleged omissions.  See Fecht, 70 F.3d at 1083

(noting plaintiff must show "how and why the statement was misleading when made").  For

example, none of the confidential witnesses' allegations contradicts defendants' statement

that the "bottleneck was strictly in Costa Rica" or that it resulted from a lack of technicians

and not a lack of "adequate capacity through the rest of [Align's] system."  (See FAC ¶ 55.)

Similarly, CW2's assertion that Align "did not have enough trained ClinCheck technicians"

(see FAC ¶ 60) does not contradict the statement that, by April 26, 2007, Align had hired

and trained sufficient technicians to remove the bottleneck (see FAC ¶ 70).  Nor does

CW1's assertion that Align was experiencing delays in its ClinCheck processing time

"almost immediately after the Patients First Program got under way" (see FAC ¶ 61)

contradict defendants' statement that Align's past "cycle times," prior to the Patients First

Program, were typically about 30 days (see FAC ¶ 56).  CW3's assertion that Align's

14

1  processing time "doubled from two weeks to four weeks or longer in 2007" (see FAC ¶ 61)

2  is ambiguous as to when in 2007 the alleged increases occurred, and thus does not

3  contradict Prescott's statement that, as of January 30, 2007, Align's processing delay was

4  "one week" (see FAC ¶ 51), that, by April 26, 2007, the bottleneck was removed (see FAC

5  ¶ 70), or that, by July 25, 2007, Align was "typically [ ] back to [its] published delivery times"

6  of "about a month" (see FAC ¶ 80).  Nor, in the absence of any assertion by a confidential

7  witness as to the effect of customer complaints on sales and/or customer demand, does

8  any omitted reference thereto create a false impression.

9      In sum, plaintiff fails to show the alleged omissions "affirmatively create[d] an

10 impression of a state of affairs that differs in a material way from the one that actually

11 exist[ed]," see Brody, 280 F.3d at 1006, and, consequently, plaintiff fails to state a claim

12 under the PSLRA based on any such alleged omission.

13     Moreover, rather than omitting any reference to the backlog resulting from the

14 Patients First cases, defendants made numerous disclosures in that regard, both prior to

15 and during the Class Period.  Just one month before the January 30, 2007 statements on

16 which plaintiff relies, defendants, in a December 21, 2006 press release, made the

17 following disclosures:  "preparation time for some new cases may be extended

18 approximately 10 days" and "[p]rocessing time for Patients First program cases may take

19 12 to 16 weeks due to manufacturing constraints"; "[b]ased on higher than anticipated

20 demand from the Patients First Program and from regular new patients, we have to re-set

21 expectations going forward"; and "Invisalign customers may see longer customer service

22 hold times and slight delays in ClinCheck processing time for the next few months."  (See

23 Arico Decl. Ex. 2.)[6]  Indeed, as noted above, Align disclosed the potential risks of a backlog

24 from Patients First cases as early as November 2006.  (See id. Ex. 1 at 24, 39.)  Similarly,

25 just one month before defendants' April 26, 2007 press release and conference call,

26 defendants, in Align's 2006 10-K filed March 12, 2007, disclosed the following:

27

28     [6] Plaintiff does not object to the Court's taking judicial notice of Exhibit 2.

15

> In implementing this program, we experienced higher than anticipated demand from the Patients First Program as well as regular new patients. As a result, many of our customers experienced . . . slight delays in ClinCheck processing times during the fourth quarter of 2006 which we anticipate will continue during the first and second quarter of 2007. Although we believe these delays are temporary in nature, these difficulties could cause us to lose existing customers, face potential customer disputes or limit the number of new customers who purchase our products or services.  This could cause a decline in our revenues, gross margins and net profits, and could adversely affect our operating results.

(See Arico Decl. Ex. 3 at 19.)[7]  The March 2007 10-K further disclosed that "the influx of Patients First Program cases, as well as a higher than expected number of paid Invisalign case submissions in the fourth quarter, caused a delay in ClinCheck preparation time for some new cases by approximately 10 days."  (See id. at 43.)

Thereafter, during the April 26, 2007 conference call, Prescott stated: "it's important to note that some of our expected Q2 revenue will result from a conversion of our case backlog and not solely from natural or organic growth" and "[o]ur projected revenue for the second half of 2007 reflects a return to more normal business patterns and may look a little less extraordinary than the first half of the year."  (See Arico Decl. Ex. 13 at 2.)  Indeed, in the FAC, plaintiff sets forth without challenge the following additional disclosures by Prescott during that conference call: "[i]ncreased demand . . . is a problem that has stretched our cycle times over the past five months, and as we predicted at the end of 2006, created a backlog of cases" (see FAC ¶ 67), and "we're still chipping away at the roughly 8,000 cases that remained of the [P]atients [F]irst cases, along with compression of backlog–reducing that and getting our cycle times reduced[;] [t]hat's going to take us the better part of Q2" (see FAC ¶ 70 (alteration in original)).

