ROBBINS GELLER RUDMAN
& DOWD LLP
WILLOW E. RADCLIFFE (200087)
SARAH R. HOLLOWAY (254134)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
willowr@rgrdlaw.com
sholloway@rgrdlaw.com

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHARLES WOZNIAK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALIGN TECHNOLOGY, INC., et al.,<br><br>Defendants. | No. 3:09-cv-03671-MMC<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u> |

## NATURE OF THE ACTION

1. Lead plaintiff Plumbers and Pipefitters National Pension Fund brings this securities class action on behalf of itself and purchasers of the common stock of Align Technology, Inc. ("Align" or the "Company") between January 30, 2007 and October 24, 2007, inclusive (the "Class Period"), under the Securities Exchange Act of 1934 (the "Exchange Act"), against Align and its Chief Executive Officer ("CEO") Thomas M. Prescott ("Prescott"). Lead plaintiff alleges that defendants Prescott and Align violated the securities laws by disseminating materially false and misleading statements and concealing material adverse facts regarding Align's growth prospects, business and ClinAdvisor product.

2. Align designs, manufactures and markets Invisalign, a proprietary method for treating malocclusion, or the misalignment of teeth, using a series of clear, removable appliances that gently and incrementally move teeth to a desired final position. Align was founded in 1997. The Company went public four years later in January 2001 at an offering price of $13 per share. In 2006, after losing approximately 20% of its market share in a year to its main competitor, OrthoClear, Inc. ("OrthoClear"), Align paid OrthoClear $20 million to shut its doors. Align also agreed to continue treatment for all OrthoClear patients ***for free*** under a program dubbed the "Patients First Program."

3. After reporting a net loss and negative earnings per share ("EPS") in every quarter of 2006 and hitting stock price lows of $5.62 (down 56.8% from Align's offering price) in August 2006, defendants were under pressure to deliver a road map that would pave the way to growth. Having eliminated its competition, Align could no longer blame its lack of growth and market share on OrthoClear. Defendant Prescott, Align's CEO and executive in charge of Align's overall performance, told investors that he had such a road map – a five to seven year plan that would transform Align from a company generating $206.4 million in revenue in 2006 to one that, according to the Company's 2006 Annual Report, would generate "$1 billion in annual revenue" and operating margins of 20%. The "key elements of [this] roadmap" included "increased adoption and frequency of use by [Align] customers [*i.e.*, utilization]." Utilization is the average number of cases submitted per doctor and was the main performance metric used at Align.

4.      In order to increase utilization and, in turn, sales, in October 2006, Align announced the launch of "ClinAdvisor," "a new suite of software tools designed to make Invisalign case selection, submission and review processes more efficient for doctors." According to an October 17, 2006 press release, "ClinAdvisor [wa]s being launched in North America through a phased rollout program with full commercial availability planned for Q1 of [2007]." Internally, Align was pushing for commercial deployment in January 2007. According to a former Manager of Clinical Training at Align ("CW9"), Align originally projected sales for ClinAdvisor in the tens of millions of dollars. ClinAdvisor was intended for use by general practitioner dentists ("GPs"), which, according to Align's 2006 Annual Report, represented a virtually untapped "sweet spot" of 77 million potential Invisalign adult patients.

5.      Historically, GPs were uncomfortable using Invisalign because they were not trained in orthodontia. According to Align's October 17, 2006 press release, ClinAdvisor would help these doctors identify the skills necessary for a specific case and would benefit both doctors and patients by providing a chair-side tool for prospective patients to view their treatment plan before committing to treatment. On an October 25, 2006 conference call with analysts, defendant Prescott described ClinAdvisor in three words: "***confidence, simplicity,*** and ***efficiency***." In other words, ClinAdvisor would provide GPs with the needed comfort to promote and prescribe Invisalign and would increase utilization, paving the way for annual sales of $1 billion.

6.      Analyst comments reflect that the market understood defendants' intended message. On October 19, 2006, Roth Capital Partners reported that ClinAdvisor would "provide an easier means of assessing cases for GPs" and, "[m]ore importantly . . . reflects a broader trend of innovation for the company," and upgraded Align's stock rating to "Buy." Indeed, despite defendants' simultaneous announcement of ***negative*** Q3 2006 results on October 25, 2006, numerous analysts ***upgraded*** Align's stock rating. Investors were focused on future growth.

7.      On the first day of the Class Period, January 30, 2007, defendant Prescott told analysts and investors that Align had launched ClinAdvisor in over 100 practices and was "***very pleased*** with the learning from [its] pilot launch." Further, he said that Align was "***getting really great feedback***" from doctors using ClinAdvisor, who were "***more comfortable using it and more***

***comfortable discussing it at chair side with patients***." Prescott also represented that Align's "hypothesis" that ClinAdvisor would help GPs with case selection and increase utilization was "***still right on track***." Align's stock price increased 21% that day, to close at $16.69.

8. Unbeknownst to investors, these statements were false. Defendants knew that ClinAdvisor's underlying "hypothesis" was based on a flawed concept. Three key witnesses – Align's Lead ClinAdvisor Engineer ("CW10"), Manager of Clinical Training ("CW9") and Senior Director of Software Development ("CW12") – all confirm that by January 2007, it was clear that ClinAdvisor would ***not*** be effective as intended and, even if fully developed, would ***not*** help GPs or increase sales and utilization rates as defendants promised. Moreover, contrary to defendants' statements that they were "***very pleased***" and "***getting really great feedback***," CW12 reported that feedback from early users in January 2007 was ***negative***. According to Align's Lead ClinAdvisor Engineer, however, defendants did not want to retract their public statements regarding ClinAdvisor's launch, particularly given Align's history of failing to deliver promised results. Thus, defendants continued to push for ClinAdvisor's launch, while at the same time working internally on a new, separate replacement product. Despite knowing that ClinAdvisor would be ineffective at driving sales and utilization rate as initially claimed, defendant Prescott authorized additional resources for its development and continued to falsely tout its success.

9. Defendants' scheme continued unabated. On April 26, 2007, defendant Prescott again told analysts and investors that, based on its progress, he was "***confident***" that ClinAdvisor's "***improved features in user experience***" would "***increase and sustain utilization over time***." Three months later, on July 25, 2007, defendant Prescott reported that ClinAdvisor "ha[d] now been launched nationally," and that "***[e]arly feedback*** tells us it ***really helps newly certified and less experienced doctors*** select appropriate cases based on their experience and skill set, ***which is exactly what we were hoping to achieve***." Moreover, Prescott stated that ClinAdvisor was "***increas[ing] . . . utilization growth***." According to Prescott, ClinAdvisor was a "***key element***" in Align's utilization growth strategy and, in turn, its sales growth.

10. These statements too were false. By April and July 2007, Prescott had known for months that this purported "key element" to growth was a failure and was ***not*** "increas[ing] . . .

utilization growth." According to CW12, feedback in January 2007 showed that ClinAdvisor ***was not effective*** at helping GPs with case selection. CW9 further reported that feedback on a limited ClinAdvisor release in April/May 2007 was also ***negative*** and indicated that ClinAdvisor would ***not*** positively contribute to Align's sales and revenues. Likewise, an internal marketing study in June/July 2007 confirmed that ClinAdvisor was ***not*** improving revenue or meeting projected sales. Thus, contrary to defendants' assurances, ClinAdvisor was ***not*** "increas[ing] . . . utilization growth" or doing "exactly what [defendants] were hoping to achieve."

11. At the same time, in addition to ClinAdvisor, defendants were also falsely reassuring the market that Align's agreement to provide thousands of OrthoClear patients with free cases was not interfering with the Company's focus on regaining growth. For example, on January 30, 2007, defendant Prescott told investors that the Company had "resolved [its] legal disputes with OrthoClear and ***refocused [its] efforts*** on product development, customer service and market expansion." On April 26, 2007, defendant Prescott further reassured investors that, despite the influx of thousands of Patients First cases, the ***sales representatives' focus*** on generating new revenue cases "***ha[d]n't changed***." Moreover, having reported a processing "bottleneck" in free Patients First cases in Q4 2006, defendants told investors on April 26, 2007 that the "***bottleneck no longer exists***" for new revenue cases.

12. Under the OrthoClear settlement and resulting Patients First Program, OrthoClear doctors had until December 15, 2006, to register their patients for Free Cases, and until March 30, 2007 to submit cases for those patients. As of December 21, 2006, OrthoClear doctors had registered 30,500 patients for the program and had submitted cases for 16,200 of those patients. Multiple witnesses confirm that Align was overwhelmed with thousands of free Patients First cases in the first two quarters of 2007, creating a significant backlog of both Patients First cases and new revenue cases. Defendant Prescott attended Executive Committee Meetings where PowerPoint slides presented this significant backlog. Prescott also received daily information via email regarding case shipments and delays. Accordingly, Prescott was aware that there was still a "bottleneck" in processing new revenue cases.

13. Defendant Prescott has also admitted that his Class Period statements regarding Align's sales representatives' focus on generating new case growth were false. On October 24, 2007, Prescott admitted that the sales representatives had "***moved their focus away from generating case growth***" in order to focus on "***managing backlog and turnaround and expediting of cases***" resulting from the Patients First Program. Further, defendant Prescott admitted that he had ***instructed*** the sales teams to focus on the backlog: "[E]ven in Q2 as [the sales teams] were finishing handling off the ends of the Patients First cases and clearing backlog, that was their activity. ***We told them that [i.e., "clearing backlog"] was the priority***, to manage this churn at the doctor and patient level."

14. Other witnesses corroborate the falsity of defendants' statements. According to multiple former Territory Account Managers (*i.e*., sales representatives), the Patients First Program required significant time and hand-holding of doctors on the part of Align's sales force. As a result, Align sales representatives spent as much as ***50%*** of their time on free Patients First cases and the resulting backlog (rather than generating new revenue cases) during the Class Period. Thus, the sales representatives were not "focused" on generating new revenue cases as Prescott had told investors during the Class Period.

15. Central to defendants' scheme was the appearance of growth in utilization and revenue cases. Thus, having falsely assured investors that Align's sales representatives were focused on generating revenue cases, that the backlog created by the Patients First Program was behind them, and that ClinAdvisor was driving utilization growth, on July 25, 2007, defendants increased Align's fiscal year ("FY") 2007 cases shipment guidance from 200,000 to 206,000 cases (given on April 26, 2007) to a range of ***206,000 to 209,000 cases***, an increase of 27.1% to 28.2% over 2006. On this news, Align's stock price increased another 7%, to $27.69. Analysts bought into defendants' growth story. The next day, JPMorgan reported that, despite the Company's "historical . . . inability to generate profitability," "***Align's business model [wa]s now finally poised to begin demonstrating operating leverage***."

16. Two days later on July 27, 2007, Prescott diverted from his Rule 10b5-1 trading plan and began selling 200,300 shares of his personally held Align stock, for proceeds of over $5.4

million. Defendant Prescott similarly sold 200,000 shares, for proceeds of over $4.6 million, just four days after issuing his April 26, 2007 false and misleading statements. All told, defendant Prescott sold ***400,300 shares*** (***76%*** of his holdings) for proceeds of ***over $10 million*** in the days immediately following his April and July 2007 misstatements. Notably, ***all*** of Align's executive officers but one sold significant amounts of their personally held Align stock during the Class Period.

17. After months of touting ClinAdvisor's success and future case shipment growth, defendants' scheme began to unravel. On October 24, 2007, defendants announced that Align had shipped only 52,000 cases in Q3 2007, below their prior guidance of 53,000 to 54,000 cases. Further, defendants announced that Align would not achieve its previously forecasted future sales projections for Q4 and FY 2007, and lowered their FY case shipment guidance from a range of 206,000 to 209,000 cases given on July 25, 2007 to a range of 202,000 to 204,000 cases. That same day, October 24, 2007, Align issued a press release disclosing that, contrary to Prescott's earlier assurance that ClinAdvisor was increasing utilization rates, utilization rates had ***decreased*** from 3.4 in Q2 to 3.2 in Q3, and from 2.7 to 2.6 for GPs specifically. In other words, Align's road map and growth story had been derailed. According to CW9, ClinAdvisor's inability to increase sales or utilization rates contributed to Align's missed Q3 case shipments and lowered Q4 and FY projections.

18. In addition, defendants admitted that the Company would "not have the pipeline of case receipts" to meet defendants' prior guidance because the sales teams "***weren't pushing as hard to get new case starts***." Contrary to their prior promise to investors that Align's sales teams' focus "ha[d]n't changed," defendants admitted that Align's sales teams had, in fact, "moved their focus ***away*** from generating case growth" during the Class Period in order to focus on "***managing backlog and turnaround and expediting of cases***." Further, while defendants' previously assured investors that there were "no issues" or "bottlenecks" for revenue cases, the opposite was true. Defendants admitted that "virtually ***all*** of [Align's] customers were impacted by ***slower cycle times*** and ***backlogs***." Align's CFO, Bullington, resigned that same day.