The above-referenced disclosures, made both prior to the Class Period and reiterated during it, revealed the very backlog, understaffing, and customer complaints plaintiff alleges were omitted.  Consequently, for that additional reason, the FAC fails to state a cause of action for securities fraud based on a theory of omission.  See Heliotrope

---

[7]  Plaintiff does not object to the Court's taking judicial notice of Exhibit 3.

1  Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 976 (9th Cir. 1999) (holding where allegedly

2  omitted information was part of the "total mix of information" available, plaintiff could not

3  state a claim under § 10b).

4      **B.     Scienter**

5      Plaintiff alleges scienter based on five grounds: (1) defendants' knowledge of

6  internal reports (see FAC ¶¶ 94-98); (2) management's attendance and knowledge of

7  corporate meetings (see FAC ¶¶ 99-104); (3) a presumption that, as Align's CEO, Prescott

8  had knowledge of adverse facts affecting Align's core business (see FAC ¶ 107);

9  (4) Prescott's "admission" in the October 24, 2007 press release and conference call (see

10  FAC ¶¶ 84-87, 105-106); and (5) "[i]nsider [s]ales" during the Class Period by Prescott and

11  other executives (see FAC ¶¶ 108-113).

12      To plead scienter under the PSLRA, a plaintiff must plead with particularity facts that

13  "constitute strong circumstantial evidence of deliberately reckless or conscious

14  misconduct." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388-89 (9th

15  Cir. 2002); 15 U.S.C. § 78u-4(b)(2).  For a plaintiff to allege a strong inference of deliberate

16  recklessness, such plaintiff "must state facts that come closer to demonstrating intent, as

17  opposed to mere motive and opportunity." In re Silicon Graphics, Inc. Sec Litig., 183 F.3d

18  970, 974 (9th Cir. 1999) (rev'd on other grounds, South Ferry No. 2 v. Kinninger, 542 F.3d

19  776, 784 (9th Cir. 2008)).  "To qualify as 'strong' . . . an inference of scienter must be more

20  than merely plausible or reasonable–it must be cogent and at least as compelling as any

21  opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, 551

22  U.S. 308, 314 (2007).  Although the plaintiff need not allege facts giving rise to an

23  "irrefutable" inference of scienter, and although the complaint must be viewed "holistically,"

24  the plaintiff "must plead facts rendering an inference of scienter at least as likely as any

25  plausible opposing inference." Id. at 324, 326, 328 (emphasis in original).  For the reasons

26  stated below, plaintiff fails to allege sufficient facts to support an inference of scienter on

27  the part of either Align or Prescott.

28

17

1

### 1.    Internal Reports

2        The FAC alleges defendants "should have known of the revenues, new case starts

3    and case shipments on a regular basis throughout the Class Period." (See FAC ¶ 96.)  In

4    support thereof, plaintiff points to a salesforce.com report that allegedly tracked the number

5    of new case sales on a daily basis, and alleges "CW3 indicated that this report was

6    available to everyone within the sales organization, to varying degrees, at all times." (See

7    FAC ¶ 95 (emphasis omitted).)  Plaintiff further alleges that "Align also created numerous

8    other sales reports . . . to track data such as the number of new cases or revenue by

9    geographic region"; that "[a]ccording to a former Senior Manager of Business Intelligence at

10    Align, CW8, these sales reports . . . were made available to the sales department through

11    an intranet";  and that CW8 "received special requests or requests for customized reports"

12    that were "usually focused on sales or marketing data" and "believed the data was

13    presented to Align's executives, including defendant Prescott."  (See FAC ¶ 96.)  Lastly,

14    plaintiff alleges that, according to another confidential witness, "a former Cost Accounting

15    Manager at Align, CW6," Align's "MES [manufacturing execution system] program . . .

16    generated daily metrics that included the number of cases shipped by product . . . [and]

17    then automatically sent an e-mail with the metrics on a daily basis to the Company's chief

18    executives, directors, and managers, including CW6, and defendant Prescott and CFO

19    Bullington," and that, "[p]ursuant to these daily metrics, CW6 stated that defendant Prescott

20    and other high level managers would have known before October 24, 2007 that the

21    Company would not be able to meet its forecasts for new case shipments" (see FAC

22    ¶ 97).