19. In response to defendants' October 24, 2007 disclosures, the price of Align common stock fell $9.63 per share, or approximately 34%, thereby damaging investors. The chart on the next page reveals the impact that defendants' misrepresentations and disclosures had on Align's stock price:

638754_1

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 3:09-cv-03671-MMC

- 7 -

Align Technology, Inc.
January 3, 2007 to December 31, 2007
Dollars Per Share
$30
$25
$20
$15
$10
01/03/2007
02/08/2007
03/16/2007
04/23/2007
05/29/2007
07/03/2007
08/08/2007
09/13/2007
10/18/2007
11/23/2007
12/31/2007
Class Period: 1/30/07 - 10/24/07
1/30/07: Defendants tell investors that they are "very pleased" with ClinAdvisor's pilot launch, are getting "really great feedback" from doctors and that defendants' "hypothesis" that ClinAdvisor would increase sales and utilization rates "is still right on track." Additionally, defendants tell investors that Align has "refocused [its] efforts" on generating new revenue case growth.
4/30/07 - 5/4/07: Align insiders sell 364,925 shares of Align stock for proceeds of over $8.4 million. Defendant Prescott alone sells 200,000 shares of Align stock for proceeds of over $4.6 million on 4/30/07
4/26/07: Defendants tell investors that they are "very pleased" with ClinAdvisor's progress and that they are "confident" that ClinAdvisor will "increase and sustain utilization over time." Defendants also assure investors that the sales teams' focus on new revenue cases "haven't changed," and that Align has "no issues" or "bottleneck" with new revenue case processing.
7/27/07 - 8/9/07: Align insiders sell 419,236 shares of Align stock for proceeds of nearly $11.4 million. Defendant Prescott alone sells 200,300 shares of Align stock for proceeds of over $5.4 million between 7/27/07 and 8/7/07.
7/25/07: Defendants tell investors that ClinAdvisor "has now been launched nationally" and "[e]arly feedback tells us" that the results are "exactly what we were hoping to achieve." Defendants also tout ClinAdvisor as "a key element of [Align's] customer utilization growth strategy" and tell investors that it is already "increas[ing] . . . utilization growth." In addition, defendants increase Align's Q3, Q4 and FY 2007 case shipment guidance.
10/24/07: Defendants admit that ClinAdvisor was not increasing sales or utilization rates, report lower than expected Q3 case shipments and decreasing utilization rates, and lower Align's Q4 and FY 2007 case shipment guidance. Defendants also admit that Align's sales teams had "moved their focus away from generating case growth" in order to focus on "managing backlog," and that "virtually all of [Align's] customers were impacted by slower cycle times and backlogs" due to the Patients First Program.



20. Defendants' announcement of lower than expected Q3 2007 case shipments, decreasing utilization rates and flat or decreasing case shipments for the remainder of 2007, after months of touting ClinAdvisor and Align's increasing growth rates, informed the market that defendants' promised growth strategy and growth drivers were false. According to Roth Capital Partners, case shipment volume was "a key metric in evaluating the company's performance." As one analyst commented on Align's October 24, 2007 conference call: "I think what may surprise people more than the third quarter [miss] was just that the fourth quarter looks like it's weaker than you thought it would be previously."

21. The next day, analyst Jim Cramer ("Cramer") reported that defendants' October 24, 2007 disclosures were "a ***big mea culpa***" that Align's "***growth story is in jeopardy***." As Cramer aptly observed: "There is something wrong with this stock, it raised guidance two consecutive quarters then dropped it the next and the CFO resigned to coincide with the revision[,] raising eyebrows." Similarly, on October 25, 2007, Barrington Research, which had upgraded Align's stock rating to "Outperform" a year earlier based on defendants' ClinAdvisor announcement, downgraded the Company's stock rating to "Underperform" based on Align's announcement of decreasing future growth.

22. Align's downward spiral continued throughout 2007 and into 2008. On January 29, 2008, defendants again reported a decrease in Q4 2007 utilization rates and case shipments, and issued Q1 2008 guidance of ***decreasing*** EPS. In other words, even after the Class Period, defendants expected future growth and earnings to continue to decline.

**JURISDICTION AND VENUE**

23. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5). Align's stock price fell another 15% in response to defendants' disclosure of further decreasing future growth.

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

25. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

26. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**THE PARTIES**

27. Lead plaintiff Plumbers and Pipefitters National Pension Fund, as set forth in the accompanying certification attached hereto and incorporated by reference herein, purchased the common stock of Align at artificially inflated prices during the Class Period and has been damaged thereby.

28. Defendant Align is incorporated in Delaware and maintains its headquarters at 2560 Orchard Parkway, San Jose, CA 95131. The Company designs, manufactures and markets the Invisalign system for treating malocclusion, or the misalignment of teeth. As of December 31, 2006, Align had 1,253 employees: 672 in manufacturing and operations, 309 in sales and marketing, 115 in research and development and 157 in general and administrative functions. The Company had 487 employees in the U.S., 620 employees in Costa Rica, 116 employees in Europe and 30 employees in other international regions. As a corporate entity, Align was bound by the actions and knowledge of its senior officers and employees during the Class Period, including Align executive officers Arjomand, Bullington, Ellis, Zoromksi and defendant Prescott as alleged herein.

29. Defendant Prescott is, and was at all relevant times, President and CEO of Align. Defendant Prescott has served as President and CEO of Align since March 2002.

30. During the Class Period, defendant Prescott, as a senior executive officer of Align, was privy to confidential and proprietary information concerning Align, its products and operations, finances, financial condition and present and future business prospects. Defendant Prescott also had access to material adverse non-public information concerning Align, as discussed in detail below. Because of his position with Align, defendant Prescott had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal

corporate documents, conversations and connections with other corporate officers and employees, attendance at executive, management and/or board of directors meetings and committees thereof and via reports and other information provided to him in connection therewith. Because of his possession of such information, defendant Prescott knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31. Defendants Prescott and Align are liable as direct participants in the wrongs complained of herein. In addition, defendant Prescott, by reason of his status as CEO, was a "controlling person" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his position of control, defendant Prescott was able to and did, directly or indirectly, control the conduct of Align's business, including Align's CFO, Bullington, and other Company officers.

32. Defendant Prescott, as CEO, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. According to Align's January 2007 Disclosure Policy, ***Align's press releases could only be approved by and issued under the supervision of Align's CEO, defendant Prescott***, the CFO, the General Counsel or the Investor Relations Officer. Defendant Prescott was provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Defendant Prescott also made statements alleged herein to be misleading during Align's conference calls, or was present when the statements were made, and had the ability and opportunity to prevent the statements from being made or cause them to be corrected. Thus, defendant Prescott had the opportunity to commit the fraudulent acts alleged herein.

33. As the CEO and a controlling person of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, defendant Prescott had a duty to promptly disseminate accurate and truthful information with respect to Align's financial condition and performance, growth, operations, financial statements, business, products,

markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Align's common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**CONFIDENTIAL WITNESSES**

34. The allegations herein are supported by first-hand accounts of confidential witnesses ("CWs"). These witnesses are comprised of former Align employees employed during the Class Period. The CWs provided facts from different departmental and geographic vantage points within the Company and are sufficiently reliable.

35. CW1 was a Territory Account Manager (*i.e.*, sales representative) for Align in Atlanta, Georgia from January 2003 to February 7, 2009. CW1's job entailed selling Align's Invisalign products to general practitioner dentists and orthodontists and helping doctors become certified to offer Invisalign products to their patients. CW1's job involved making cold calls as well as following up with doctors in his[1] territory who had called the Company's customer service department to inquire about the product. CW1 worked with both Invisalign doctors in his territory as well as former OrthoClear doctors who had patients registered in the Patients First Program. In addition, CW1 attended, via conference call, weekly meetings with his Regional Business Manager and other Territory Account Managers in the region and created and submitted weekly field reports to his Regional Business Manager. CW1 also was experienced with and used Align's salesforce.com software to track his daily sales metrics. Thus, CW1 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

36. CW2 was a Territory Account Manager for Align in Rancho Santa Margarita, California from June 2002 to December 31, 2008. CW2's job entailed selling Invisalign products to general practitioner dentists and orthodontists and helping doctors become certified to offer

---

[1] The use of the words "he," "his," and "him" in connection with CWs is not meant to be gender specific and shall also be meant to pertain to the female gender.

Invisalign products to their patients. CW2 worked with Align doctors as well as former OrthoClear doctors who had patients registered in the Patients First Program. In addition, CW2 attended weekly conference calls with his Regional Business Manager and other Territory Account Managers in his region. CW2 was also experienced with and used Align's salesforce.com software to track the sales in his region during the Class Period and received breakdowns of his sales performance daily via e-mail from Align's headquarters. Thus, CW2 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

37. CW3 was a Territory Account Manager for Align in Atlanta, Georgia from 2002 to January 2009. CW3's job entailed selling Invisalign products to general practitioner dentists and orthodontists and following up on leads in his territory. CW3 also worked with doctors to become certified as Align providers, which involved attendance at a half-day training seminar. In addition, CW3 helped provide the doctors' offices with training and educational materials, demonstrated the product and helped doctors navigate and operate the ClinCheck software system. CW3 worked with both Invisalign doctors and former OrthoClear doctors who had patients registered in the Patients First Program. In addition, CW3 was experienced with and used Align's salesforce.com software to track his daily sales metrics. CW3 also attended weekly meetings with his Regional Business Manager and other Territory Account Managers, and submitted his weekly sales information to his Regional Business Manager. Thus, CW3 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

38. CW4 was a Territory Account Manager at Align in the San Francisco Bay Area, California from October 2003 to April 2008. CW4's job entailed selling Invisalign products to general practitioner dentists and orthodontists and helping doctors become certified to sell Invisalign products. CW4 also had regular contact with existing Invisalign-certified doctors, which included providing educational and training materials and demonstrating the ClinCheck software. CW4 worked with both Invisalign doctors and former OrthoClear doctors who had patients registered in the Patients First Program. In addition, CW4 was experienced with and used Align's salesforce.com software to track his daily sales metrics and monitor missing record reports daily. CW4 also attended weekly meetings with his Regional Business Manager and other Territory Account

Managers in the region every Monday during the Class Period, as well as national sales meetings which took place in January. Thus, CW4 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

39. CW5 was a Regional Business Manager at Align in Bothell, Washington from 1999 to October 2007. Pursuant to this position, CW5 oversaw a staff of 12 Territory Account Managers and one Staff Trainer. CW5 spent most of his time traveling throughout the region and making sales calls with his Territory Account Managers. The Territory Account Managers in CW5's region worked with both Invisalign doctors and former OrthoClear doctors who had patients registered in the Patients First Program. CW5 was also responsible for assigning sales quotas to his Territory Account Managers. In addition, CW5 attended monthly and quarterly meetings attended by all of the other Regional Business Managers and the Sales Directors from various parts of the country during the Class Period. CW5 also attended weekly conference calls with the other Regional Business Managers and conducted weekly meetings on Mondays with the Territory Account Managers in his territory. CW5 kept track of daily sales metrics (including new cases generated and cases shipped as well as the dollar amount) for each Territory Account Manager in his region using Align's salesforce.com software. Thus, CW5 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

40. CW6 was a Cost Accounting Manager at Align in Santa Clara, California from May 2005 to May 2009. CW6 worked within Align's finance department and was responsible for the cost accounting for manufacturing operations, including employee costs and overhead, in Costa Rica, Juarez, Mexico and to a lesser extent, Santa Clara, California. CW6's job also included financial planning and analysis for manufacturing, in terms of ensuring that manufacturing was prepared for the Invisalign cases generated by the sales organization. CW6 attended monthly financial reviews and monthly manufacturing meetings. CW6 was also aware of and familiar with Align's monthly Executive Management Committee meetings, of which Prescott was a member. In addition, CW6 was experienced with and used Align's MES software to track the number of cases shipped daily, and received an e-mail, along with others on the distribution list, including defendant Prescott, with the sales and shipment metrics on a daily basis. CW6 also received monthly sales projections,

including the forecasts for case shipments, via e-mail in an Excel spreadsheet. Thus, CW6 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

41. CW7 was a US Controller at Align in Santa Clara, California from October 2006 to July 2008. As a Controller, CW7 oversaw the accounts payable, accounts receivable, payroll, revenue and general ledger departments. CW7 had 16 individuals reporting to him, who prepared and consolidated the financials worldwide on a quarterly basis, including income statements and balance sheets. CW7 attended monthly meetings during the Class Period to review Align's monthly financials, along with Align CFO Bullington and several other Align executives. CW7 believed that CFO Bullington informed defendant Prescott about the content of these meetings. Thus, CW7 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

42. CW8 was a Senior Manager of Business Intelligence at Align in Santa Clara, California from August 2006 to January 2009. Align's Business Intelligence group was part of its information technology department. CW8 was responsible for maintaining Align's internal reports and reporting systems as well as creating additional reports upon request. CW8 explained that the Company's Senior Manager of Sales Operations provided him with parameters for the reports, such as specific revenue breakdowns by sales person or by region, and that most of the reports he created were made available to the approximately 100-person core sales team at Align. The reports CW8 created were maintained in Microsoft SharePoint and were made available to the sales department through an intranet. CW8 indicated that VP of Sales Dan Ellis ("Ellis"), who reported directly to defendant Prescott, had access to all of the data in these reports. In addition to the sales reports, CW8 also received special requests or requests for customized reports every quarter at Align, especially within the last two weeks of a quarter. CW8 stated that these reports usually focused on sales or marketing data. Once the sales or marketing individuals analyzed these reports, CW8 believed the data was presented to Align's executives, including defendant Prescott. According to CW8, based on the reports that existed during the Class Period, Align executives, including defendant Prescott, would have been aware of Align's revenues, new case starts and case shipments on a regular basis throughout the Class Period. Thus, CW8 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

43.     CW9 was a Manager of Clinical Training at Align from 2005 until mid-August 2007 and had regular contact with Align executives.  CW9 had personal knowledge of Align's backlog of new revenue cases based on his regular participation in quarterly marketing meetings and discussions with numerous personnel throughout the Company.  According to CW9, PowerPoint slides containing the key metrics for manufacturing, order backlog and order fulfillment for both free Patients First cases and new revenue cases were presented to him at the quarterly marketing meetings held immediately after the end of each quarter.  These slides indicated that Align was overwhelmed with fulfilling free Patients First cases during the first half of 2007.  The backlog arising from the Patients First Program was discussed at the marketing meetings.  CW9 reported that this same data was presented by VP of Marketing Darrell Zoromski ("Zoromski") to Align's Executive Management Committee, including defendant Prescott, shortly after the marketing meetings.  The title slides of the PowerPoint slides indicated that they were intended for the Executive Management Committee.  According to CW9, subsequent public statements by Align's senior executives regarding the health of Align's numbers were not consistent with the PowerPoint presentations.

44.     CW9 also had first hand knowledge of problems at Align's Costa Rica ClinCheck facility.  CW9 was responsible for developing a support system for clinical work and clinical training development in Costa Rica.  CW9 had frequent phone conversations about the Costa Rica operations with senior personnel at the Costa Rica facility and traveled to the facility once.  Based on these regular interactions, CW9 learned that the Costa Rica facility was operating at maximum capacity, involved extremely tedious work and had a very high attrition rate.