23        To establish a strong inference of scienter, "a proper complaint which purports to

24    rely on the existence of internal reports would contain at least some specifics from those

25    reports as well as such facts as may indicate their reliability."  Nursing Home Pension Fund,

26    Local 144 v. Oracle Corporation, 380 F.3d 1226, 1230-31 (9th Cir. 2004) (finding internal

27    report allegations sufficient to support strong inference of scienter where plaintiff alleged

28    "hard numbers and ma[de] specific allegations regarding large portions of [defendant's]

sales data").  Here, plaintiff's allegations are insufficient to plead scienter under the PSLRA.

Although plaintiff refers to the existence of sales and shipment data and makes a general

assertion about what the data showed,' plaintiff alleges no hard numbers or other specific

information.  See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035-36 (9th Cir. 2002)

(holding plaintiffs failed to plead claim under PSLRA where plaintiffs alleged defendant

pharmaceutical corporation "could regularly track its sales data," which "indicated that test

patient demand was flat," but failed to "plead, in any detail, the contents of such report or

the purported data").[8]

## 2.    Corporate Meetings

Plaintiff next points to sales conference calls, sales meetings, financial reviews,

manufacturing meetings, and executive management committee meetings.  (See FAC

¶¶ 99-104.)  In particular, the FAC alleges that, "[a]ccording to CW1, CW2, CW3, and CW4,

Territory Account Managers submitted weekly field reports to their Regional Business

Managers and attended weekly conference calls" with them (see FAC ¶ 99), that

"[a]ccording to CW5, the Regional Business Managers [ ] held weekly conference calls, as

well as monthly and quarterly meetings . . . [and] VP of Sales Ellis–who reported directly to

defendant Prescott and was a member of Align's executive team–attended these monthly

and quarterly meetings" (see FAC ¶ 100).  The FAC further alleges that CW6 attended

"monthly financial reviews and monthly manufacturing meetings" that were "conducted by

Align CFO Bullington," and "understood that CFO Bullington reported the substance of

these meetings to defendant Prescott."  (See FAC ¶ 101.)  The FAC also alleges,

"[a]ccording to CW6, Align held monthly Executive Management Committee Meetings . . .

to discuss sales data and forecasts," and "[t]he meetings were conducted by defendant

---

[8]  Plaintiff submits as an exhibit to the FAC a page showing monthly orders and shipments for Patients First cases (see FAC ¶¶ 73, 98, & Ex. A), but does not expressly identify the exhibit as part of any distributed report, and, in any event, fails to allege how such data is inconsistent with any statement made by a defendant or otherwise would support a finding of scienter, see Oracle, 380 F.3d at 1230 (noting party may show scienter "via contemporaneous reports or data, available to the party, which contradict the statement").

1  Prescott and attendees included Align's top executives and VPs from across the

2  Company."  (See FAC ¶ 103.)  Lastly, the FAC alleges that, "[a]ccording to a former

3  Controller at Align, CW7, the Company held a monthly meeting . . . to preview the financials

4  from the previous month," that "CW7 attended . . . , along with CFO Bullington," and that

5  "CW7 understood that CFO Bullington informed defendant Prescott about the content of

6  these meetings."  (See FAC ¶ 104.)

7      Once again, assuming the confidential witnesses have sufficient knowledge to

8  support plaintiff's reliance thereon, the FAC's allegations are not sufficient to plead scienter.

9  There is no allegation as to any "hard numbers," see Oracle, 380 F.3d at 1231, discussed

10  with Prescott at any meeting, let alone numbers that would serve to contradict Prescott's

11  statements.  Plaintiff alleges only the existence of the meetings, and the general topics

12  discussed; none of the confidential witnesses describes the contents of any of the

13  meetings.  Such vague and conclusory allegations do not give rise to an inference, let

14  alone a strong inference, that defendants acted with deliberate recklessness.  See 15

15  U.S.C. § 78u-4(b)(2); In re Daou, 411 F.3d at 1022 ("General allegations of defendants'

16  'hands-on' management style, their interaction with other officers and employees, their

17  attendance at meetings, and their receipt of unspecified weekly or monthly reports are

18  insufficient.").  Moreover, plaintiff only alleges that confidential witnesses "understood" that

19  the information covered at these meetings was reported to Prescott, not that the

20  information from the meetings actually was reported.  (See FAC ¶¶ 101, 104); Zucco

21  Partners, LLC v. Digimarc Corp., 552 F.3d 981, 994, 998 (9th Cir. 2009) (finding allegation

22  CFO attended various meetings and "had to have known what was going on with respect to

23  the Company's inventory accounting manipulation" insufficient to support strong inference

24  of scienter).