45.     CW9 also knew about ClinAdvisor's delayed launch and early failure because it was integral to his job.  CW9 was a key player in building ClinAdvisor.  He was responsible for developing the training materials for doctors on ClinAdvisor's use and was regularly informed of its status.  CW9 was also personally involved in delaying ClinAdvisor's planned January 2007 commercial launch, along with VP of Sales Ellis, VP of Clinical Research and Technology Dr. Erik Kuo ("Kuo") and VP of Marketing Zoromski, and personally informed defendant Prescott that it could not be launched until June 2007.  In addition, CW9 knew that ClinAdvisor was a major factor

in Align's projections for new case growth based on internal PowerPoint slides. CW9 personally saw a proposal for ClinAdvisor that originally projected sales for ClinAdvisor in the tens of millions of dollars.

46. Further, CW9 had direct contact with Align's executives, including Prescott, Zoromski, Ellis, Kuo and Align's Director of Marketing. Align's Director of Marketing shared ClinAdvisor's projected and actual sales numbers with CW9 every quarter and informed CW9 that ClinAdvisor was not working and not meeting its projected sales. Similarly, in early July 2007, Zoromski (an executive officer at Align) personally told CW9 that clinical education, specifically ClinAdvisor, was not having a positive impact on Align's revenues. Further, Align's VP of Clinical Research and Technology Kuo told CW9 in August 2007 that Align's prospects were not looking very good. Thus, CW9 was in a position to have knowledge of the facts attributed to him throughout this Complaint.

47. CW10 was a Director of Engineering at Align from February 2004 until the end of 2008 and was the Lead Engineer for ClinAdvisor. During 2007, CW10 reported to Align's VP of Research and Development, Hossein Arjomand ("Arjomand"), who in turn reported to defendant Prescott. CW10 was responsible for software engineering for case treatment and new products, including ClinAdvisor and ClinAssist.

48. In January 2007, Product Manager Ren Menon ("Menon") asked CW10 to be involved in the development of ClinAssist, a new product. Menon informed CW10 that Align had held a meeting in Costa Rica in December 2006 to work on the specifications for ClinAssist. CW10 stated that ClinAssist was being developed as a replacement for ClinAdvisor. CW10 explained that ClinAdvisor was based on a flawed concept and, although it was ultimately released, Align knew that the product was ineffective and made no plans to improve or enhance it. CW10 confirmed that Prescott was aware that ClinAdvisor was ineffective both during its beta testing and after its commercial launch because there were no efforts to increase its functionality, continue development or release a version 2.0. CW10 was in a position to know the facts attributed to him throughout this Complaint.

49. CW11 was a Senior Business Intelligence Analyst at Align from 2005 until August 2010. CW11 was part of Align's manufacturing organization and reported to the Director of Production Systems Lance Aldrich, who reported to VP of Operations Emory Wright and, in turn, defendant Prescott. CW11 was responsible for preparing and configuring "key indicator reports," also known as daily "run-rate reports," regarding manufacturing and order fulfillment during the quarter and at the end of the quarter. These reports showed, on a daily basis: (i) the manufacturing targets for the quarter; (ii) how many orders had been submitted to and received by the Order Entry department; (iii) how many orders were going throughout the ClinCheck process; (iv) how many orders were being manufactured; and (v) how many orders had been shipped. Each day of the quarter was assigned a separate line on the report so that by the end of the quarter there were approximately 90 lines. As such, each daily line provided an update regarding the previous day's numbers, including how close (or far) the Company was from achieving its manufacturing goals for the period. The reports also distinguished Patients First orders in separate columns from new revenue orders, so that it was very easy to tell how each was doing separately. The reports were automatically generated every day at 1:00 am and distributed at 5:00 am electronically to the email in-boxes and/or blackberries of designated subscribers, in pdf format. CW11 confirmed that defendant Prescott was a designated subscriber and received and reviewed these reports daily. Thus, CW11 was in a position to know the facts attributed to him throughout this Complaint.

50. CW12 was a Senior Director of Software Development at Align from September 2006 to July 2008. During the Class Period, CW12 reported to VP of Research and Development Arjomand, who in turn reported to defendant Prescott. In this position, CW12 oversaw Align's software development, including ClinAdvisor and ClinAssist. CW12 explained that the concept of ClinAdvisor was developed largely by Align's marketing group. ClinAdvisor was designed to help GPs determine whether a potential case was easy, medium or difficult in order to determine whether the GP should accept the case. CW12 confirmed that the internal name for ClinAdvisor was "Vail," based on its three-tiered difficulty rating system similar to those found at ski resorts (*i.e.*, black diamond for difficult, blue square for intermediate, green circle for beginners). CW12 stated that Align initially expected ClinAdvisor to increase sales and revenues in the form of new case

shipments, but did not charge early users. CW12 attended an annual strategic planning session at which General Manager of Product Innovation for ClinAdvisor Rick Matty ("Matty") and Product Manager Menon discussed information about specific case shipments and revenues tied to ClinAdvisor. According to CW12, utilization rates were the main metric used at Align to access its performance.

51. According to CW12, Align had two main practicing orthodontists that provided the Company with feedback, including Kuo (Align's VP of Clinical Research and Technology). Once a new product was developed, the prototype was made available to Align's Customer Advisory Board. Early adopters or beta testers were from the Customer Advisory Board and received compensation for their participation.

52. CW12 stated that ClinAdvisor was made available on Align's infrastructure in September 2006. In January 2007, CW12 began to hear internal rumors that feedback from doctors indicated that ClinAdvisor was not helping with case selection. In January 2007, CW12 learned more officially that the feedback from beta users was poor and that ClinAdvisor was not effective in helping doctors choose even easy or medium-level cases.

53. In January 2007, CW12 attended a meeting to discuss early feedback on ClinAdvisor, along with Product Manager Menon, General Manager of Product Innovation for ClinAdvisor Matty, Director of Product Management Maia Singer ("Singer"), Arjomand and Zoromski. Arjomand and Zoromski were executive officers at Align and reported directly to defendant Prescott. In the meeting, marketing personnel, including Menon, explained that early feedback was negative and that dentists did not find ClinAdvisor to be helpful. CW12 personally saw a PowerPoint presentation that listed at least 10 to 12 things wrong with "Vail" (*i.e.*, ClinAdvisor). Thus, CW12 was in a position to know the facts attributed to him throughout this Complaint.

## DEFENDANTS' FRAUDULENT SCHEME

54. Defendants Prescott and Align are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Align's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Align's business, growth and management

and the intrinsic value of Align's stock; (ii) enabled defendant Prescott and other Align officers and directors to collectively sell 948,157 shares of their personally held Align common stock for gross proceeds in excess of $22.8 million; and (iii) caused lead plaintiff and members of the class to purchase Align common stock at artificially inflated prices and be damaged thereby.

**BACKGROUND TO THE CLASS PERIOD**

55. Align designs, manufactures and markets the Invisalign system, a proprietary method for treating malocclusion, or the misalignment of teeth. According to Align's 2006 Form 10-K, the Invisalign process involves several steps. First, the doctor takes impressions and X-rays of the patient's teeth. Then, the doctor digitally sends the impressions, X-rays and a treatment form outlining the desired results to Align's simulation modeling center. Using its ClinCheck modeling process, Align uses the impressions, X-rays and treatment form to create a simulated model for the aligners. ClinCheck is an internally developed computer modeling program that allows dental professionals to diagnose and plan treatments for their patients. During the Class Period, Align's ClinCheck operations were located at its Costa Rica facility.

56. Once complete, Align digitally sends the ClinCheck simulation to the doctor for approval. The doctor may immediately approve the projected treatment, or may provide Align with feedback for modifications. Align then reflects any requested adjustments in a modified simulation. Upon approval of the ClinCheck simulation, Align uses the data underlying the simulation to manufacture the aligner molds. During the Class Period, Align used a third party contractor in Juarez, Mexico to manufacture the molds and aligners. According to percipient witnesses, the standard delivery time (from the time ClinCheck is approved to the time the doctor receives the aligners) before the Patients First Program was implemented was typically two weeks, putting the total cycle time at approximately 30 days.

**ClinAdvisor's October 2006 "Launch"**

57. In 2006, the year before the Class Period, Align was struggling to achieve a profit. The Company reported a net loss and negative earnings per share for ***every quarter*** during 2006 as follows:

| | Q1 2006 | Q2 2006 | Q3 2006 | Q4 2006 | FY 2006 |
|---|---|---|---|---|---|
| Revenue | $48,900,000 | $53,200,000 | $49,000,000 | $55,200,000 | $206,400,000 |
| Net Loss | ($4,800,000) | ($2,600,000) | ($10,300,000) | ($17,300,000) | ($35,000,000) |
| EPS | ($0.08) | ($0.04) | ($0.16) | ($0.27) | ($0.55) |

58.    In Q2 2006, Align reported its third consecutive quarter of negative cash flow from operations, reaching a three-year low.  By Q3 2006,  Align was experiencing decreasing revenues (both year-over-year and sequentially).   The market reacted negatively to Align's decreasing revenues and profitability, pushing its stock price to a low of $5.62 on August 24, 2006.

59.    By 2006, the orthodontic market that had climbed in prior years had leveled off. Moreover, most Invisalign certified GPs, Align's new self-proclaimed "sweet spot" of 77 million adult patients who regularly visited their dentists, were completing few cases.  Thus, to drive sales growth, Align began focusing intensely on increasing utilization rates among GPs.  On a December 1, 2006 conference call, defendant Prescott told analysts that "the way we will measure our success over the longer term is not just in revenue and volume growth, but it is at that ***fundamental utilization*** that we measure in number of cases per week for submitting doctors.  We actually report that on a quarterly basis at a utilization rate for our GP's and orthos."  The Company's 2006 Form 10-K, similarly reported that Align "focus[ed] on increasing utilization rates" among doctors to generate new case growth.  According to CW12, utilization rates were the main metric used at Align to assess its performance.

60.    Because GPs were not trained in orthodontia, Align sought to develop a product that would help GPs through the case selection and submission process and, in turn, increase GP sales and utilization rates. That product was ClinAdvisor, known internally at Align as "Vail."  Align officially announced ClinAdvisor's launch on October 16, 2006.  As part of the "launch," defendants demonstrated ClinAdvisor at an American Dental Association ("ADA") conference in Las Vegas on October 16-19, 2006.  Align issued a press release on October 17, 2006 announcing the launch to investors.  According to the October 17, 2006 press release, ClinAdvisor was "a new suite of software tools designed to make Invisalign case selection, submission and review processes more efficient for doctors."  ClinAdvisor was to simplify case selection by "helping doctors identify the

skills necessary for a specific case." According to Align, the software contained a complexity rating system that categorized treatment plans as "Easy," "Moderate" or "Advanced," and listed expected treatment characteristics and potentially challenging movements for each option. In addition, Align said that patients would "benefit from the case knowledge inherent in the new software," which provided doctors with a "chair-side tool to help illustrate potential treatment progression to prospective patients" and "allow[ed] prospective patients to see how their treatment is likely to progress before committing to treatment and taking dental records."

61. On an October 25, 2006 earnings conference call with analysts, defendant Prescott further described ClinAdvisor and its significance to investors:

> I can summarize ClinAdvisor's impact on our doctors with three words; ***confidence, simplicity,*** and ***efficiency***. Using the experienced understanding gained from over 490,000 cases and thousands of Invisalign doctors, Align has addressed several key issues or questions. . . . Now with ClinAdvisor doctors can confidently select the right cases appropriate for their skills and experience. With ClinAdvisor's goal-based treatment approach, selection, set-up and monitoring for successful outcomes has dramatically improved and will greatly simplify the doctor's experience for the entire process.

62. In addition, defendant Prescott told analysts that, "[b]ased on the feedback from ADA last week, doctors really get it and they seem to be very excited about this simple approach, which is going to make them more confident about utilizing Invisalign in their practice and gain efficiency as a result." According to the October 17, 2006 press release, "ClinAdvisor [wa]s being launched in North America through a phased rollout program with ***full commercial availability*** planned for ***Q1 of next year [Q1 2007]***."

63. As intended, analysts responded favorably to defendants' announcement of a new product to help GPs. For example, on October 19, 2006, Roth Capital Partners reported: "At the [ADA] meeting, Align launched its ClinAdvisor software, which we believe will provide an easier means of assessing cases for GPs. More importantly, the ClinAdvisor launch reflects a ***broader trend of innovation for the company***, which we anticipate will continue to provide incremental products that target both the GP and the orthodontist . . . ." and upgraded Align's stock rating to "Buy." Similarly, on October 27, 2006, Barrington Research reported that it believed ClinAdvisor would "drive penetration in the general practitioner segment," and gave Align's stock an

"Outperform" rating, even though the Company had reported ***negative*** Q3 2006 earnings (below expectations) just two days earlier.

**The OrthoClear Settlement**

64. On October 16, 2006, the same day they announced ClinAdvisor's purported launch, defendants also announced that Align had entered into a binding agreement with the Company's main competitor, OrthoClear. In 2004, former Align co-founder and CEO Zia Chishti ("Chishti"), who departed from the Company in 2002, started OrthoClear to compete with Align. Like Align, OrthoClear designed, manufactured and marketed clear, removable aligners, very similar to Invisalign, to treat malocclusion. In addition to producing a competing product at a lower price, OrthoClear also recruited several of Align's sales representatives to work for it.

65. In February 2005, Align filed a state action against OrthoClear, Chishti and certain OrthoClear executives for unlawful use of Align's intellectual property, among other claims. In response, OrthoClear filed a multi-claim cross-complaint against Align, defendant Prescott and other Align executives alleging, *inter alia*, breach of contract, libel, slander and unfair competition. Align then filed two federal actions against OrthoClear in July 2005 and July 2006 for violations of the Federal Lanham Act including unfair competition, trademark infringement and false advertising. Finally, in January 2006, Align filed a federal patent infringement action against OrthoClear and filed a formal complaint with the United States International Trade Commission against OrthoClear seeking to halt the importation into the United States of infringing aligners manufactured by OrthoClear in Pakistan in violation of Align's patents and other intellectual property rights.