25          **3.     Core Operations**

26      Plaintiff alleges that "Prescott, the CEO of Align, can be presumed to have

27  knowledge of adverse facts affecting the Company's core business" which is "the sale and

28  shipment of new revenue cases."  (See FAC ¶ 107.)

20

1    "Where a complaint relies on allegations that management had an important role in

2    the company but does not contain additional detailed allegations about the defendants'

3    actual exposure to information, it will usually fall short of the PSLRA standard." South

4    Ferry, 542 F.3d at 784.  "[C]orporate management's general awareness of the day-to-day

5    workings of the company's business do not establish scienter absent some additional

6    allegations of specific information." Id. at 784-85 (noting, in "some unusual circumstances,"

7    "core operations inference" will suffice to raise requisite "strong inference").  Here, plaintiff

8    fails to allege any facts about Prescott's actual exposure to "adverse facts affecting [Align's]

9    core business" (see FAC ¶ 107), nor circumstances cognizable as "unusual" for purposes

10   of the "core operations inference," see South Ferry, 542 F.3d at 784 (citing, as example of

11   unusual circumstances, case where defendant allegedly failed to disclose loss of two

12   largest customers, comprising 80% of company's revenue).

13                    **4.    Later "Admissions"**

14    Plaintiff alleges that, during the October 24, 2007 conference call, Prescott

15   "admitted," contrary to his previous assurances, that "Align's sales force had 'moved their

16   focus away from generating case growth' during the Class Period in order to focus on

17   'managing backlog and turnaround and expediting of cases.'" (See FAC ¶ 116)  The FAC

18   further alleges that Prescott admitted "the sales teams 'weren't pushing as hard to get new

19   case starts' and 'did not focus enough effort on filling the pipeline for new case starts.'"

20   (See id.)

21         Although "[a] later statement may suggest that a defendant had contemporaneous

22   knowledge of the falsity of his statement, if the later statement directly contradicts or is

23   inconsistent with the earlier statement," In re Read-Rite Corp., 335 F.3d 843, 846 (9th Cir.

24   2003), "[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes

25   an earlier, cheerier statement a falsehood," id. (internal quotation and citation omitted).

26         Here, although Prescott's October 2007 statements may show defendants did not

27   accurately foresee the impact of the Patients First Program on Align's new cases,

28   defendants did not make "admissions" that were contradictory to or necessarily inconsistent

with any statements made in the January, April, and July 2007 press releases and/or

conference calls.[9]

### 5. Stock Sales

Lastly, plaintiff relies on the FAC's allegations regarding stock sales by Prescott and

other insiders during the Class Period.  (See FAC ¶¶ 108-110)  "[U]nusual or suspicious

stock sales by corporate insiders may constitute circumstantial evidence of scienter."

Silicon Graphics, 183 F.3d at 986 (internal quotation and citation omitted).  In evaluating

stock sales by corporate insiders, courts consider "(1) the amount and percentage of

shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were

consistent with the insider's prior trading history."  Id.

"When evaluating stock sales, . . . the proportion of shares actually sold by an

insider to the volume of shares he could have sold is probative of whether the sale was

unusual or suspicious."  Id.  The Ninth Circuit has held that typically "larger sales amounts"

than 37% of a defendant's holdings are necessary to support scienter.  Metzler Inv. GMBH

v. Corinthian Colleges, Inc., 540 F.3d 1049, 1067 (9th Cir. 2008) (finding allegation

defendant sold 37% of total stock holdings insufficient; noting "[w]e typically require larger

sales amounts–and corroborative sales by other defendants–to allow insider trading to

support scienter").  Further, as the Ninth Circuit has recognized, "[a]ctual stock shares plus

exercisable stock options represent the owner's trading potential more accurately than the

stock shares alone."  Silicon Graphics,183 F.3d at 986-87.[10]  Here, plaintiff alleges Prescott

sold only 29% of his aggregate holdings, comprising stock shares and stock options.  (See

___

[9]  The only statement to which the October 2007 "admission" appears relevant is Prescott's response, to an analyst during the April 27, 2007 conference call, that Align's sales teams "[had] a specific game plan about how they [were] going to go about covering their territory and taking care of their existing accounts and building new practices."  (See FAC ¶ 69).  Prescott did not say, however, that the sales team was not also focusing on "managing backlog" (see FAC ¶ 116), nor does the October 2007 press release state Align's sales team had no such plan.