66. On September 28, 2006, Align announced that it had signed a Binding Settlement Term Sheet with OrthoClear to end all pending litigation between the parties. The parties signed a formal settlement agreement on October 13, 2006. Under the terms of the agreement, OrthoClear was to immediately discontinue all design, manufacture, marketing and sales of removable dental aligners worldwide, to stop accepting new patient cases for treatment, and to transfer and assign to Align all intellectual property rights with application to the treatment of malocclusion in exchange for payment by Align to OrthoClear of $20 million. In addition, Align agreed to make Invisalign treatment available to all OrthoClear patients existing as of September 27, 2006 at ***no additional***

***charge*** to the patient, the doctor or OrthoClear under its Patients First Program. Doctors who wished to take advantage of the program were required to become certified by Align (if they were not already), register their OrthoClear patients with Align by December 15, 2006 and submit cases for their OrthoClear patients by March 30, 2007. As of December 21, 2006, doctors had registered 30,500 OrthoClear patients for the Patients First Program and had submitted cases for 16,200 of those registered patients.

67. At Align, the processing and manufacturing of free Patients First cases were identical to that of new Invisalign cases. In other words, the Patients First case submission process required doctors to provide Align with the same information that doctors provide for new Invisalign cases (*i.e.*, full X-rays, impressions and treatment forms), and the aligners for Patients First cases were processed and manufactured in the same facilities and manner as new Invisalign cases. Align, however, did not have the manufacturing or processing capacity to handle the additional Patients First cases in addition to its own revenue cases.

68. Despite Align's reported attempts to increase its capacity, analysts were concerned about the impact of the Patients First Program on Align. For example, on December 21, 2006, Roth Capital Partners reported that its "primary concern" was "Align's ability to provide enough manufacturing capacity to supply the increased level of demand." Jefferies & Company, Inc. similarly reported on December 21, 2006 that: "[it] remain[ed] concerned about the ongoing transition and disruption in converting doctors to Invisalign (many we have spoken to are aggravated by the transition process)."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### Defendants' January 30, 2007 False and Misleading Statements

69. On January 30, 2007, the first day of the Class Period, Align held an earnings conference call with analysts and investors to discuss the Company's Q4 and FY 2006 results. Despite having previously told investors in October 2006 that ClinAdvisor would be fully deployed and commercially available by Q1 2007, Align had internally postponed ClinAdvisor's January 2007 commercial deployment until July 2007. Nonetheless, during the conference call, defendant Prescott

continued to mislead investors that ClinAdvisor was progressing and functioning as planned, and that defendants were "***very pleased***" with its pilot launch:[2]

> Our goals in 2007 are straightforward – first, we're going to generate meaningful top line growth and continue the path to profitability using that momentum to regain the kind of growth we believe is possible – around 40% per year.
>
> Second, we're going to develop and deploy a new Ortho-specific product platform while ***extending the GP-focused ClinAdvisor product features and functionality***.
>
> * * *
>
> On the R&D and new product development front, I previously mentioned ClinAdvisor, our first step towards creating a GP specific Invisalign product. ***We are very pleased with the learning from our pilot launch*** to around 25 practices and have now expanded the pilot to over 100 offices. ***The goal here is that you play a turnkey system for the GP, making it easier to select simple cases, simplify the diagnostic and setup process, and ensure great results – all with less time and effort***.

70. According to CW9, ClinAdvisor was the only meaningful new product planned for release in 2007 and was critical to Align's future. Given its importance, analysts questioned defendants on its progress and results. In response, defendant Prescott continued to hype ClinAdvisor and told analysts that defendants were getting "***really great feedback***" from dentists and that ClinAdvisor's "hypothesis" for ***helping GPs with case selection and increasing utilization*** was "***still right on track***."

> [ANALYST]: . . . One question – early results from ClinAdvisor – are you seeing greater utilization in those practices ***that have it up and running***?
>
> TOM PRESCOTT: So, we started in 25 and we had a hypothesis that the principal usage mode would be to use this to submit all of their cases. And one of the things we found was, they in fact wanted to even simplify it more than that and what they wanted was, many of these practices wanted, was a way to just push a button and say, here's the case, keep it green, using the green/blue/black kind of ski model. So as we went through a fast evolution with that input and we then released it to around 100 sites now, ***we are finding that doctors are using it for real-time as we had originally thought, for real-time discussions with patients at chair side and to improve their submissions***. But a lot of them really simply want a way to say, here is a case, keep me green, and if it's [sic] is on the edge, show me what the trade-offs are.

---

[2] False and misleading statements in quotations are in bold and italics.

> So what our goal in having these limited releases and then staged rollouts is that where we extract learning from the earlier users, we can then implement that in the next release very quickly on a smaller base. ***So***, ***so far we're getting really great feedback*** and I think the jury is still out on this hundred, but ***the net is that they are more comfortable using it*** and more comfortable discussing it at chair side with patients, which has always been an issue for GPs.
>
> [ANALYST]: And so the ultimate hypothesis, which was that this would help get more GPs started more confidently, seems to be holding.
>
> TOM PRESCOTT: ***That is still right***, again. But with a hypothesis it's either right or wrong or partially one or the other. It is still in pilot. It is still rolling out. And we aren't ready to fully release it for a broader set of staged launches but ***the hypothesis to get at confidence and selection of the right case and simplification of the submission process, and then monitoring for results is still right on track.*** And again, as we go out through '07, ***we will buildout [sic] around that initial core of functionality and features***.

71. In addition, in a press release the same day, January 30, 2007, defendant Prescott told investors that, having resolved its legal disputes with OrthoClear, the Company had "***refocused [its] efforts***" on expanding its customer base and revenue case growth:

> 2006 was eventful and productive . . . . We resolved our legal disputes with OrthoClear and ***refocused our efforts on product development, customer service and market expansion***.

72. In response to defendants' January 30, 2007 statements, the Company's stock price rose $2.92 per share, or 21%, to close at $16.69 per share.

73. Analysts responded favorably to defendants' January 30, 2007 statements. For example, on January 31, 2007, Roth Capital Partners reported that, based on defendants' representations, "utilization rates [we]re expected to increase in the upcoming quarters." Similarly, on April 23, 2007, JPMorgan reported that, with regard to ClinAdvisor, "Align ha[d] responded to . . . key utilization barriers, including . . . evolving the product offering to be more GP-friendly [*i.e.*, ClinAdvisor]."

74. Defendants' January 30, 2007 statements about ClinAdvisor were knowingly materially false. Contrary to defendant Prescott's statements that ClinAdvisor was "***getting really great feedback***," that "***doctors [we]re using it . . . as we had originally thought***" and that ClinAdvisor's original "hypothesis" of increasing sales and utilization rates was "***still right on track***," according to multiple witnesses, defendants knew prior to the Class Period that ClinAdvisor would not be effective as represented. For example, CW10 explained that, by December 2006,

defendants knew that ClinAdvisor was based on a flawed concept and would ***not*** be effective at increasing sales volumes or utilization rates, even if ultimately developed. According to CW10, ClinAdvisor was supposed to assist GPs in determining whether or not a case was feasible for Invisalign use by providing comparable cases from Align's extensive database. This concept was flawed, however, because the GPs' lack of experience in orthodontia made it difficult for them to evaluate the complexity of a case, even with a comparable case model. In addition, according to CW12, dentists (and patients) did not like that, after taking a model of the patient's teeth, the patient had to come back two to three weeks later just to learn whether their case was easy, medium or difficult and whether the GP could assist them.

75. Moreover, according to CW9, ClinAdvisor's software was complicated and time-consuming to use and required Align's sales teams to spend a lot of time instructing GPs how to use it. In sum, contrary to Prescott's prior description of "confidence, simplicity, and efficiency," ClinAdvisor was ***not*** effective at assisting GPs with case selection and, instead, made the selection process more complicated and time-consuming.

76. Further, defendants knew that ClinAdvisor was not "***getting really great feedback***." In January 2007, Align held a meeting to discuss feedback from early ClinAdvisor beta users. Attendees included Align executive officers, VP of Research and Development Arjomand and VP of Marketing Zoromski, as well as Product Manager Menon, General Manager of Product Innovation for ClinAdvisor Matty, Director of Product Management Singer, and CW12. According to CW12, feedback at the meeting from ClinAdvisor beta users was poor. Marketing personnel, including Menon, explained that GPs did ***not*** find ClinAdvisor to be helpful or effective. According to a PowerPoint slide presentation, there were at least 10 to 12 things wrong with ClinAdvisor.

77. Aware of its flawed concept and ineffectiveness, Align made no plans to improve or enhance ClinAdvisor's initial specifications and, instead, began working on a separate, replacement product – "ClinAssist," also known internally as "Delta." According to CW10 and CW12, in December 2006, Align held a meeting in Costa Rica, led by Senior Director of Development CW12 and Director of Marketing Singer to develop ClinAssist's specifications. Rather than focusing on case selection assistance by providing case comparisons (ClinAdvisor's main function), ClinAssist

was to assist GPs with developing and working through case treatment plans. In January 2007, Product Manager Menon asked CW10 to help develop ClinAssist. CW10 reported that, according to Menon, ClinAssist was being discussed as a replacement for ClinAdvisor for at least three to four months prior to the December 2006 meeting, indicating Align's early lack of confidence in ClinAdvisor. Having already announced ClinAdvisor, however, defendants continued to push for its launch, while at the same time working internally on its replacement.

78. Further, by January 2007, ClinAdvisor's development was still well behind schedule. According to CW9, Align Marketing Manager Robert Arnone ("Arnone") tried to force a January 2007 deployment in order to satisfy defendants' October 2006 promise of ClinAdvisor's "full commercial availability" by Q1 2007. But the January 2007 launch was entirely unrealistic. In November 2006, CW9, VP of Sales Ellis, VP of Clinical Research and Technology Kuo and VP of Marketing Zoromski told Align executives that ClinAdvisor's planned January 2007 deployment was impossible. Consequently, Align canceled the January 2007 deployment (and fired Arnone). CW10 elaborated that ClinAdvisor's Q1 2007 launch was delayed because the software still had at least ten major bugs, including one that caused the manufactured aligners to physically break.

79. In mid-December 2006, CW9, Ellis, Kuo and Zoromski further informed defendant Prescott that ClinAdvisor could not be developed and deployed without a significant investment of time and money and, even then, could not be launched ***until June 2007***. Specifically, they advised Prescott that ClinAdvisor lacked defined project specifications and needed a dedicated team. Further, they told Prescott that hundreds of thousands, if not millions, of dollars were needed to develop the system. Accordingly, Align set a new launch date for July 2007. According to CW9, Prescott was informed through regular updates that ClinAdvisor was well behind schedule and personally authorized additional funds for its development.

80. In addition to his false statements about ClinAdvisor, defendant Prescott's unduly positive statement that Align was "***refocused*** . . . on product development, customer service and market expansion" was also misleading in light of the problems stemming from the Patients First Program. Contrary to Prescott's statement, Align's sales representatives were forced to focus on the backlog created by the Patients First cases instead of generating new case growth. In other words, as

defendant Prescott later admitted, the sales representatives had "***moved their focus away from generating case growth***" in order to focus on "***managing backlog and turnaround and expediting of cases***."

81. According to two former Territory Account Managers at Align, CW1 and CW2, Align was unprepared to handle the additional OrthoClear cases and underestimated the number of OrthoClear cases it would assume as part of the settlement. CW2 indicated that Align expected between 10,000 and 15,000 patients to enroll in the Patients First Program, but the number was substantially higher (Align reported that OrthoClear doctors initially registered over 30,000 patients and submitted over 16,000 cases by the start of the Class Period). As another former Territory Account Manager, CW3, put it, once the settlement was announced, everyone was in panic mode.

82. The Patients First Program required existing OrthoClear patients to go back to their doctors to get all new records (*i.e.*, impressions, X-rays and treatment plans) – no matter where they were in their course treatment – in order to receive the new Invisalign aligners. According to CW1 and CW3, both patients and doctors were upset about having to repeat this process. CW3 reported that this led to a lot of explaining and hand-holding with Patients First doctors on the part of Align's sales force. As a result, Align's sales representatives spent between ***20% to 50%*** of their time on Patients First cases during the Class Period. Another former Territory Account Manager, CW4, corroborated that the sales representatives were forced to spend significant time on Patients First cases, rather than new revenue cases, during the Class Period. Thus, Align's sales representatives were continuing to manage backlog and expediting of cases resulting from the OrthoClear settlement and were not "refocused" on generating new revenue cases.

**Defendants' April 26, 2007 False and Misleading Statements**

83. On April 26, 2007, defendants held a conference call with analysts to discuss Align's Q1 2007 results. On the call, defendant Prescott continued to tout ClinAdvisor and told investors that he was "***confident***" that its "***improved features in user experience***" would "***increase and sustain utilization over time***." With regard to its full commercial availability, Prescott said that ClinAdvisor would be "rolled out broadly . . . before the end of Q3":

> We previewed [ClinAdvisor], the first element of our new GP platform at the ADA Conference last October. Since then, ClinAdvisor has undergone a series of pilot tests and beta releases to refine the product. ***ClinAdvisor will help newly certified and less experienced doctors learn how to assess and select appropriate cases, given their current experience and skills. This should boost the early confidence and clinical success of new users.*** ClinAdvisor will be integrated into our certification level on training and rolled out broadly to our customer base before the end of Q3.
>
> * * *
>
> ***We are confident the improved features in user experience for Orthos and GPs will increase and sustain utilization over time***. . . .
>
> Let me reiterate that we are ***very pleased*** with our progress to date on ***key strategic initiatives*** [*i.e.*, ClinAdvisor], as well as our Q1 performance.