[10]  Plaintiff opposes any consideration of Prescott's stock options, but cites no authority contrary to Silicon Graphics, nor facts distinguishing the instant options from those considered therein.

1   FAC Ex. B.)

2        Plaintiff alleges that, in addition to Prescott's stock sales, the sales of other "Align

3   insiders" were suspicious in timing and amount.  (See FAC ¶ 110.)  Sales by insiders not

4   named as defendants, however, are irrelevant to the determination of the named

5   defendant's scienter.  See In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d

6   1059, 1081 n.22 (N.D. Cal. 2001) ("[T]he Court finds no reason to consider the

7   [non-defendants'] sales in determining the scienter of the named defendants."); Plevy v.

8   Haggerty, 38 F. Supp. 2d 816, 834 (C.D. Cal. 1998) (noting PSLRA requires court to

9   consider "each defendant's sales separately").  Consequently, plaintiff's reliance thereon is

10  unavailing.

11              **6.      Plaintiff's Scienter Allegations as a Whole**

12       In assessing a pleading, the Court must "consider the complaint in its entirety" to

13  determine whether "all of the facts alleged, taken collectively, give rise to a strong inference

14  of scienter."  Tellabs, 551 U.S. at 310.  "Vague or ambiguous allegations are . . . properly

15  considered as part of a holistic review when considering whether the complaint raises a

16  strong inference of scienter."  South Ferry, 542 F.3d at 784.  "When conducting this holistic

17  review, however, [the court] must also 'take into account plausible opposing inferences' that

18  could weigh against a finding of scienter."  Zucco Partners, 552 F.3d at 1006 (quoting

19  Tellabs, 551 U.S. at 323).

20       Here, plaintiff's allegations, whether viewed separately or holistically, are insufficient

21  to raise an inference of scienter that is as "cogent and at least as compelling as any

22  opposing inference of nonfraudulent intent."  See Tellabs, 551 U.S. at 314.  In particular,

23  the FAC fails to raise an inference that is as compelling as the opposing inference that

24  Align, without any intent to defraud, simply failed to accurately predict the magnitude of the

25  effect of the Patients First Program on Align's ability to produce new revenue cases,

26  resulting in a modest, approximately 2%, reduction in Align's anticipated case shipments for

27

28

1  2007.[11]

2          In sum, the FAC fails to sufficiently allege scienter under the PSLRA.

3  **II.     Insider Trading**

4          The FAC alleges that Prescott engaged in insider trading, in violation of § 10(b) of

5  the Exchange Act.  (See FAC ¶¶ 133-134.)  Plaintiff's insider trading allegations are

6  duplicative of those described above, and, accordingly, likewise fail to state a claim.  See

7  U.S. v. Smith, 155 F.3d 1051, 1063 (9th Cir. 1998) (noting plaintiff, in alleging insider

8  trading, must allege "a (1) misleading (2) statement or omission (3) of a 'material' fact

9  (4) made with scienter").

10 **III.    Section 20(a)**

11         Plaintiff alleges, as against all defendants, a violation of § 20(a) of the Exchange Act.

12 (See FAC ¶ 135-36.)  Under § 20(a) of the Exchange Act, any person who controls a

13 person liable for violating § 10(b) is jointly and severally liable for the violation.  See 15

14 U.S.C. § 78t(a).  "To establish 'controlling person' liability, the plaintiff must show that a

15 primary violation was committed and that the defendant 'directly or indirectly' controlled the

16 violator."  Paracor Finance, Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir.

17 1996).  Here, plaintiff's failure to state a primary violation under § 10(b) precludes plaintiff

18 from stating a claim under § 20(a).

19                                  **CONCLUSION**

20         For the reasons set forth above, defendants' motion to dismiss the FAC is hereby

21 GRANTED, and the FAC is hereby DISMISSED with leave to amend.  The Second

22 Amended Complaint, if any, shall be filed no later than July 22, 2011.

23         **IT IS SO ORDERED.**

24 Dated:  June 8, 2011

                                         _Maxine M. Chesney_
25                                       MAXINE M. CHESNEY
                                         United States District Judge

26

27  ───────────────────

28         [11]  In July 2007, Align, as discussed above, predicated shipments of 206,000 to
    209,000 cases and, in October 2007, announced a lowered expectation of 202,000 to
    204,000 cases.