84. When asked about Align's new products, defendant Prescott further focused analysts on ClinAdvisor, stating that it was the "***first step for the GP towards being a trusted advisor***":

> On the GP side, we're a bit further along and ClinAdvisor is a first step that we're now getting ready to roll out very broadly. I think I said before the end of Q3 and it's – ***importantly, it's a very good front-end***, especially for our less experienced, newly trained doctors. And it's also going to migrate up into university education as a set of tools and it becomes an important part of streamlining our new certification one program, which will be compressed down by a day and involve a lot more pre-work and online and internet-based education before they come. ***But ClinAdvisor starts to help them select the right cases and support them as they get going. And so, ClinAdvisor is a first step for the GP towards being a trusted advisor, a clinical resource, and leading them more towards a turn-key solution***.

85. Analysts also questioned defendant Prescott about the Patients First Program and its affect on new revenue growth. Specifically, given the huge influx in Patients First cases, analysts questioned the focus of Align's sales teams. Defendant Prescott, however, falsely reassured the analysts that "***nothing really has changed***" with regard to the sales teams' focus on new revenue cases:

> [ANALYST]: Are your sales people making – or are they spending more of their time on your – with your current [contract] than getting new accounts?
>
> TOM PRESCOTT: ***No, it's a very consistent approach. We haven't changed. We've optimized coverage as we look at in 2007, but we're – they have a very specific game plan about how they are to go about covering their territory and taking care of their existing accounts and building new practices. So nothing really has changed there. It's just things are settling down. We're getting back to business and good execution is occurring.***

86. In addition, with regard to Align's ClinCheck processing capacity, an "Unidentified Company Representative" (either defendant Prescott or CFO Bullington) reassured investors that

there were "***no issues***" with Align's capacity to process new revenue cases and that the "***bottleneck no longer exists***":

> [W]e're pretty much finished with the expansion. By probably the middle – a little past the middle of Q1, we had gotten the head count we needed in place and they were all coming online. As we speak today, our head count has expanded. It's stable and they're cranking. So, we have – what I would say is Costa Rica – that expansion and that capacity expansion is permanent and it's in place and it's online. And so we have ***no issues there*** and ***that bottleneck no longer exists***, other than the fact we're still chipping away at the roughly 8,000 cases that remained of the [P]atients First cases, along with compression of the backlog – reducing that and getting our cycle times reduced. That's going to take us the better part of Q2.

87. In response to defendants' April 26, 2007 statements, the Company's stock price rose $5.91 per share, or 33%, to close at $23.60 per share.

88. Four days later, on April 30, 2007, while Align's stock price was artificially inflated due to defendants' false and misleading statements, defendant Prescott ***sold 200,000 shares*** of his personally held Align stock, for proceeds of ***over $4.6 million***. Defendant Prescott knew when he sold his Align shares that early feedback indicated that ClinAdvisor was a failure and would not increase sales or utilization. He also knew that the Company was continuing to experience a significant backlog in its processing as a result of the influx of Patients First cases, and that Align's sales representatives were focused on handling Patients First cases and the resulting backlog rather than generating new revenue case growth. Numerous other Align insiders sold as well. All told, Align insiders, including ***six top executive officers*** (Arjomand, VP, Research and Development; Bullington, CFO; Hedge, VP, Operations; Henry, VP, Information Technology and Chief Information Officer; Laks, VP, International; and defendant Prescott) and ***one director*** (Collins) sold ***364,925 shares*** of Align stock, for proceeds of ***over $8.4 million***, in the days immediately following defendants' April 26, 2007 false and misleading statements.

89. Defendant Prescott's positive April 26, 2007 statements about ClinAdvisor were materially false and concealed that the product was ineffective and flawed from the start. Contrary to Prescott's statements, ClinAdvisor was not "a very good front-end" product or progressing as represented. According to CW9, as of April 26, 2007, ClinAdvisor was still not fully developed and feedback from initial users was ***negative***. CW9 reported that, in April/May 2007, Align released a limited prototype of certain ClinAdvisor user tools. According to CW9, like its beta testing,

feedback on the limited release showed that ClinAdvisor was ineffective. One reason ClinAdvisor was so unsuccessful was because it was very complicated for doctors to use, and Align's sales force had to spend an inordinate amount of time instructing doctors on how to use it. The feedback Align received from its limited April/May launch indicated that ClinAdvisor would ***not*** positively contribute to sales and revenues, even if a final version was released. CW9 was aware of ClinAdvisor's prototype launch and failure from his discussions with Zoromski and Align's Director of Marketing, and from his own role in developing the product. CW9 was responsible for developing the training material for ClinAdvisor and was a key player in building it.

90. Defendants also knew that ClinAdvisor would not "***increase and sustain utilization over time***" as they had told investors. According to CW10, as set forth in ¶¶74-77, defendants knew by December 2006 that ClinAdvisor was based on a flawed concept and would ***not*** increase sales volumes or utilization rates. CW10 explained that, typically, when a company releases a new software product, such as ClinAdvisor, it makes plans to improve the software's functionality through product enhancements and works towards the release of a version 2.0. Align, however, made no such plans for ClinAdvisor. Instead, by December 2006, Align was already working on a separate replacement product. CW12 confirms, as set forth in ¶76, that defendants knew by January 2007 that early feedback on ClinAdvisor from beta users was ***negative***. According to CW10, defendants knew that ClinAdvisor was flawed and ineffective, but released it anyway to satisfy their public statements.

91. Defendants' statements that there were "***no issues***" or "***bottleneck***" in Align's new revenue case processing were also false or misleading. As defendant Prescott later admitted on October 24, 2007, "virtually ***all*** of [Align's] customers were impacted by ***slower cycle times*** and ***backlogs***," including new revenue cases, as a result of the Patients First Program. According to CW9 and CW10, Align was overwhelmed with fulfilling Patients First cases, creating a significant backlog for both Patients First cases and new revenue cases. These witnesses' accounts are

supported by the fact that Align had already processed and shipped 521,680 Patients First aligners to OrthoClear doctors by the end of April 2007, to the detriment of its revenue cases.[3]

92. CW1, CW2, and CW3 confirm that the delay was in Align's ClinCheck process. According to CW2 and CW9, the Company did not have enough trained ClinCheck technicians in place during the Class Period to handle the new revenue cases and the Patients First cases. Align did not even hire additional ClinCheck technicians, who take three to four months to train, until November or December 2006. Thus, the technicians could not have been fully trained and able to process cases until February or March 2007 at the earliest. In addition, according to CW9, Align's ClinCheck personnel, who were located in Costa Rica, were required to perform extremely tedious work for little pay – essentially creating a high-tech sweat shop. As a result, Align's ClinCheck facility suffered from a very high attrition rate – an "***issue***" that had a direct and negative impact on Align's ability to process orders and contributed to its backlog during the first two quarters of 2007.

93. Confidential witnesses confirm that "***issues***" with revenue case processing persisted throughout Q1 and Q2 2007. CW3 reported that, due to the influx of Patients First cases, the typical ClinCheck processing time for new revenue cases doubled from two weeks to four weeks or longer during the first half of 2007. And the processing time for Patients First cases was even longer, anywhere from six weeks to several months. CW1 confirmed that processing delays for all cases began almost immediately after the Patients First Program was implemented.

94. In addition, contrary to Prescott's statement that the sales teams' focus on generating new revenue cases "***ha[d]n't changed***," Align's sales teams were ***not focused on new revenue cases***. Instead, Align's sales teams remained focused on managing the backlog and case load created by the influx of new Patients First cases. Indeed, defendant Prescott later admitted on October 24, 2007 that he had ***instructed*** the sales representatives to focus on the backlog during the Class Period:

---

[3] *See* Align's Order and Aligner Shipment Report for Patients First cases, attached hereto as Exhibit A. Defendant Align submitted the Order and Aligner Shipment Report for Patients First as "Exhibit A" to the Declaration of Lance Aldrich in Support of Defendant Align Technology, Inc's Motion for Summary Judgment in *Weber v. Align Technology, Inc.*, No 5:07-CV-535 (NAM)(GJD) in the United States District Court, Northern District of New York.

"***[E]ven in Q2*** as [the sales teams] were finishing handling off the ends of the Patients First cases and clearing backlog, ***that [i.e., clearing the backlog] was their activity. We told them that was the priority,*** to manage this churn at the doctor and patient level." According to CW3, Align's sales representatives were forced to spend at least ***20% to 50%*** of their time on Patients First cases during the Class Period, instead of generating new revenue cases.

**Defendants' July 25, 2007 False and Misleading Statements**

95. On July 25, 2007, defendants held an earnings conference call with analysts and investors to discuss Align's Q2 2007 results. On the conference call, defendant Prescott continued to falsely represent ClinAdvisor's progress and success. Specifically, defendant Prescott told investors that Align had launched ClinAdvisor nationally and that the results were "***exactly what we were hoping to achieve***":

> ClinAdvisor, the first step towards a new GP platform, was previewed last October, piloted and beta tested over the past 6 months, and ***has now been launched nationally***. ***Early feedback tells us it really helps newly certified and less experienced doctors select appropriate cases based on their experience and skill set, which is exactly what we were hoping to achieve***. In addition, a number of docs are using ClinAdvisor as a chair-side selling tool during patient consultations. This software has been integrated into our new GP certification program, which launches nationally this fall. ***This program has been tested*** and will be rolled out broadly as a ***key element of our customer utilization growth strategy***.

96. When asked about Align's utilization rates among different doctors, defendant Prescott told analysts that ClinAdvisor was "***increas[ing] . . . utilization growth***":

> ***[T]he new ClinAdvisor integration into our first level certification will help [to increase utilization growth] further***. ***We are seeing newly certified doctors start their cases sooner***. ***We are seeing the ramp a little bit faster***. These are all relative statements. The ramp to adoption a little quicker in those newer trained cohorts of doctors. So – but ***the bigger effect is*** more of a widespread general slow but ***important increase in utilization growth*** across most cohorts of previously trained docs.

97. In addition, defendant Prescott told investors that Align continued to see "***progress in utilization growth***":

> ***We continue to see*** expansion in our customer base, both newly trained and repeat submitters, ***as well as progress in utilization growth*** for orthos, GPs, and international, as well as solid demand at the consumer level.

98. Also during the July 25, 2007 conference call, Align CFO Bullington told investors that case shipments in Q2 were higher than usual (55,000) due to a backlog of 4,000 revenue cases

from Q1 that were not processed until Q2. Excluding the 4,000 backlogged revenue cases, Bullington told investors that Align would ***increase its new revenue case shipments in Q3 and Q4 and increased Align's 2007 case shipment guidance***, from a range of 200,000 to 206,000 cases given on April 26, 2007, ***to a range of 206,000 to 209,000 cases***, an increase of 27.1% to 28.2% over 2006. Defendants' FY 2007 guidance falsely implied Q4 2007 case shipment guidance of ***51,000 to 56,000 cases***. Notably, while Align announced an increase in utilization rates from 3.2 in Q1 to 3.4 in Q2, this increase was namely the result of backlogged Q1 revenue cases that were processed in Q2 – ***not*** ClinAdvisor. According to Align's January 2007 Disclosure Policy, Bullington was an "'Authorized Spokesperson' to speak on behalf of Align."

99. In response to defendants' July 25, 2007 statements, the Company's stock price rose $1.85 per share, or approximately 7%, to close at $27.69 per share.

100. As intended, analysts responded favorably to defendants' July 25, 2007 statements. For example, on July 25, 2007, Deutsche Bank reported that "[e]arly feedback on ClinAdvisor points to increased utilization trends [and] improved volumes in newly trained doctors." Based on this feedback, "[w]e expect the strength in the business to continue throughout the remainder of the year with increasing utilization rates and improving volumes." Similarly, on July 26, 2007, JPMorgan reported that, despite the Company's "historical . . . inability to generate profitability," "Align's business model [wa]s now finally poised to begin demonstrating operating leverage." Also on July 26, 2007, Roth Capital Partners reported that "[t]o capitalize on the market demand for Invisalign, we believe that Align has improved its selling and training protocol, with the help of its recently launched ClinAdvisor, to accelerate a doctor's learning curve and increase the speed and magnitude of adoption. Importantly in 2Q, the company increased both the number of doctors . . . receiving cases as well as the utilization rates over 1Q07 . . . ."

101. Two days later, on July 27, 2007, defendant Prescott again took advantage of Align's artificially inflated stock price from defendants' false and misleading statements and began selling ***200,300 shares*** of his personally held Align stock for proceeds of ***over $5.4 million***. Defendant Prescott knew when he sold his Align shares that ClinAdvisor was a failure and would not contribute to Align's sales or utilization growth. Prescott also knew that Align's sales force had been focused

on handling Patients First cases and backlogged cases during the first two quarters of 2007, resulting in decreased future revenue case growth. Numerous other Align insiders sold as well. All told, Align insiders, including ***six top executive officers*** (Bullington, CFO; Ellis, VP, North America Sales; George, General Counsel and VP, Legal and Corporate Affairs; Hedge, VP, Operations; Zoromski, VP, Global Marketing and Chief Marketing Officer; and defendant Prescott) and ***one director*** (Collins), sold ***419,236 shares*** of Align stock, for proceeds of nearly ***$11.4 million***, in the days immediately following defendants' July 25, 2007 statements.

102. Defendants' increased case shipment guidance and statements about increasing sales growth and utilization rates lacked reasonable basis. First, as set forth in ¶¶74-79, 89-90, defendants knew that ClinAdvisor was a failure and would not increase sales or utilization rates as defendants had promised. Second, as set forth in ¶¶80-82, 91-94, Align's sales representatives were focused on handling the backlog and expediting cases resulting from the Patients First Program throughout Q1 and Q2 2007 instead of generating new case starts. Third, as set forth in ¶¶107-109, *infra*, the Patients First Program and Align's processing and shipment delays were alienating doctors, resulting in lost business and lower utilization.

103. Defendants' statements about ClinAdvisor were also materially false. As set forth in ¶¶74-79, 89-90, defendants knew by at least January 2007 that ClinAdvisor was a flawed concept and would ***not*** increase sales or utilization rates. Contrary to Prescott's statement that "***early feedback***" showed that ClinAdvisor was doing "***exactly what we were hoping to achieve***," according to CW12, defendants knew by January 2007 that early feedback from initial ClinAdvisor users was ***negative***. Similarly, according to CW9, feedback on ClinAdvisor's limited prototype launch of software tools in April/May 2007 was also negative, and indicated that ClinAdvisor would ***not*** positively contribute to Align's sales and revenues.

104. In addition, CW9 reported that in June/July 2007, Align completed a marketing study to assess the effectiveness of its clinical education, including ClinAdvisor. The results of this study confirmed earlier indications that ClinAdvisor was ***not*** improving revenue or meeting its projected sales. CW9 knew of the study and its results from his discussions with Align's Director of Marketing and Zoromski, as well as through his own involvement with clinical education and

ClinAdvisor. Zoromski, an executive officer at Align, personally told CW9 in late June/early July 2007 that Align's clinical education initiatives – specifically ClinAdvisor – would not contribute to Align's projected revenues. Separately, Align's Director of Marketing told CW9 that ClinAdvisor was simply "not working." Thus, contrary to Prescott's statement that ClinAdvisor was "***increas[ing] . . . utilization growth***," it was very clear by July 2007 that ClinAdvisor was not successful and would ***not*** increase sales or utilization in 2007. CW9 stated that Prescott received detailed updates regarding ClinAdvisor, including that the main version of the system was behind schedule and that the limited prototype released in April/May 2007 was not meeting projected sales.

105. CW10 confirmed that ClinAdvisor was not increasing sales or utilization rates. According to CW10, defendants were aware of ClinAdvisor's ineffectiveness and, accordingly, did not plan for any further product enhancements or versions. Instead, in December 2006, Align began working separately on ClinAssist. Ultimately, Align announced ClinAssist's release in October 2008.

106. Defendants' increased case shipment guidance was further undermined by the issues stemming from the Patients First Program. Throughout Align's 2Q 2007, the Company continued to experience a significant backlog in production and increased processing times for both Patients First cases and new revenue cases as a result of the Patients First Program. Align's cycle times were so delayed that in May 2007, former OrthoClear patients filed a class action lawsuit against Align for breach of contract, claiming that Align breached its contract with doctors and patients pursuant to the OrthoClear settlement by delaying delivery of new aligners by as much as ***seven months***. Consequently, Align's sales representatives continued to focus on managing the backlog created by the Patients First cases rather than focusing primarily on generating new case growth.

107. Defendants' increased case shipment guidance was also undermined by Align's loss in business from aggravated doctors. Indeed, maintaining good doctor relationships was vitally important for Align's utilization rate. As CW9 explained, patients typically had an appointment scheduled with the doctor based on Align's expected delivery date. A delivery delay of even ***one day*** could require the doctor and patient to re-schedule the appointment ***and result in Align losing the doctor (or patient) as a customer***. According to CW5, the Patients First Program and resulting

backlogs aggravated Align's relationship with OrthoClear doctors. CW3 explained that Align made OrthoClear doctors jump through hoops in order to get their patients registered on time for the Patients First Program with a complicated submission process and an especially short time period in which to register their patients (right before Christmas 2006) and submit all-new records. CW3 believed that Align was punishing these doctors for switching from Align to OrthoClear in the first place. CW2 confirmed that Align expected significantly less doctors to complete the submission process than ultimately did.

108. Once registered, Patients First cases were treated by Align as secondary to new revenue cases. According to CW4, this led to numerous complaints from doctors, particularly those who used both OrthoClear and Invisalign products (which, according to defendants, was the "majority" of OrthoClear doctors), as it was difficult for Align to explain why the same product took significantly longer to produce under the Patients First Program.

109. Doctors complained about the backlog created by the OrthoClear settlement throughout the Class Period and were frustrated at the length of time they had to wait to get their patients' aligners. Align's Territory Account Managers bore the brunt of the doctors' criticism and complained about the influx of OrthoClear cases and the significant case backlogs to their Regional Business Managers regularly throughout 2007; complaints that were generated from the doctors Align was relying on for new case and utilization growth. In short, Align's alienation of doctors resulted in lost sales and lower utilization rates, undermining defendants' July 25, 2007 increased case shipment guidance.

**Investors Begin to Learn the Truth**

110. On October 24, 2007, Align issued a press release announcing its financial results for the Q3 2007. Despite their prior assurances that ClinAdvisor was increasing utilization rates, defendants disclosed that utilization rates (Align's key metric) had ***decreased*** from 3.4 in Q2 to 3.2 in Q3. For GPs specifically (the target market for ClinAdvisor), utilization rates had decreased from 2.7 in Q2 to 2.6 in Q3. In addition, contrary to their repeated statements projecting increased case shipments, defendants reported Q3 2007 case shipments of 52,000, ***below*** their prior guidance of 53,000 to 54,000 cases. Further, defendants ***lowered*** their FY 2007 case shipment guidance from a

range of 206,000 to 209,000 cases previously given to investors on July 25, 2007, to a range of 202,000 to 204,000 cases, and ***lowered*** Q4 2007 case shipment guidance to a range of 50,000 to 52,000 cases. In other words, Q4 case shipments would ***remain flat or decrease compared to Q3***. CW9 confirmed that Align's missed Q3 case shipments and lowered Q4 and FY 2007 case shipment guidance were based largely on ClinAdvisor's failure to increase sales.

111. In addition, Prescott and CFO Bullington admitted on the October 24, 2007 conference call that the Company would "***not have the pipeline of case receipts*** to meet the level of expected Q4 case shipments provided on [Align's] last earnings call":

> [PRESCOTT:] ***Q4 case shipment volume will be lower than our prior outlook***, which is largely related to the new case receipt shortfall we experienced during the last several weeks of Q3. However, the trajectory of case receipts has picked up pace as we return to normal levels, and we remain confident in our long-term outlook.
>
> * * *
>
> [BULLINGTON:] Now let me turn to our outlook for the fourth quarter and full year. . . . As Tom described in his earlier comments, ***our baseline entering into Q4 was lower because the number of new case starts received during the latter part of Q3 did not ramp as quickly as expected***. Q4 has historically been a stronger quarter and while the current rate of new case starts has picked up, ***we will not have the pipeline of case receipts to meet the level of expected Q4 case shipments provided on our last earnings call***.

112. Further, contrary to his January and April 2007 statements that Align was focused on new revenue sales growth, Prescott admitted that Align had shifted the focus of its sales force to managing Patients First cases and backlogged cases rather than generating new revenue case growth:

> ***In our efforts to ensure customer satisfaction in Q2 by completing the Patients First Program and clearing the backlog, we did not focus enough effort on filling the pipeline for new case starts***. We are addressing these issues and are now seeing growth in new case receipts. We expect further progress and anticipate growth in receipts through the remainder of 2007.

113. When questioned by analysts, defendant Prescott further admitted that the sales teams had "***moved their focus away from generating case growth***":

> [ANALYST]: So, first question. Tom, can you just go through the sequential weakness that you saw relative to your expectations? I think you commented that sales staff, et cetera, was busy with the Patients First Program through the second quarter. Maybe you could spell that out a little bit for us and just let us know, do you think, was this a patient issue? A practice issue? A sales issue? Help us out there.

> TOM PRESCOTT: The simplest way to answer the questions is all of the above. We had the normal seasonality that we expected and based on our run rates in Q2, thought we could drive through a little bit better – didn't.
>
> ***Secondly, I think as I described, sales force, after focusing for about three quarters on managing backlog and turnaround and expediting of cases, moved their focus away from generating case growth in a lot of practices where they were waiting on cases***. And we didn't see it as clearly and we didn't get our foot back on that gas at the timeframe we needed. That contributed as well.
>
> * * *
>
> ***[E]ven in Q2 as they were finishing handling off the ends of the Patients First cases and clearing backlog, that was their activity. We told them that was the priority, to manage this churn at the doctor and patient level***. And our goal was to minimize [the] impact on our customers or docs. And we really couldn't shift gears on that until we finished the Patients First shipments and got cycle times back to a normalized mode.

114. In addition, defendant Prescott admitted that the backlog created by the Patients First Program impacted "***virtually all of [Align's] customers***" and that the Company's sales teams "***weren't pushing as hard to get new case starts***" during the Class Period:

> [I]n many practices – and the roughly 4,000 to 5,000 practices that had Patients First cases were affected, but ***virtually all of our customers were impacted by slower cycle times and backlogs. So this effect of having people waiting on cases was a very broad effect for our entire customer base***. And even for some of our most loyal customers that had five volumes, they were just as impacted as everybody else.
>
> ***So, in many of those practices they weren't pushing as hard to get new case starts. And the reps – the field teams weren't driving for that same goal***. That has been very clearly corrected and we have confidence that our efforts are paying off and will continue to pay off.

115. That same day, October 24, 2007, CFO Bullington announced his resignation from the Company.

116. The market reacted negatively and severely to defendants' October 24, 2007 announcement of lower than expected case shipments and utilization rates, particularly for Q4 and FY 2007. According to an October 6, 2006 Roth Capital Partners report, Align's case shipment volume was "a key metric in evaluating the company's performance." As one analyst commented on the October 24, 2007 conference call: "I think what may surprise people more than the third quarter [miss] was just that the fourth quarter looks like it's weaker than you thought it would be previously." The next day, October 25, 2007, analyst Cramer aptly observed: "***There is something wrong with this stock***, it raised guidance two consecutive quarters then dropped it the next and the

CFO resigned to coincide with the revision[,] raising eyebrows." In other words, ***Align's*** "***growth story is in jeopardy***," and "[t]his is a ***big mea culpa.***" Jefferies & Company, Inc. similarly reported, on October 25, 2007, that, based on defendants' disclosures, "[w]e remain very concerned regarding [Align's] future growth prospects." Barrington Research, which had upgraded Align's stock rating to "Outperform" a year earlier based on defendants' ClinAdvisor statements, ***downgraded*** its rating to "Underperform" on October 25, 2007 based on defendants' disclosure of decreasing growth.

117. In response to defendants' October 24, 2007 disclosures, the price of Align common stock fell $9.63 per share, or approximately ***34%***, to close at $19.07 per share, on unusually heavy trading volume.

118. Align continued its downward spiral after the Class Period. On January 29, 2008, defendants again reported a decrease in Q4 2007 utilization rates to 3.1 (down from 3.2 in Q3) and case shipments of 50,830 (down from 52,000 in Q3). Align achieved its previously lowered Q4 and FY 2007 revenue guidance only through price increases in Q4, not utilization or sales growth. In addition, defendants issued decreasing Q1 2008 EPS guidance of $0.01 to $0.03 (down from Q4 2007 EPS of $0.08) and FY 2008 EPS guidance of $0.40 to $0.45 (down from $0.50 in 2007). As Barrington Research noted on January 31, 2008, Align's "[s]equential utilization and case shipment trends remained negative, as initially noted in Q3." In other words, defendants expected sales growth and earnings to continue to decline sequentially in 2008. Despite hitting its Q4 revenue forecasts, Align's stock price fell another 15% on these disclosures, to close at $11.93 on January 30, 2008. Align's further declining growth confirmed for investors that defendants' prior Class Period statements regarding Align's prospects for increasing sales and utilization, and, specifically, ClinAdvisor, were false. Notably, after Q3 2007, defendants stopped talking about ClinAdvisor altogether.

119. The market for Align common stock was open, well-developed and efficient at all relevant times. As a result of defendants' materially false and misleading statements and omissions, Align common stock traded at artificially inflated prices during the Class Period. Lead plaintiff and other members of the class purchased or otherwise acquired Align common stock relying upon the

integrity of the market price of Align common stock and market information relating to Align, and have been damaged thereby.

120. During the Class Period, defendants Prescott and Align materially misled the investing public, thereby inflating the price of Align's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Defendants' statements and omissions were materially false and misleading because they concealed material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

121. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by lead plaintiff and other members of the class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Align's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Align and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in lead plaintiff and other members of the class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**ADDITIONAL SCIENTER ALLEGATIONS**

122. As alleged herein, defendants CEO Prescott and Align acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of Align were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Align, their control over, and/or receipt

and/or modification of Align's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

123. According to CW10, ClinAdvisor's Lead Engineer, defendants knew by at least December 2006 that ClinAdvisor was based on a flawed concept and would not increase sales volumes or utilization rates. Accordingly, defendants did not plan for any product enhancements or new versions of ClinAdvisor, as a company typically would with a successful product. Instead, in December 2006, Align began developing a separate product, ClinAssist, to replace ClinAdvisor. CW10 reported that, in December 2006, Align held a meeting in Costa Rica, led by Senior Director of Software Development CW12 and Director of Marketing Singer, to develop ClinAssist's product specifications. CW10 confirmed that ClinAssist's early development to replace ClinAdvisor indicated that Align lacked confidence in ClinAdvisor and knew that it would be ineffective. CW10 further emphasized that Prescott was aware that ClinAdvisor was ineffective both during its beta testing and after its ultimate launch because there were no efforts to increase its functionality or continue development. According to CW10, a company does not abandon a successful product, as defendants did here. Moreover, Prescott later admitted on January 9, 2008 that defendants had "***known for some time*** that there's a consistent theme out there with our doctors. . . . they need ***different features than we've given them*** [*i.e.*, ClinAdvisor]."

124. In addition, defendants knew that feedback on ClinAdvisor was overwhelmingly negative. According to CW12, Align's Product Manager reported at a January 2007 ClinAdvisor meeting that early beta users did not find ClinAdvisor to be helpful. According to CW9, feedback on a limited release of certain ClinAdvisor tools in April/May 2007 was also negative. Further, in June/July 2007, Align completed a marketing study regarding the effectiveness of clinical education, specifically ClinAdvisor. According to CW9, the study showed that ClinAdvisor was not increasing Align's sales or revenues. Thus, it was clear throughout the Class Period that ClinAdvisor would not increase sales or utilization rates as defendant Prescott had promised. CW9 stated that defendant Prescott received detailed ClinAdvisor updates, including that the main version was well behind schedule and that the limited version was not meeting sales projections, and personally authorized the additional resources for its development.

125. In addition, defendants knew that the Patients First Program was deteriorating Align's relationship with doctors, further hampering its ability to generate new revenue case growth as falsely forecasted in July 2007. According to CW2, shortly after Align and OrthoClear reached a settlement in October 2006, the Regional Business Managers told the Territory Account Managers during their weekly Monday meetings to prepare to receive complaints from the doctors in their territories as a result of the OrthoClear settlement. Further, defendant Prescott admitted on the January 30, 2007 earnings conference call that, with regard to Align's relationship with and sales to OrthoClear doctors, "***[he] actually watched that very, very closely week to week by practice***" during the Class Period.

126. Moreover, Align closely tracked doctor and patient complaints during the Class Period. According to CW4, Territory Account Managers input information into salesforce.com daily regarding such discussions with doctors in their territories. Align also kept a record of customer complaints in its customer communication records. Lance Aldrich, Align's Director of Production Systems, who attests to familiarity with Align's procedures for record keeping, has declared under penalty of perjury on behalf of Align that "Align's customer communication records reflect information regarding patient cases that is recorded by Align's customer support personnel. It is the regular practice of Align's customer support personnel to enter information regarding ***every communication*** they have with a patient or doctor at or near the time of communication."

127. In addition, throughout the Class Period, defendants knew exactly how many new cases were sold, how many cases were in ClinCheck, how many cases were in manufacturing and how many cases were shipped on a ***daily basis***. According to CW4, Align very closely tracked new case sales on a daily basis during the Class Period using a program called salesforce.com. Territory Account Managers input information into salesforce.com every morning regarding the number of calls they had made the day before, the doctors (by name) they had visited and what specifically took place during the call (such as a demonstration or a discussion). The Territory Account Managers also monitored missing record reports every morning in salesforce.com because missing records could delay the ClinCheck process. CW1 corroborated that Align used salesforce.com to track new revenue case sales daily.

128. According to CW3, salesforce.com also contained a case report that listed all of the cases in the pipeline, including, but not limited to, cases submitted, cases currently in the ClinCheck process, cases in manufacturing and cases shipped by product type. CW3 indicated that this report was available to ***everyone*** within the sales organization, to varying degrees, ***at all times***. CW3 also reported that the information about cases was input into salesforce.com by employees in the corporate office at least daily. According to CW2, the Territory Account Managers then received breakdowns of their sales performance daily via e-mail from Company headquarters, which was contained in a PDF file.

129. In addition to salesforce.com reports, Align also created numerous other sales reports during the Class Period to track data, including the number of new cases and revenue by geographic region. According to a former Senior Manager of Business Intelligence at Align, CW8, these sales reports were available in Microsoft SharePoint and were made available to the sales department through an intranet. CW8 indicated that VP of Sales Ellis, who reported directly to defendant Prescott, had access to all of the data in these reports. In addition to the sales reports, CW8 also received special requests or requests for customized reports every quarter at Align, especially within the last two weeks of a quarter. CW8 stated that these reports usually focused on sales or marketing data. Once the sales or marketing individuals analyzed these customized reports, CW8 believed the data was presented to Align's executives, including defendant Prescott. Based on the various sales reports that existed during the Class Period, Align executives, including defendant Prescott, were informed of Align's revenues, new case starts and case shipments on a regular basis throughout the Class Period. These reports informed defendants that Align: (i) was experiencing a "bottleneck" in revenue case processing; and (ii) was not increasing sales and utilization as defendants had led investors to believe.

130. According to a former Cost Accounting Manager at Align, CW6, Align also tracked the different types of cases (revenue cases as well as Patients First cases) by part number during the Class Period. Thus, it was apparent how many new revenue cases and Patients First cases were shipped ***each day***. CW6 reported that the shipments were tracked in Align's MES program, which was automatically updated when cases shipped. Align's MES generated daily metrics that included

the number of cases shipped by product, where the case originated (the U.S. or overseas) and whether it had been shipped to a general practice dentist or orthodontist. The MES then automatically sent an e-mail with the metrics on a ***daily basis*** to the Company's chief executives, directors and managers, ***including defendant Prescott***, CW6 and CFO Bullington. Based on these daily metrics, defendant Prescott and other high level managers would have known that the Company would not be able to meet its case shipment forecasts.

131. Defendant Prescott also received daily "run-rate" reports. According to CW11, these reports showed, on a ***daily basis,*** (i) the manufacturing and shipping targets for the quarter, (ii) how many orders had been submitted and received by the Order Entry department, (iii) how many orders were going through the ClinCheck process; (iv) how many orders were being manufactured, and (v) how many orders had been shipped. Each day of the quarter was assigned a separate line on the report so that, by the end of the quarter, there were approximately 90 separate lines. As such, each daily line report provided the recipients with an update regarding the prior day's events and how close (or far) the Company was from achieving its manufacturing goals for the period. According to CW11, the reports were automatically generated every day at 1:00 am and distributed at 5:00 am electronically to the e-mail in-boxes and/or blackberries of designated subscribers, ***including defendant Prescott***. After reviewing the reports, any issues Prescott had would be raised in a subsequent meeting.

132. Align also tracked the number of Patients First cases that were ordered and shipped on a monthly basis in its Order and Aligner Shipment Report for Patients First. *See* Exhibit A. According to this report, Align processed and shipped the vast majority of the Patients First cases, to the detriment of its new revenue cases, by the end of April 2007. At least 521,680 Patients First cases were shipped to former OrthoClear doctors by the end of April 2007 and 580,099 by mid-July 2007. Lance Aldrich, Align's Director of Production Systems, has declared under penalty of perjury on behalf of Align that "[i]t is the regular practice of Align that this information be entered and maintained in [Align's] enterprise computing systems, which include a web-based interface used by dentists, an ERP (enterprise resources planning) computer system used to manage billing and other

business processes, and an MES (manufacturing execution system) used to manage design and production of Invisalign products."

133. In addition, according to CW1, CW2, CW3 and CW4, Territory Account Managers submitted weekly field reports to their Regional Business Managers and attended weekly conference calls with their Regional Business Managers every Monday during the Class Period. During these group meetings, the Territory Account Managers and Regional Business Managers discussed sales strategies and contacts for the week ahead. They also went over the number of cases and/or contacts submitted for that region. Directors and/or VPs for Sales also attended these calls. According to CW4, Territory Account Managers complained about the influx of the OrthoClear cases to the Regional Business Managers regularly throughout 2007 due to complaints received from doctors. CW3 confirmed that Territory Account Managers voiced concerns about the increased workload in 2007 to their managers.

134. According to CW5, the Regional Business Managers, in turn, held weekly conference calls, as well as monthly and quarterly meetings, attended by all of the other Regional Business Managers and the Sales Directors from various parts of the country during the Class Period. The monthly meetings were usually held over the phone and focused on discussing the sales teams' performance by region and whether the regions were keeping pace with their sales targets. The quarterly meetings were typically held at a Marriott hotel in downtown San Jose or at the Company's headquarters and involved discussion of the top performing Territory Account Managers in their region and new sales tactics or strategies employed by their Territory Account Managers. VP of Sales Ellis – who reported directly to defendant Prescott and was a member of Align's executive team – attended these monthly and quarterly meetings. Thus, defendants knew that Align was continuing to face disruptions in its sales practice, despite their contrary assurances to investors.

135. According to CW6, Align also held monthly financial reviews and monthly manufacturing meetings during the Class Period. The monthly financial reviews were held toward the end of the first week of the month and included discussion of financial results from the previous month, including the revenue and case shipments generated in the previous month and for the quarter to date. The meeting was conducted by Align CFO Bullington and attendees included all of

Bullington's direct reports, including the Controllers and managers and representatives from the Financial Planning and Analysis team. During the meeting, each individual in attendance gave a presentation about his or her department and typically went over income statements for his or her area of responsibility. Based on his attendance at the meetings, CW6 understood that CFO Bullington reported the substance of these meetings to defendant Prescott.

136. The monthly manufacturing meetings were typically held on the second Friday of the month at the Company's headquarters and lasted about two and a half to three hours. The purpose of these meetings was to review operational issues at the Juarez, Mexico and Costa Rica facilities, as well as discuss finances related to manufacturing and a review of the production and shipping numbers. Attendees included managers from each facility, including the general managers of the facilities, the VP of Manufacturing, and other managers who oversaw quality, purchasing, shipping and receiving. At the meeting, the general managers would present reports that broke down the manufacturing numbers by department. In addition, CW9 reported that Align's production and manufacturing numbers and operational details, including the high attrition rate at Align's Costa Rica facility, were reported ***to defendant Prescott*** on a weekly, if not daily, basis. Thus, defendant Prescott was aware of Align's backlog and "issues" in processing new revenue cases.

137. According to CW9, the amount of cases being manufactured and how many cases needed to be manufactured to meet existing Patients First and new revenue orders were also presented on PowerPoint slides during quarterly marketing meetings. These slides contained high level numbers regarding various key metrics for manufacturing, order backlog and order fulfillment and were presented in a clear and straightforward manner. These slides showed that Align was overwhelmed with fulfilling Patients First orders and had a backlog of new revenue orders. CW9 attended these meetings, which were intended to review quarterly results and were held shortly after the end of the quarter.

138. These same PowerPoint slides were then presented by Zoromski to Align management, ***including defendant Prescott***, at Executive Management Committee meetings. According to CW9, the Executive Management Committee meetings took place immediately after the quarterly marketing meetings, and the slides' titles indicated that they were intended for the

Executive Management Committee. CW6 confirmed that Align held monthly Executive Management Committee meetings during the second week of the month during the Class Period to discuss sales data and forecasts. The meetings were conducted by defendant Prescott and attendees included Align's top executives and VPs from across the Company, including the Corporate Controllers and the VPs of Sales, Marketing, Manufacturing and Human Resources. CW9 stated that, based on these PowerPoint presentations, ***public statements by Align's senior executives regarding the health of Align's numbers were inconsistent with the PowerPoint presentations***.

139. Defendants also reviewed Align's financials on a monthly basis. According to a former Controller at Align, CW7, the Company held a meeting at the beginning of each month during the Class Period to review the financials from the previous month. CW7 attended the meeting, along with CFO Bullington, the Corporate Controller, the Senior Director of Finance, the Cost Accounting Manager, the Senior Director of Internal Audit and several senior financial analyst managers. Based on his attendance at the meetings, CW7 understood that CFO Bullington informed defendant Prescott about the content of these meetings.

140. Defendant Prescott's bonus compensation provides further indicia of his scienter. During the Class Period, Prescott's compensation was heavily dependent on meeting Align's strategic priorities. In 2007, defendant Prescott was eligible for a target incentive bonus of 100% of his salary, an amount set at the beginning of the year. His bonus (as well as Align's other executives) were dependent on meeting specific performance measures, including "financial targets and critical strategic priorities." Thirty percent of the corporate performance target included "[d]eveloping and implementing a product vision and roadmap." Another thirty percent required "[d]elivering key elements of product roadmap in accordance with expectations."

141. Align explained that meeting these strategic priorities were "[c]ritical to our achievement of our multi-year strategic corporate priorities, specifically, ***increased adoption and frequency of use*** [*i.e.*, utilization] by our customers, the orthodontist and general practitioner dentist." Thus, defendant Prescott was required, as part of his compensation as CEO, to know of and deliver on these critical strategic priorities, which included ClinAdvisor and revenue case growth. Yet, as reflected in Align's 2007 Proxy Statement, Align's executives, including defendant Prescott,

fell short of these strategic priorities, with the level of achievement "BELOW TARGET." Significantly, in Align's 2007 Proxy's discussion of bonus awards, there is no discussion of ClinAdvisor, only of three other products, two of which were not even expected until the latter part of 2008.

142. In addition, as Align's CEO, defendant Prescott can be presumed to have knowledge of adverse facts affecting the Company's core business. The sale and shipment of new revenue cases is Align's core revenue generating business. Defendants admitted in the Company's 2006 Form 10-K, "[t]he vast majority of [Align's] revenue is generated from the sale of full Invisalign treatment and Invisalign Express treatment." Moreover, ClinAdvisor was the ***only*** new product touted for launch in 2007, and Prescott specifically focused on its importance and success throughout the Class Period. Thus, defendant Prescott can be presumed to have knowledge of the adverse facts outlined in ¶¶74-82, 89-94, 102-109, affecting ClinAdvisor and Align's sales growth during the Class Period.

143. Further, Align's officers' and employees' scienter can be imputed to Align. As outlined above, numerous Align executive and senior officers, including defendant Prescott, Ellis, Kuo, Arjomand, Menon, Singer and Zoromski, were aware of undisclosed, adverse problems regarding ClinAdvisor's launch and effectiveness and Align's ability to achieve increased sales and utilization rates. These employees' scienter is imputable to Align.

**Prescott's Insider Sales**

144. Defendants were further motivated to engage in this course of conduct in order to allow defendant Prescott and other Company insiders to collectively sell ***948,157*** shares of their personally held Align common stock for gross proceeds in excess of ***$22.8 million*** during the Class Period. Comparably, Align reported total net profit of only $35.7 million in 2007. The insider trading is set forth in detail in the chart attached as Exhibit B to this Complaint.

145. Defendant Prescott sold significant amounts of his personally held Align stock during the Class Period while in possession of material, non-public information about Align. As set forth in ¶¶74-82, 89-94, 102-109, defendant Prescott knew, and failed to disclose, at the time he sold his Align stock that: (i) ClinAdvisor was ineffective and would not increase sales and utilization rates; (ii) Align was experiencing significant backlogs in processing new revenue cases; (iii) Align's sales

force had shifted its focus to managing Patients First and backlogged cases rather than generating new revenue case growth; and (iv) Align was receiving numerous complaints from doctors due to its Patients First Program throughout the Class Period, further hampering its ability to generate new revenue case growth.

146. Defendant Prescott's insider sales, as well as the sales of other Align insiders, were suspicious in both timing and amount and provide additional indicia of scienter. Defendant Prescott sold ***400,300 shares*** (***76%*** of his holdings) for proceeds of ***over $10 million*** during the Class Period, while Align's stock price was artificially inflated as a result of defendants' false and misleading statements and material omissions. Other Align executives sold significant amounts as well:

- Hossein Arjomand, VP, Research and Development, sold 37,996 shares (***99%*** of his holdings) for proceeds of over $878,000;
- Eldon Bullington, CFO and VP, Finance, sold 124,800 shares (***97%*** of his holdings) for proceeds of over $3.1 million;
- David Collins, Director, sold 46,000 shares (***72%*** of his holdings) for proceeds of over $1.2 million;
- Dan Ellis, VP, North America Sales, sold 50,000 shares (***93%*** of his holdings) for proceeds of nearly $1.4 million;
- Roger E. George, General Counsel and VP, Legal and Corporate Affairs, sold 48,398 shares (***99%*** of his holdings) for proceeds of over $1 million;
- Len Hedge, VP, Operations, sold 49,887 shares (***52%*** of his holdings) for proceeds of nearly $1.3 million;
- Michael Henry, VP, Information Technology and Chief Information Officer, sold 52,584 shares (***100%*** of his holdings) for proceeds of over $1 million;
- Gil Laks, VP, International, sold 58,998 shares (***97%*** of his holdings) for proceeds of nearly $1.2 million; and
- Darrell Zoromski, VP, Global Marketing and Chief Marketing Officer, sold 79,194 shares (***100%*** of his holdings) for proceeds of over $1.6 million.

Indeed, ***all*** of Align's executive officers (except Sonia Clark, VP, Human Resources) sold significant amounts of their personally held Align stock – some as much as ***100%*** of their holdings – during the Class Period. While options are not stock holdings and should not be included in the insiders retained holdings, even including options, the percentages and amounts sold are highly suspicious, especially when considered with the suspicious timing of the sales. *See* Exhibit B.

147. The timing of defendant Prescott's (and other Align executives') insider sales was also highly suspicious, as they were timed to take maximum advantage of the artificial price inflation caused by defendants' misrepresentations and while Align stock was trading at or near record highs. The vast majority of the insiders' sales, including ***all*** of defendant Prescott's sales, were made in the days immediately following defendants' false and misleading statements. For example, defendant Prescott sold ***200,000 shares***, for proceeds of ***over $4.6 million***, on April 30, 2007, just ***four days*** after defendants' April 26, 2007 misrepresentations. Defendant Prescott then sold an additional ***200,300 shares***, for proceeds of ***over $5.4 million***, between July 27, 2007 and August 7, 2007 – starting just ***two days*** after defendants' July 25, 2007 misrepresentations. Notably, these were defendant Prescott's ***only*** sales during the Class Period. All told, Align insiders sold 364,925 shares for proceeds of nearly ***$8.5 million*** and 419,236 shares for proceeds of nearly ***$11.4 million*** (*i.e.*, the bulk of the insider sales during the Class Period) in the days immediately following defendants' April 26, 2007 and July 25, 2007 misrepresentations, respectively. Collectively, these sales support a strong inference of scienter.

148. In addition, defendant Prescott's Class Period sales did not follow a regular trading pattern. Prior to these sales, defendant Prescott had sold Align stock only ***once*** since July 2004, when he sold 142,600 shares on November 22, 2006. Even then, Prescott's sales were intentionally timed with the stock price increase resulting from Align's October 2006 announcements of ClinAdvisor and the OrthoClear settlement. Other Align insiders' sales also did not follow regular trading patterns. For example, Bullington, George and Laks also sold only once prior to their Class Period sales since mid-2004, and, like defendant Prescott, those sales were timed with the stock price increase resulting from ClinAdvisor's announced launch and the OrthoClear settlement. Other

selling insiders, including Arjomand, Collins, Ellis, Henry and Zoromski, had ***no*** sales in the past several years prior to their Class Period sales.

149. Prior to the Class Period, on February 20, 2004, defendant Prescott adopted a trading plan pursuant to Rule 10b5-1 of the Exchange Act through which he sold his personally owned Align stock. During the Class Period, however, defendant Prescott ***diverted from his trading plan*** in order to unload his Align stock at the most beneficial times when the stock was most artificially inflated. Defendant Prescott had a duty to shareholders to abstain from trading while in possession of material, non-public information or disclose such information prior to trading – a duty defendant Prescott breached. Notably, ***none*** of defendant Prescott's, or any other Align insiders' Class Period sales were made pursuant to a Rule 10b5-1 trading plan.

**LOSS CAUSATION/ECONOMIC LOSS**

150. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Align common stock and operated as a fraud or deceit on Class Period purchasers of Align common stock by misrepresenting or failing to disclose to investors, *inter alia*, that (i) ClinAdvisor was ineffective and would not increase sales and utilization rates; (ii) Align was experiencing significant backlogs in processing new revenue cases; (iii) Align's sales force had shifted its focus to managing backlogged cases rather than generating new case growth; and (iv) Align was receiving numerous complaints from doctors due to its Patients First Program, further hampering its ability to generate growth.

151. Defendants' false or misleading statements and omissions, identified herein at ¶¶69-71, 83-86, 95-98, had the intended effect and caused Align common stock to trade at artificially inflated levels throughout the Class Period, reaching a high of $28.70 per share on October 24, 2007, the last day of the Class Period. Defendants' false or misleading statements and omissions directly caused Align's stock price to increase: (i) ***over 21%*** on January 30, 2007, to close at $16.69; (ii) ***over 33%*** on April 26, 2007, to close at $23.60; and (iii) ***over 7%*** on July 25, 2007, to close at $27.69.

152. On October 24, 2007, defendants disclosed that, despite their prior statements that ClinAdvisor was increasing utilization, Align's utilization rates had decreased from 3.4 in Q2 to 3.2 in Q3. Further, defendants disclosed that Align's case shipments for Q3 and Q4 2007 would be

below defendants' prior guidance, and lowered their Q4 and FY 2007 case shipment guidance. Based on defendants' new guidance, Q4 case shipments would remain flat or decrease from Q3 levels. These disclosures revealed that Align's business strategy was not on track. Align had paid off its competition and, yet, even with a virtual monopoly, it was not generating growth as promised. CW9 confirmed that Align's missed Q3 case shipments and lowered FY projections were based largely on ClinAdvisor's failure to increase sales.

153. Defendants also admitted that the Company would "not have the pipeline of case receipts" to meet defendants' prior guidance because the sales teams "weren't pushing as hard to get new case starts" during the Class Period. Contrary to their prior Class Period assurances, defendants disclosed that Align's sales force had "moved their focus away from generating case growth" during the Class Period in order to focus on "managing backlog and turnaround and expediting of cases" as a result of the Patients First Program. In addition, defendants admitted that Align was experiencing slower cycle times and significant backlogs during the Class Period, and that "virtually ***all*** of [Align's] customers were impacted by [the] slower cycle times and backlogs."

154. Given defendants' repeated bullish statements and assurances throughout 2007, analysts were surprised and disappointed by defendants' announcement of lower case shipments, as described in ¶116. Defendants' disclosures of decreasing sales and utilization rates informed investors that defendants' prior assurances of increasing sales and utilization and ClinAdvisor's success were false. Indeed, on defendants' disclosures, numerous analysts downgraded their recommendations for Align stock.

155. As a direct result of defendants' October 24, 2007 disclosures, the price of Align common stock fell precipitously, from $28.70 to $19.07, or approximately 34%. This drop removed the inflation from Align's stock price, causing real economic loss to investors who had purchased Align common stock during the Class Period. The timing and magnitude of the price decline in Align common stock negates any inference that the loss suffered by lead plaintiff and the other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. The following chart illustrates

the effect of defendants' fraud on Align's stock price, compared to Align's three main competitors, Danaher Corp., 3M Company and Dentsply International, Inc., listed in its 2006 Form 10-K:

**Align Technology, Inc.**

Indexed vs Danaher Corp., 3M Company, & DENTSPLY International, Inc.(1)
January 3, 2007 to December 31, 2007

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

156. At all relevant times, the market for Align common stock was an efficient market for the following reasons, among others:

(a) Align common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, Align filed periodic public reports with the SEC and the NASDAQ;

(c) Align regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Align was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

157. As a result of the foregoing, the market for Align common stock promptly digested current information regarding Align from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Align common stock during the Class Period suffered similar injury through their purchase of Align common stock at artificially inflated prices, and a presumption of reliance applies.

**CLASS ACTION ALLEGATIONS**

158. Lead plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Align between January 30, 2007 and October 24, 2007, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

159. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Align common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to lead plaintiff at this time and can only be ascertained through appropriate discovery, lead plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Align or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

160. Lead plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

161. Lead plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

162. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Align;

(c) whether the price of Align common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

163. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**NO SAFE HARBOR**

164. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. For example, the following statements identified as false or misleading in ¶¶69-71, 83-86, 95-98 above are statements of past or present fact and are not forward-looking: "We ***are very***

***pleased*** with the learning from our pilot launch . . . ." (¶69); "we ***are finding*** that doctors are using [ClinAdvisor] for real-time as we had originally thought" (¶70); "so far ***we're getting*** really great feedback [from ClinAdvisor]" (¶70); "the net ***is*** that they are more comfortable using it" (¶70); "the hypothesis to get at confidence and selection of the right case and simplification of the submission process . . . ***is*** still right on track" (¶70); "[w]e . . . ***refocused*** our efforts on product development, customer service and market expansion" (¶71); "[w]e ***are confident*** that improved features in user experience for Orthos and GPs will increase and sustain utilization over time" (¶83); "we ***are very pleased*** with our progress to date" (¶83); "importantly, it's a very good front-end" (¶84); "ClinAdvisor starts to help them select the right cases and support them as they get going" (¶84); "ClinAdvisor is a first step for the GP towards being a trusted advisor" (¶84); "[w]e haven't changed. . . . nothing really has changed there" (¶85); "we have no issues there and that bottleneck no longer exists" (¶86); "[ClinAdvisor] ***has now been launched*** nationally" (¶95); "[e]arly feedback ***tells us*** it really helps newly certified and less experienced doctors select appropriate cases based on their experience and skill set, which is exactly what we ***were hoping*** to achieve" (¶95); "[w]e ***are seeing*** newly certified doctors start their cases sooner" (¶96); "the bigger effect ***is*** . . . important increase in utilization growth" (¶96); "[w]e ***continue to see*** . . . progress in utilization growth" (¶97). Indeed, the only alleged false and misleading statements identified by defendants as forward-looking are defendants' July 25, 2007 case shipment forecasts.

165. Even with regard to defendants' forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For example, defendants did not caution investors that ClinAdvisor was a flawed concept and was not increasing sales or utilization rates. Defendants also did not caution investors that Align's sales force continued to be focused on expediting cases and handling the backlog caused by the Patients First Program instead of generating new revenue cases, or that Align was, in fact, losing business as a result of the "issues" caused by the Patients First Program. While defendants disclosed in Align's Q1 2007 Form 10-Q that the Company had experienced a delay of "approximately 10 days" ***in Q1 2007***, defendants falsely assured investors on April 26, 2007 that "***bottleneck no longer exists***" when, in fact, the bottleneck

did exist, as defendants later admitted on October 24, 2007. Moreover, as set forth in ¶¶74-82, 89-94, 102-109, 122-149, at the time the purportedly forward-looking statements were made, the speaker knew that the particular forward-looking statement was false.

**COUNT I**

**Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

166. Lead plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

167. During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168. Defendants (a) employed devices, schemes and artifices to defraud, (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

169. Lead plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Align common stock. Lead plaintiff and the Class would not have purchased Align common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

170. As a direct and proximate result of defendants' wrongful conduct, lead plaintiff and the other members of the Class suffered damages in connection with their purchases of Align common stock during the Class Period.

**COUNT II**

**Insider Trading Violations of §10(b) and Rule 10b-5 Against Defendant Prescott**

171. Lead plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

172. Defendant Prescott violated §10(b) of the Exchange Act and Rule 10b-5 in that he is liable for making false and misleading statements and failing to disclose material known to him about Align. Defendant Prescott, while in possession of material non-public information about the Company's true financial and business condition, sold millions of dollars worth of Align stock at artificially inflated prices, as set forth in ¶¶144-149.

**COUNT III**

**Violation of §20(a) of the Exchange Act Against All Defendants**

173. Lead plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

174. Defendant Prescott acted as a controlling person of Align within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of his position as CEO of Align, his ownership of Align stock, and his statements made on behalf of the Company, defendant Prescott had the power and authority to cause Align and its officers and employees to engage in the wrongful conduct complained of herein. Align controlled defendant Prescott and the Company's other officers and employees, including executive officers Arjomand, Bullington, Ellis and Zoromski. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, lead plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying lead plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of lead plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding lead plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

175. Lead plaintiff hereby demands a trial by jury.

DATED: July 22, 2011

ROBBINS GELLER RUDMAN
& DOWD LLP
WILLOW E. RADCLIFFE
SARAH R. HOLLOWAY

s/ WILLOW E. RADCLIFFE
WILLOW E. RADCLIFFE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiff

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
4748 Wisconsin Avenue, N.W.
Washington, DC 20016
Telephone: 202/362-0041
202/362-2640 (fax)

Additional Counsel for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of OCTOBER, 2009.

PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUND

By: [signature]

Its: [illegible]

ALIGN

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/19/2007 | 76,400 | $26.09 |
| 07/20/2007 | 42,300 | $26.05 |
| 08/16/2007 | 20,700 | $24.49 |
| 08/17/2007 | 2,700 | $25.48 |
| 08/24/2007 | 48,300 | $23.45 |

CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 22, 2011.

s/ WILLOW E. RADCLIFFE
WILLOW E. RADCLIFFE

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail:willowr@rgrdlaw.com

# Mailing Information for a Case 3:09-cv-03671-MMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Molly Allison Arico**
  marico@wsgr.com,cjohnston@wsgr.com

- **Douglas John Clark**
  dclark@wsgr.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Caz Hashemi**
  CHASHEMI@WSGR.COM,tbell@wsgr.com,vmendoza@wsgr.com

- **Katherine Leigh Henderson**
  khenderson@wsgr.com,mmsmith@wsgr.com,abaranski@wsgr.com

- **Sarah Renee Holloway**
  SHolloway@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,SHolloway@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)