1   DOUGLAS J. CLARK, State Bar No. 171499
    dclark@wsgr.com
2   CAZ HASHEMI, State Bar No. 210239
    chashemi@wsgr.com
3   KATHERINE L. HENDERSON, State Bar No. 242676
    khenderson@wsgr.com
4   MOLLY A. ARICO, State Bar No. 260472
    marico@wsgr.com
5   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
6   650 Page Mill Road
    Palo Alto, CA 94304-1050
7   Telephone:  (650) 493-9300
    Facsimile:   (650) 565-5100

8

9   Attorneys for Defendants
    ALIGN TECHNOLOGY, INC. AND
10  THOMAS M. PRESCOTT

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14  CHARLES WOZNIAK, Individually and on      )   Case No.:  C-09-03671-MMC
    Behalf of All Other Similarly Situated,    )
15                                             )   **DEFENDANTS' NOTICE OF**
                                               )   **MOTION AND MEMORANDUM OF**
16                Plaintiffs,                   )   **POINTS AND AUTHORITIES IN**
                                               )   **SUPPORT OF MOTION TO**
17        v.                                    )   **DISMISS PLAINTIFFS' SECOND**
                                               )   **AMENDED COMPLAINT**
18  ALIGN TECHNOLOGY, INC. AND THOMAS          )
    M. PRESCOTT,                               )   Hearing Date:  December 9, 2011
19                                             )   Hearing Time: 9:00 a.m.
                  Defendants.                  )   Courtroom:  7, 19th floor
20                                             )   Before:  Judge Maxine M. Chesney
                                               )
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................................1

ISSUES TO BE DECIDED.........................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................1

INTRODUCTION........................................................................................................................1

BACKGROUND..........................................................................................................................2

ARGUMENT ...............................................................................................................................4

I. PLAINTIFFS SIMPLY REITERATE THEIR ALLEGATIONS REGARDING PATIENTS FIRST WHICH THIS COURT ALREADY DEEMED INSUFFICIENT TO STATE A CLAIM UNDER SECTION 10(b) ..................................4

II. PLAINTIFFS' NEW ALLEGATIONS REGARDING CLINADVISOR FAIL TO STATE A CLAIM FOR THE SAME REASONS THE COURT FOUND THE PATIENTS FIRST ALLEGATIONS LACKING .............................................................6

    A. Plaintiffs Fail to Plead Loss Causation With Respect to Allegedly False Statements Regarding ClinAdvisor.................................................................6

    B. Many of the Allegedly False Statements Regarding ClinAdvisor Are Inactionable Puffery .........................................................................................8

    C. Many of the Allegedly False Statements Regarding ClinAdvisor Are Protected by the Safe Harbor and Bespeaks Caution Doctrine ...........................11

    D. Align Did Not Omit Any Material Information Regarding ClinAdvisor.............13

III. PLAINTIFFS FAIL TO PLEAD WITH PARTICULARITY ANY FACTS CREATING A STRONG INFERENCE OF SCIENTER................................................19

    A. Plaintiffs Offer No New Allegations....................................................................20

        1. Internal Reports and Sales Meetings ........................................................20

        2. Core Operations........................................................................................22

        3. Admissions ................................................................................................23

        4. Stock Sales ................................................................................................23

    B. When Considered Holistically, the SAC Fails to Allege Scienter ........................24

CONCLUSION ...........................................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4   *Brodsky v. Yahoo! Inc.,* 630 F. Supp. 2d 1104 (N.D. Cal. 2009)................................... 15

5   *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997 (9th Cir. 2002).......................... 13

6   *DSAM Global Value Fund v. Altris Software, Inc.*. 288 F. 3d 385 (9th Cir. 2002) ..................... 19

7   *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ....................................................... 6

8   *In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010)....................................... 5, 9, 12

9   *In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005) ....................................... 17, 20

10  *In re Immersion Corp., Sec. Litig.*, No. C 09-04073 MMC, 2011 WL 871650 (N.D.
11      Cal. Mar. 11, 2011) .............................................................................................. 6

    *In re NVIDIA Corp. Sec. Litig.*, No. 08-CV-04260 RS, 2010 WL 4117561 (N.D.
12      Cal. Oct. 19, 2010) .............................................................................................. 8

13  *In re Portal Software Inc. Sec. Litig.,* No. C 03-5138 VRW, 2006 WL 2385250
14      (N.D. Cal. Aug. 17, 2006) .................................................................................. 19

    *In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222 CW, 2010 WL 3447857 (N.D.
15      Cal. Aug. 27, 2010) ............................................................................................ 8

16  *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003).................................. 23

17  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F. 3d 970 (9th Cir. 1999), *rev'd on
        other grounds by South Ferry LP No. 2 v. Killinger*, 542 F. 3d 776 (9th Cir.
18      2008)............................................................................................................. 20, 23

19  *In re Silicon Image, Inc. Sec. Litig.,* No. C-05-456 MMC, 2007 WL 2778414 (N.D.
20      Cal. Sept. 21, 2007), *aff'd*, 325 Fed. Appx. 560 (9th Cir. 2009)..................... 18

    *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059 (N.D. Cal.
21      2001)................................................................................................................. 24

22  *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996) ....................................... 11

23  *In re Tibco Software, Inc.*, No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May
24      25, 2006)........................................................................................................... 18

    *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir. 1994) .............................................................. 9
25
    *Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426
26      (N.D. Cal. July 27, 2005) .................................................................................. 19

27  *Lapiner v. Camtek Ltd.*, No. C 08-01327 MMC, 2011 WL 445849 (N.D. Cal. Feb.
        2, 2011)............................................................................................................... 7
28

*Lipton v. Pathogenesis Corp.*, 284 F. 3d 1027 (9th Cir. 2002) ................................................. 20, 24

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) ......................... 6, 8

*Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F. 3d 1424 (9th Cir. 1995).......................................... 24

*Plevy v. Haggerty*, 38 F. Supp. 2d 816 (C.D. Cal. 1998)............................................................. 24

*South Ferry LP No. 2 v. Killinger,* 542 F.3d 776 (9th Cir. 2008) .......................................... 22, 23

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308 (2007) .............................................. 20

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009)................................. 17, 19

**STATUTES**

15 U.S.C. § 78u-4(b)(2) .............................................................................................................. 19

15 U.S.C. § 78u-5(c)(1)(A) ......................................................................................................... 11

15 U.S.C. § 78u-5(c)(1)(B) ......................................................................................................... 12

1

## NOTICE OF MOTION

2        PLEASE TAKE NOTICE that on December 9, 2011 at 9:00 a.m. or as soon thereafter as

3 may be heard, before the Honorable Maxine Chesney of the United States District Court for the

4 Northern District of California, San Francisco, California, defendants Align Technology, Inc.

5 ("Align" or the "Company") and Thomas Prescott (collectively, the "Defendants") will and

6 hereby do move, pursuant to Fed. R. Civ. P. 9(b) and 12(b), and the Private Securities Litigation

7 Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5 *et seq*., to dismiss plaintiffs'

8 Second Amended Complaint for Violations of Federal Securities Laws ("SAC") with prejudice.

9 This Motion is supported by this Notice, Motion and Memorandum of Points and Authorities in

10 Support of the Motion; the Declaration of Molly Arico ("Arico Decl.") and accompanying

11 exhibits ("Ex. __"); the Request for Judicial Notice; the [Proposed] Order; all pleadings and

12 papers filed herein; oral argument of counsel; and any other matter properly before this Court.

13

## ISSUES TO BE DECIDED

14 1.        Does the SAC cure the defects identified by the Court's June 8, 2011 Order and

15 adequately plead with particularized facts that Defendants made an actionable false or

16 misleading statement between January 30, 2007 and October 24, 2007 (the "Class Period")?

17 2.        Does the SAC cure the defects identified by the Court's June 8, 2011 Order and

18 adequately plead particularized facts giving rise to a strong inference that Defendants made a

19 false and misleading statement with scienter?

20 3.        Does the SAC adequately plead loss causation?

21

## MEMORANDUM OF POINTS AND AUTHORITIES

22

### INTRODUCTION

23        The SAC is plaintiffs' second attempt to manufacture a fraud case from Align's October

24 24, 2007 announcement that, although the Company had met its previously announced revenue

25 guidance, it was lowering its guidance for Q4 2007 due to a reduced pipeline of new cases.  This

26 second attempt fares no better than the first.  Plaintiffs' first theory of fraud revolved around

27 Align's Patients First Program ("Patients First").  Plaintiffs alleged that purportedly undisclosed

28 information about Patients First rendered false and misleading various Class Period statements

1   about Align's processing capacity, production backlog and sales focus on new revenue cases.  In

2   dismissing plaintiffs' first amended complaint ("FAC"), the Court correctly rejected this theory in

3   its entirety.

4          Now, while plaintiffs retain some of the previously rejected Patients First allegations, they

5   largely shift gears and center the SAC on ClinAdvisor – a software tool released by Align during

6   the Class Period which was designed to support dental practitioners in using Align's main product

7   Invisalign.  Just as they did with Patients First, plaintiffs allege that purportedly undisclosed

8   information about ClinAdvisor rendered certain Class Period statements about ClinAdvisor and

9   Align's growth prospects false and misleading.  These new allegations fail for the same reasons

10  the original allegations failed: (1) plaintiffs rely upon inactionable puffery, (2) Defendants'

11  forward-looking statements are protected by the PSLRA's safe harbor, (3) none of plaintiffs' CW

12  allegations actually contradict any of the allegedly misleading statements, and (4) plaintiffs still

13  fail to provide any specific allegations sufficient to plead scienter.

14         The SAC is beset by a new, fatal problem.  It fails to plead loss causation.  Neither the

15  October 24, 2007 press release nor earnings call precipitating the stock drop contained a mention

16  of ClinAdvisor.  ClinAdvisor was irrelevant to the market reaction that eventually prompted the

17  filing of this action.  While it is possible to cobble together snippets of company statements or

18  disclosures concerning one aspect of a company's business in a desperate attempt to plead a fraud

19  claim, it is impossible to rewrite market history.  Because there was no corrective disclosure

20  related to ClinAdvisor which caused a stock drop on October 24, there is no loss causation, and

21  there is no securities fraud claim.

## BACKGROUND

23         As explained in Defendants' motion to dismiss the FAC, the Class Period was both a

24  prosperous and challenging time for Align.  It experienced remarkable growth, with a 40%

25  increase in revenue from 2006 to 2007, while also dealing with thoroughly disclosed issues

26  arising from Patients First.  When Align announced that its incredible growth trend would not

27  necessarily continue at the then current rates – a possibility Align had specifically warned against

28  – the market reacted.

1    **Procedural History and the FAC.**  This purported securities class action was filed on

2  August 11, 2009.  Plaintiffs filed their FAC on January 29, 2010.  The original theory of the FAC

3  was based upon Patients First – a program whereby Align made Invisalign treatment available to

4  former OrthoClear, Inc. ("OrthoClear") patients at no additional cost after a settlement between

5  the parties led to OrthoClear's removal from the marketplace.  Plaintiffs alleged that purportedly

6  undisclosed information about Patients First rendered various statements about Align's processing

7  capacity, production backlog and sales focus on new revenue cases false and misleading.  On

8  March 26, 2010, Defendants filed a motion to dismiss the FAC.  On June 8, 2011, the Court

9  issued an Order dismissing the FAC with leave to amend ("Order").

10    **The SAC.**  Despite the Court's Order, plaintiffs reiterate – nearly verbatim – certain of

11  their previously rejected allegations regarding Align's processing capacity, backlog and sales

12  focus following the implementation of Patients First.  *See* ¶¶ 11-15, 71, 80-82, 85-86, 91-94, 98,

13  102, 106-109, 111-114, 122, 125-139 (paragraph (¶) references refer to the SAC, unless

14  otherwise noted).  In addition, plaintiffs now focus on an entirely new theory of fraud centered

15  on Align's ClinAdvisor software tool.  Just as with Patients First, plaintiffs point to a number of

16  CW allegations which they claim rendered false and misleading several of Defendants'

17  statements about ClinAdvisor and Align's general prospects for growth.

18    **ClinAdvisor.**  Align first introduced ClinAdvisor in October 2006.  ¶¶ 4-5, 60; Ex. 1.

19  ClinAdvisor was not a product sold by Align, but rather was a suite of software tools (for which

20  Align did not charge) aimed at making Invisalign case selection, submission and review

21  processes more efficient for general practitioner dentists ("GPs").  *Id.*  ClinAdvisor was intended

22  to both help GPs use Invisalign and for use as a "chair side tool" to help illustrate potential

23  treatment options to prospective patients.  *Id.*

24    ClinAdvisor was announced as a "first step" in Align's strategic plan to evolve Invisalign

25  into a system targeted specifically at GP and orthodontist needs.  Ex. 2 at 4-5.  Align first

26  released ClinAdvisor in Q4 2006 to a pilot group of specifically targeted practices, from whom

27  Align hoped to learn and integrate feedback into a future commercial launch.  *Id.* at 5.

28  Throughout Q1 2007, ClinAdvisor underwent a series of beta releases and pilot tests in order to

1  refine the software tool.  Ex. 3 at 3.  Align did an additional limited release to certain GPs in

2  April 2007 and then a full launch in July 2007.  ¶ 9.  Align's goal was to integrate ClinAdvisor

3  into its GP certification training by the end of Q3 2007.  Exs. 3 at 3; 4 at 17; 5 at 2-3.

**ARGUMENT**

4

5  **I.    PLAINTIFFS SIMPLY REITERATE THEIR ALLEGATIONS REGARDING
        PATIENTS FIRST WHICH THIS COURT ALREADY DEEMED INSUFFICIENT
6      TO STATE A CLAIM UNDER SECTION 10(b)**

7          Despite the Court's Order rejecting the FAC in its entirety, plaintiffs point to the exact

8  same statements with respect to Patients First and allege they were false and misleading for the

9  exact same reasons.  In fact, all plaintiffs have done with respect to their Patients First allegations

10  is delete some of the text, not add any new allegations.  Since what remains in the SAC is a

11  verbatim recitation of allegations already deemed insufficient, these allegations should be

12  summarily rejected.

13          **January 30, 2007 Statements.**  Plaintiffs first reallege Mr. Prescott's statement that,

14  "[w]e . . . refocused our efforts on product development, customer service and market

15  expansion" was false and misleading.  *Compare* ¶ 71 *with* FAC ¶ 49 (emphasis omitted).

16  Plaintiffs rely on the same vague and generic CW statements regarding Align's ability to handle

17  Patients First cases to support this claim.  *Compare* ¶ 81 *with* FAC ¶ 58 ("According to

18  [Territory Account Managers CW1 and CW2], Align was unprepared to handle . . . and

19  underestimated the number of OrthoClear cases it would assume as part of the settlement") and ¶

20  82 *with* FAC ¶ 62 ("Align's sales representatives spent between 20% to 50% of their time on

21  Patients First . . . .") (emphasis omitted).  The Court has already rejected these allegations,

22  finding the passage to be a "generalized statement[] of optimism that constitute[s] 'non-

23  actionable puffing.'"  Order at 5-6 (citation omitted).  The Court further found that the CW

24  statements did "not suffice" to demonstrate Defendants lacked a reasonable basis for their

25  statements.  Order at 7-8.

26          **April 26, 2007 Statements.**  Plaintiffs reassert the following two statements made during

27  Align's April 26, 2007 earnings call were false and misleading as a result of alleged omissions

28  regarding Patients First:

- "No, it's a very consistent approach.  We haven't changed.  We've optimized coverage as we look at in 2007, but we're – they have a very specific game plan about how they are to go about covering their territory and taking care of their existing accounts and building new practices.  So nothing really has changed there." *compare* ¶ 85 *with* FAC ¶ 69; and
- "And so, we have no issues there and that bottleneck no longer exists." *compare* ¶ 86 *with* FAC ¶ 70 (emphasis omitted).

The Court also already rejected these allegations, finding plaintiffs "fail[ed] to show how the above statements were misleading in light of the alleged omissions."  Order at 13-14.  Plaintiffs' substitution of CWs 9 and 10 to stand for the same propositions regarding Patients First and ClinCheck (*i.e.,* that Align was "overwhelmed" with Patients First and had a "significant" backlog) as CWs 1, 2 and 3 does not save plaintiffs' claims.  *Compare* ¶¶ 91, 93 *with* FAC ¶ 73 and ¶ 92 *with* FAC ¶ 60; *compare also* ¶ 94 *with* FAC ¶ 74.  The Court already ruled that "none of the [CW] allegations contradicts defendants' statements."  Order at 14-15.

**July 25, 2007 Statements.**  Notwithstanding the Court's ruling that Defendants' projections "qualify as forward-looking[,]" were "accompanied by meaningful cautionary statements[,]" and thus "fall within the PSLRA's safe harbor[,]" plaintiffs reiterate the allegation that Align's July 2007 case shipment projections of 206,000 to 209,000 cases were false.  Order at 9-11; *compare* ¶ 98 *with* FAC ¶ 78.  The reasons plaintiffs give for falsity also remain largely the same and focus only on Defendants' alleged knowledge of falsity.  *See*, *e.g.*, ¶ 102.  Since the Court has already found that Defendants' projections fall within the safe harbor, Defendants' state of mind is "irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112-13 (9th Cir. 2010).  Thus, plaintiffs can do nothing to revive their claims concerning Defendants' projections.[1]

In short, plaintiffs again fail to meet the pleading requirements of Rule 9(b) and the PSLRA by recycling allegations regarding Patients First already rejected by this Court.

---

[1] Although plaintiffs contend their new ClinAdvisor allegations render Align's case shipment projections false and misleading (*see* ¶ 102), those allegations are irrelevant because the Court has already ruled Align's projections fall within the safe harbor.  Order at 9-11.

## II.   PLAINTIFFS' NEW ALLEGATIONS REGARDING CLINADVISOR FAIL TO STATE A CLAIM FOR THE SAME REASONS THE COURT FOUND THE PATIENTS FIRST ALLEGATIONS LACKING

Apparently recognizing that their Patients First based theory of fraud cannot be salvaged, plaintiffs attempt to recast their complaint with ClinAdvisor as the new star.  Just as they did with Patients First, plaintiffs allege that various statements in Align's January, April and July 2007 earnings calls were false and misleading in light of certain CW allegations about purported problems with ClinAdvisor.  As demonstrated below, these allegations fail for the same reasons plaintiffs' Patients First allegations failed: (1) Defendants' statements were inactionable puffery, (2) Defendants' statements were forward-looking and protected by the safe harbor, and (3) there was no actionable omission because the new CW allegations similarly do not contradict Defendants' actual statements.

As a preliminary matter, however, these new allegations fail for a more fundamental and simple reason.  A fraud claim requires that a plaintiff allege when the fraud was revealed to the market and a resulting stock drop.  Because plaintiffs have simply substituted ClinAdvisor allegations for Patients First allegations, yet retained the same allegations as to when the market purportedly learned of the "fraud," they have not adequately alleged that their loss was caused by any allegedly misleading statements about ClinAdvisor.  The SAC's new story lacks an ending.  Cliffhangers may be pleasant dramatic fare, but make for poor securities fraud claims.

### A.   Plaintiffs Fail to Plead Loss Causation With Respect to Allegedly False Statements Regarding ClinAdvisor

To state a claim for securities fraud, plaintiffs must plead loss causation, the "causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  To adequately allege loss causation, plaintiffs must plead facts *closely linking* the defendant's alleged misstatements to the drop in share price.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063-64 (9th Cir. 2008) (a plaintiff must allege the "practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses.").  In other words, plaintiffs must point to a disclosure that revealed the alleged fraud to the market.  *See In re Immersion Corp., Sec. Litig.*, No. C 09-04073 MMC, 2011 WL

871650, at *8 (N.D. Cal. Mar. 11, 2011) (Chesney, M.).  Here, plaintiffs allege that Defendants made a number of false and misleading statements about ClinAdvisor, which allegedly touted ClinAdvisor's ability to increase sales and utilization rates.  Plaintiffs contend the alleged ClinAdvisor fraud was revealed to investors on October 24, 2007.  ¶¶ 110, 152.  Conspicuously absent from the SAC, however, are *any* supporting facts, *i.e., any* mention of ClinAdvisor by Defendants on October 24, 2007.

        Indeed, a careful examination of Defendants' October 24, 2007 statements shows that Defendants *never* even mentioned ClinAdvisor, much less revealed that any prior statements about ClinAdvisor were false or misleading.  *See* Exs. 6 & 7.  And, plaintiffs point to *no other* disclosure that would have revealed the alleged ClinAdvisor fraud to the market.  With respect to loss causation, the SAC alleges only that Align's October 24, 2007 announcement of its third quarter financials (1) disclosed lower than expected Q3 case shipments, (2) disclosed decreased utilization rates for Q3 as compared to Q2, and (3) lowered Align's Q4 and FY 2007 case shipment guidance.  ¶ 152.  These disclosures allegedly led to a stock price decrease of 34%.  ¶ 155.  Even assuming *arguendo* that the SAC's allegations regarding ClinAdvisor are sufficient to plead falsity – which they are not - plaintiffs fail to demonstrate any causal connection between the allegedly false statements about ClinAdvisor and the October 24, 2007 announcement regarding case shipments and utilization rates.

        This Court recently rejected a similar attempt to plead loss causation where the plaintiff failed to connect the allegedly misleading statements to the disclosures which led to a stock price decline.  *See Lapiner v. Camtek Ltd.*, No. C 08-01327 MMC, 2011 WL 445849, at *9 (N.D. Cal. Feb. 2, 2011) (Chesney, M.).  In *Lapiner*, plaintiffs alleged six disclosures and subsequent stock price declines supported their allegations of loss causation in a securities class action alleging defendants engaged in a scheme to inflate the defendant company's stock price by publishing false and misleading reports regarding the company's financials.  *Id*. at *1, 9.  In rejecting plaintiffs' claim, this Court found plaintiffs failed to plead loss causation where they did not allege how the disclosure that the company would miss its projections amounted to a revelation of the alleged fraud involving improper revenue recognition.  *Id*. at *9.  The SAC's allegations

1   are similarly deficient.  The SAC does not plead any factual allegations that demonstrate how

2   Align's lowered case shipments and utilization rates in October 2007 disclosed any fraud

3   involving ClinAdvisor.[2]  The lack of any causal connection between the alleged fraud and the

4   alleged loss warrants the SAC's dismissal.  *See In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-

5   0222 CW, 2010 WL 3447857, at *12 (N.D. Cal. Aug. 27, 2010) (allegedly corrective disclosures

6   which revealed negative news about company's financial condition and future prospects "do not

7   reveal the necessary casual link between the alleged fraud and the drop in [company's] stock

8   price"); *In re NVIDIA Corp. Sec. Litig.*, No. 08-CV-04260 RS, 2010 WL 4117561, at *12 (N.D.

9   Cal. Oct. 19, 2010) (finding "far more plausible reason for the resulting drop in [company's]

10  stock price [was that] the company failed to hit prior earnings estimates.") (citing *Metzler*, 540 F.

11  3d at 1064).

12      **B.      Many of the Allegedly False Statements Regarding ClinAdvisor Are
                  Inactionable Puffery**

13

14          Despite the Court's prior admonition that "'[v]ague, generalized, and unspecific

15  assertions' of corporate optimism or statements of 'mere puffing' cannot state actionable

16  material misstatements of fact under federal securities laws'" (Order at 4-5) (citation omitted),

17  plaintiffs, once again, base their fraud claims on precisely that type of puffery.  For example,

18  plaintiffs allege that Defendants made the following allegedly misleading statements about

19  ClinAdvisor and Align's prospects for future growth:

20      • "We are very pleased with the learning from our pilot launch to around 25
          practices and have now expanded the pilot to over 100 offices."  ¶ 69;

21      • "[S]o far we're getting really great feedback . . . ."  ¶ 70;
        • "We are confident the improved features in user experience for Orthos and GPs

22        will increase and sustain utilization over time . . . we are very pleased with our
          progress to date on key strategic initiatives . . . ."  ¶ 83;

23      • "[I]mportantly, it's a very good front-end . . . ClinAdvisor is a first step for the GP
          towards being a trusted advisor . . . ."  ¶ 84;

24      • "[B]ut the bigger effect is more of a widespread general slow but important
          increase in utilization growth across most cohorts . . . ."  ¶ 96;

25      • "This program has been tested . . . as a key element of our customer utilization
          growth strategy."  ¶ 95; and

26  _____

27      [2] CW9's hypothesis that the lower case shipments in Q3 2007 were based largely on
    ClinAdvisor's failure to increase sales (*see* ¶ 110), even if credited – which, as discussed *infra* at

28  17-19, it should not be – says nothing about what was revealed to the market.

- "We continue to see expansion in our customer base . . . as well as progress in utilization growth."  ¶ 97 (emphasis omitted).

These statements are "in essence, 'feel good monikers,' *i.e.,* statements on which investors do not rely when valuing corporations."  Order at 6-7 (citing *In re Cutera*, 610 F.3d at 1111).  As with the FAC, plaintiffs have not alleged a basis for rendering these statements actionable because none of their CW allegations demonstrates (1) that the statements were not actually believed, (2) that there was no reasonable basis for the belief, or (3) that the speaker was aware of undisclosed facts tending to undermine the statement's accuracy.  Order at 7 (citing *Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir. 1994)).

For example, plaintiffs point to purported problems with ClinAdvisor and alleged delays in its launch schedule that resulted from these issues.  ¶¶ 74-79.  Plaintiffs fail to acknowledge, however, that ClinAdvisor (which was merely a support tool) was first released only in limited form to a small group of pilot participants so that Align could test it and identify those very problems.  As Mr. Prescott disclosed:

> ClinAdvisor was launched last week and has been rolled out to a pilot group of specifically targeted practices.  We expect to learn a great deal from their broad use of this new system and **will integrate that learning into the full commercial launch in early 2007**.  Based on the feedback from ADA last week, doctors really get it and they seem to be very excited about this simple approach, which is going to make them more confident about utilizing Invisalign in their practice and gain efficiency as a result.  This is the beginning of our efforts to reach the mainstream of dental care.  The path to reach that mainstream is through continued evolution of our software and products.

Ex. 2 at 5 (emphasis added).  Accordingly, the reporting of issues during the initial pilot phase does not undermine Mr. Prescott's belief in his statements that Align was "pleased with the learning from our pilot launch" and/or that launching ClinAdvisor was the "first step" toward Align's long term goal of increasing utilization among GPs.  *See* ¶¶ 69, 84 (emphasis omitted). In fact, Align actually disclosed some of the issues that were reported in the pilot launch:

> So, we started in 25, and we had a high possessive that the principle usage mode would be to use this to submit all their cases.  **And one other things we found was they in fact wanted to even simplify it more than that, and what they wanted was many of these practices who wanted Jeff, was await or just push a button and say here is the case keep it green**.  Using the green, blue, black kind of scheme model.  So, as we went through an – a fast evolution with that input and we

1   then released into around 100 sites now, we are finding that doctor using it for
2   realtime, as we originally thought, for realtime discussions with patients at
    chairside and to improve their submissions, but a lot of them really simply want
3   way to say – here's a case, keep me green and if it's on the edge, show me what the
    trade-offs are.  So, **what our goal in having these limited releases and then
4   staged rollouts is that where we extract learning from the earlier users, we can
    then implement that in the next release very quickly on a small base.**  So, so far
5   we are getting really great feedback and the – I think then during still out on this
    hundred, but the net is that they are – they are more comfortable using it and more
6   comfortable discussing it at chairside with patients, which has always been an issue
    for GPs.

7   Ex. 8 at 10 (emphasis added).  Thus, contrary to plaintiffs' suggestions, the market was fully

8   aware that issues were encountered in the ClinAdvisor pilot launch.

9          Plaintiffs also point to allegations from CW9 and CW12 that "early feedback" on the

10  ClinAdvisor pilot launch was "negative[,]" "poor[,]" and "ineffective[.]"  ¶¶ 76, 89.  What

11  exactly do these CWs mean by "negative" or "poor[;]" what percentage of GPs reported such

12  "negative" feedback; when exactly was this feedback received during the pilot launch; and what

13  exactly was ClinAdvisor "ineffective" at doing?  Plaintiffs do not specify.  Such vague

14  allegations do nothing to undermine Mr. Prescott's statements in January 2007 that the Company

15  had received "really great feedback" in the pilot test that was allowing Align to improve the

16  software and "learn[] from the pilot launch" as he specifically disclosed was the goal of the pilot

17  test.  ¶¶ 69-70 (emphasis omitted).  Plaintiffs imply that feedback would only be "great" and help

18  in "learning" if the feedback were somehow "positive" and/or if no bugs were uncovered.  But

19  that is contrary to the nature of a pilot test launch and certainly contrary to the context in which

20  Defendants indicated that they had gotten "great" feedback – *i.e.*, valuable feedback that would

21  help Align improve the tool – and that launching ClinAdvisor was merely a "first step" and part

22  of a broader long-term strategic initiative to increase GP utilization of Invisalign.

23         Importantly, the "negative . . . early feedback" was purportedly obtained only in

24  connection with the pilot test launch (which began in October 2006) and a limited launch in

25  April 2007.  ¶¶ 76, 89, 103.  No CW alleges that Align continued to see problems or receive

26  "negative" feedback after the full launch of ClinAdvisor in July 2007.  In fact, plaintiffs concede

27  that Mr. Prescott authorized additional resources allegedly needed to develop ClinAdvisor and

28  prepare for its full scale launch in July 2007.  ¶¶ 8, 79.  In other words, the CW allegations are

1  completely consistent with Align's disclosures, *i.e.,* that Align received good useful feedback in

2  the pilot test launch that allowed it to improve the software tool before its full scale launch in

3  July 2007.  *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930 (9th Cir. 1996) (company could have

4  known of problems and still thought could achieve goals).

5        **C.**     **Many of the Allegedly False Statements Regarding ClinAdvisor Are Protected by the Safe Harbor and Bespeaks Caution Doctrine**

6

7        Plaintiffs also rely, once again, on purportedly misleading forward-looking statements,

8  this time around concerning Align's plans for ClinAdvisor and its prospects for future use:

9  - "[W]e're going to . . . while extending the GP-focused ClinAdvisor . . . ."  ¶ 69;
10  - "The goal here is that you play a turnkey system for the GP, making it easier to select simple cases, simplify the diagnostic and setup process, and ensure great results – all with less time and effort."  ¶ 69;
11  - "[T]he hypothesis to get at confidence and selection of the right case and simplification of the submission process, and then monitoring for results is still
12  right on track. And again, as we go out through '07, we will buildout [sic] around that initial core of functionality and features."  ¶ 70;
13  - "ClinAdvisor will help newly certified and less experienced doctors learn how to assess and select appropriate cases, given their current experience and skills. This
14  should boost the early confidence and clinical success of new users."  ¶ 83; and
15  - "[T]he new ClinAdvisor integration into our first level certification will help further."  ¶ 96 (emphasis omitted).[3]

16        As the Court previously noted, a person cannot be held liable for a forward-looking

17  statement provided the statement is identified as such and accompanied by meaningful

18  cautionary statements.  Order at 8-9 (citing 15 U.S.C. § 78u-5(c)(1)(A)).  Just like the forward-

19  looking statements in the FAC, liability is precluded based on the forward-looking statements

20  identified in the SAC because each of the statements was identified as forward-looking and

21  accompanied by numerous cautionary statements.  For instance, each of the earnings calls

22  included the following cautionary statement:

23      During this conference call, we may make forward-looking statements relating to Align's expectations about future events, products and future results, including
24      statements regarding expected financial results for Q1 '07 and fiscal '07.  Any forward-looking statements we make during the conference call are based upon
25      information available to Align, as of the date hereof.  Listeners are cautioned that these forward-looking statements are only predictions and are subject to risk,
26

27       [3] The SAC mischaracterizes this quote as follows: "[T]he new ClinAdvisor integration . . .
28  will help [to increase utilization growth] further."  ¶ 96.

uncertainties, and assumptions that are difficult to predict.  As a result, actual results may differ materially and adversely from those expressed in any forward-looking statements.  Factors that might cause such a difference include, but are not limited to risks that are detailed from time-to-time in Align's periodic reports filed with the SEC, including but not limited to its Annual Report on Form 10-K for the fiscal year ended December 31, 2005, which was filed with Securities and Exchange Commission on March 1, 2006, and quarterly reports on Form 10-Q.

Ex. 8 at 1; *see also* Exs. 3 at 1; 5 at 1.  Align's quarterly and annual reports, which were incorporated in each of the earnings calls, contained the following specific warnings about the future prospects for ClinAdvisor:

> We recently announced a phased rollout of ClinAdvisor, a new suite of software tools designed to make Invisalign case selection and submission processes more efficient for doctors.  In addition, we plan to introduce a further series of software enhancements that will evolve Invisalign into distinct suites of software tools for the orthodontist and GP.  There can be **no assurance that we will be able to successfully develop, sell and achieve market acceptance** of these and other new products and applications and enhanced versions of our existing product.  The extent of, and rate at which, market acceptance and penetration are achieved by future products is a function of many variables, which include, among other things, price, safety, efficacy, reliability, marketing and sales efforts, the availability of third-party reimbursement of procedures using our new products, the existence of competing products and general economic conditions affecting purchasing patterns.  Our ability to market and sell new products may also be subject to government regulation, including approval or clearance by the United States Food and Drug Administration, or FDA, and foreign government agencies.  Any failure in our ability to successfully develop and introduce new products or enhanced versions of existing products and achieve market acceptance of new products and new applications **could have a material adverse effect on our operating results and could cause our revenues to decline.**

Ex. 9 at 26 (emphasis added); *see also* Exs. 15 at 43-44; 10 at 36; 4 at 35-36; 11 at 36.  These statements identified the risks plaintiffs allege ultimately materialized, *i.e.,* the risk that ClinAdvisor would not be widely accepted and would not increase utilization and sales.  Thus, the safe harbor is applicable and bars plaintiffs' claims.

Even if these warnings could somehow be deemed insufficient – which, as the Court previously found, they cannot – the safe harbor would still be applicable because plaintiffs fail to allege actual knowledge of falsity.  15 U.S.C. § 78u-5(c)(1)(B); *In re Cutera*, 610 F.3d at 1112 (forward-looking statements unaccompanied by meaningful cautionary statements fall outside the safe harbor only if plaintiff alleges facts that would create a strong inference that defendants made the statement with actual knowledge of falsity).  *See infra* at Section III.

**D.      Align Did Not Omit Any Material Information Regarding ClinAdvisor**

Finally, plaintiffs attempt to show fraud by pointing to numerous CW allegations which detail supposedly undisclosed information about ClinAdvisor that purportedly rendered false and misleading various statements made by Defendants in the January, April and July earnings calls. As the Court previously noted, in order to be actionable, an omission must "'create an impression of a state of affairs that differs in a material way from the one that actually exists.'" Order at 12 (citing *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Plaintiffs have not shown that to be the case here with respect to ClinAdvisor.

**Statements Regarding ClinAdvisor's Efficacy.**  Plaintiffs first suggest that Align's disclosures somehow created a false impression of the efficacy and/or success of ClinAdvisor and its pilot launch.  Yet, none of the CW allegations actually contradicts Defendants' statements.

***January 2007 Statements***.  Mr. Prescott made a number of statements about ClinAdvisor in January 2007, in which he discussed the feedback Align had received as part of the pilot launch.  Plaintiffs first challenge Mr. Prescott's statements that "we are finding that doctors are using it for real-time as we had originally thought, for real-time discussions with patients at chair side and to improve their submissions" and "I think the jury is still out on this hundred, but the net is that they are more comfortable using it and more comfortable discussing it at chair side with patients, which has always been an issue for GPs."  ¶ 70 (emphasis omitted).  No CW addresses whether doctors were generally more comfortable using the Invisalign system than before the introduction of ClinAdvisor and/or whether they were, in fact, using it at chair side to demonstrate potential treatments – which, as discussed above, was one of the two goals of ClinAdvisor.  Plaintiffs also point to Mr. Prescott's response of "[t]hat is still right" to a question of whether the "ultimate hypothesis, which was that this would help get more GPs started more confidently, seems to be holding."  *Id.*[4]  Again, no CW questions that ClinAdvisor was helping

---

[4] The SAC is very misleading in asserting that this "hypothesis" was of increasing sales and utilization rates.  ¶¶ 7, 74.  As the earnings call transcript clearly indicates, it was not.  Ex. 8 at 11.

1   more GPs get started more confidently as of January 2007.  At any rate, Mr. Prescott was careful

2   to note that ClinAdvisor was "still in pilot" and thus the "jury [wa]s still out."  *Id.*

3          The purportedly contrary CW allegations merely address different issues with ClinAdvisor

4   that were supposedly identified during the testing process – which, as discussed above, was the

5   entire purpose of having the pilot test.  For instance, CW10 claims that ClinAdvisor was

6   originally "supposed to assist GPs in determining whether or not a case was feasible for Invisalign

7   use by providing comparable cases from Align's extensive database[,]" but that this turned out to

8   be a "flawed concept" due to GP lack of experience.  ¶¶ 74, 123.[5]  CW12 asserts that dentists

9   purportedly did not like that patients had to return after the initial consultation to determine

10  whether or not the GP could assist them.  ¶ 74.  CW9 reports that ClinAdvisor was "complicated

11  and time-consuming" and required Align's sales team to spend "a lot of time" instructing GPs.  ¶

12  75.  None of these issues contradicts Mr. Prescott's statements about the feedback Align received

13  about GP comfort and confidence in "getting started."  Indeed, just because Align's sales force

14  had to help GPs use the tools does not mean ClinAdvisor was not helping the GPs get started

15  more confidently with Invisalign or that ClinAdvisor was not effective as a chair side tool for use

16  with patients.  Contrary to the SAC's allegations that Align hid certain issues related to the pilot

17  test, Align actually disclosed that GPs wanted a more simplified process for ClinAdvisor and that

18  Align was working to get that tool to them.  *See supra* at 9-10.

19         ***April 2007 Statements***.  Plaintiffs also challenge Mr. Prescott's statement in April 2007

20  that "ClinAdvisor starts to help them select the right cases and support them as they get going.

21  And so, ClinAdvisor is a first step for the GP towards being a trusted advisor, a clinical resource,

22  and leading them more towards a turn-key solution."  ¶ 84 (emphasis omitted).  As supposed

23

24         [5] CW10 also claims that Align made no plans to increase functionality or release a new
25  version of ClinAdvisor because Align was developing a new software tool called ClinAssist to
    replace ClinAdvisor.  ¶¶ 48, 77, 90.  First, these allegations are irrelevant to Mr. Prescott's
26  statements which only discuss ClinAdvisor's initial release.  Second, Align actually disclosed
    that it was planning to introduce further series of software enhancements like ClinAssist to target
27  GP needs.  Ex. 9 at 9-10, 14, 26.  Third, as discussed further *infra*, plaintiffs have not alleged a
    basis for attributing knowledge of such high level product determinations to CW10 who is
28  alleged to have been an engineer.

1   evidence of falsity, plaintiffs again point to CW9 and his assertion that ClinAdvisor was "still not

2   fully developed" as of April 2007 and "very complicated for doctors to use." ¶ 89.  Again, these

3   allegations do not contradict Mr. Prescott's statement that ClinAdvisor "started" to help GPs get

4   going and that it was a "first step."  Plaintiffs also point to purported feedback that Align received

5   on a limited prototype of certain ClinAdvisor tools that was released in April/May 2007.  *Id.*  Any

6   feedback on that limited release is irrelevant to Mr. Prescott's April statements, however, because

7   he could not possibly have known about any feedback on that release at the time he made the

8   statement.

9        ***July 2007 Statements***.  At the conclusion of the testing periods, Mr. Prescott announced

10  that ClinAdvisor "has now been launched nationally.  Early feedback tells us it really helps newly

11  certified and less experienced doctors select appropriate cases based on their experience and skill

12  set, which is exactly what we were hoping to achieve." ¶ 95 (emphasis omitted).  To contradict

13  this statement, plaintiffs point to purportedly "negative" feedback that Align supposedly received

14  in January and April/May 2007.  ¶ 103.  First, neither CW9 nor CW12 specify what type of

15  "negative" feedback was received and thus do not contradict Mr. Prescott's statement that

16  ClinAdvisor was helping newly certified and less experienced doctors select appropriate cases.

17  Second, the purportedly "negative" feedback was supposedly received only during the testing

18  periods in January and April.  No CW claims that any problems persisted thereafter, *i.e.,* at the

19  time that Mr. Prescott made his statement.  *See Brodsky v. Yahoo! Inc.,* 630 F. Supp. 2d 1104,

20  1114 (N.D. Cal. 2009) (rejecting claim where plaintiffs did not plead that CW statement

21  coincided with defendants' allegedly false statement).

22       **Increasing Utilization and Sales.**  Plaintiffs also allege that Defendants' disclosures were

23  misleading because Align failed to disclose that ClinAdvisor would not increase sales volumes or

24  utilization rates.  ¶¶ 89-90, 102-104.  Yet, Defendants never indicated that ClinAdvisor itself

25  (which, again, was merely a tool designed to support GPs, not a product that Align sold) would

26  increase sales volumes or utilization rates in the near term.  Rather, Mr. Prescott repeatedly made

27  clear that ClinAdvisor was only the "first step" in a long term strategy designed to increase

28  utilization by GPs over the long term.

1    Indeed, when viewed in their entirety (instead of in misleading snippets and paraphrases),

2    the allegedly misleading statements identified in the SAC make clear that any references to

3    increasing utilization rates were addressed to Align's general GP certification program, not just

4    ClinAdvisor.  For instance, plaintiffs point to Mr. Prescott's statement in July 2007 that "[t]his

5    program has been tested and will be rolled out broadly as a key element of our customer

6    utilization growth strategy."  ¶ 95 (emphasis omitted).  Yet, the "program" Mr. Prescott identifies

7    in the previous sentence is not ClinAdvisor, but rather, the general GP certification program, of

8    which ClinAdvisor was not yet even a part.

9    Similarly, the following statements by Mr. Prescott also address Align's general GP

10   certification program: "[w]e are seeing newly certified doctors start their cases sooner.  We are

11   seeing the ramp a little bit faster.  These are all relative statements.  The ramp to adoption a little

12   quicker in those newer trained cohorts of doctors.  So – but the bigger effect is more of a

13   widespread general slow but important increase in utilization growth across most cohorts of

14   previously trained docs[,]" (¶ 96) (emphasis omitted) and "[w]e continue to see expansion in our

15   customer base, both newly trained and repeat submitters, as well as progress in utilization growth

16   for orthos, GPs, and international, as well as solid demand at the consumer level[,]" (¶ 97)

17   (emphasis omitted).  No CW contradicts Mr. Prescott's statements that the GP certification

18   program was a key element of Align's growth strategy and no CW questions that Align was, in

19   fact, experiencing an increase in utilization at the time these statements were made.  Indeed, a

20   comparison of Align's utilization rates between 2006 and 2007 shows that GP utilization rates

21   actually did increase from Q3 2006 (2.5) to Q2 2007 (2.7), *i.e.,* at the time Mr. Prescott made

22   these statements.  Ex. 6.

23   Importantly, Mr. Prescott also specifically noted that any increases in utilization would be

24   "slow" and "relative."  ¶ 96; *see also* Ex. 4 at 16-17 ("Although we expect that over the long term

25   our utilization rates will improve, we expect period over period comparisons of our utilization

26   rates will fluctuate.").  Thus, the decrease in utilization between Q2 and Q3 2007 (a small drop

27   from 2.7 to 2.6) – upon which plaintiffs rely to show falsity – was not unexpected or contrary to

28   Align's disclosures.  The state of affairs with respect to ClinAdvisor, Align's general GP

1    certification program, and its expectations for increased utilization and sales was just as Align

2    disclosed, and there was nothing misleading about any of statements identified by plaintiffs.

3    Thus, plaintiffs allege no actionable omission.

4         Even if Align had somehow indicated that ClinAdvisor would directly increase utilization

5    and sales – which, again, it did not – plaintiffs still have not alleged a sufficient basis for their

6    allegation that Defendants had any information tending to undermine any such expectation.  In

7    support of their utilization arguments, plaintiffs point to CW9, Align's former Manager of

8    Clinical Training from 2005 to August 2007.  ¶ 43.  CW9 claims that ClinAdvisor was "a major

9    factor in Align's projections" with projected sales in the "tens of millions of dollars" (¶¶ 45, 70),

10   that a marketing study in June/July 2007 confirmed that ClinAdvisor was not improving revenue

11   or meeting these projected sales (¶¶ 10, 104), and that ClinAdvisor's inability to increase sales or

12   utilization rates contributed to Align's missed Q3 case shipments.  ¶¶ 17, 103, 152.  The SAC

13   fails to allege any basis for inferring that this training manager had personal knowledge of these

14   purported facts.[6]

15        Under the PSLRA's pleading requirements, "'personal sources of information relied upon

16   in a complaint should be 'described . . . with sufficient particularity to support the probability that

17   a person in the position occupied by the source would possess the information alleged.'"  *In re*

18   *Daou Systems, Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005) (citation omitted).  In order "[t]o

19   determine whether the complaint has done so, [a court should] look to 'the level of detail provided

20   by the confidential sources, the corroborative nature of the other facts alleged (including from

21   other sources), the coherence and plausibility of the allegations, the number of sources, the

22   reliability of the sources, and similar indicia.'"  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

23   981, 995-96 (9th Cir. 2009) (quoting *In re Daou,* 411 F.3d at 1015).

24

25   _____

26   [6] CW10 also alleges that Align knew ClinAdvisor would not be effective in increasing sales
     because it did not plan any further product enhancements or versions and thus knew it was
27   "flawed."  ¶¶ 74, 90, 105.  As with CW9, plaintiffs have not alleged a proper basis for this
     allegation or for presuming that CW10, who was an engineer, would have knowledge of Align's
28   financial projections or marketing strategy.  Indeed, CW10 himself is internally inconsistent: on
     (continued...)

As Manager of Clinical Training, CW9 was purportedly responsible for developing a support system in Costa Rica and developing training materials for doctors on ClinAdvisor's use. ¶¶ 43-45.  CW9 is not alleged to have played any role whatsoever in Align's finance department, in its projections, or its long term strategy.  Nor is there any basis for inferring such a role.  It is simply not reasonable to assume that a low level training manager – whose only alleged role with respect to ClinAdvisor was that of developing "training material" (¶ 89) – would possess accurate high-level information about Align's projections and/or its long term strategy for ClinAdvisor. Additionally, CW9 is alleged to have left the Company in August 2007, well before Align's October 2007 announcement of Q3 results.  ¶ 43.  Thus, there is no basis whatsoever for CW9's allegation that ClinAdvisor was somehow responsible for Align missing its prior Q3 case shipment guidance of 53,000-54,000 cases by a mere 1,000 cases.  *In re Silicon Image, Inc. Sec. Litig.,* No. C-05-456 MMC, 2007 WL 2778414, at *1-2, 4 (N.D. Cal. Sept. 21, 2007) (Chesney, M.) (complaint deficient where plaintiffs failed to allege facts suggesting a basis for confidential sources' opinions or that sources were in a position to know of defendants' intentions), *aff'd,* 325 Fed. Appx. 560 (9th Cir. 2009); *In re Tibco Software, Inc.*, No. C 05-2146 SBA, 2006 WL 1469654, at *22 (N.D. Cal. May 25, 2006) (allegations insufficient where descriptions of duties performed by CWs do not satisfactorily demonstrate that witness would know information ascribed to them).

Indeed, the vast majority of CW9's financial allegations are based not on his own personal experience at Align, but on (1) information reportedly conveyed to him by other employees and (2) information he gleaned from unspecified "PowerPoint slides."  For instance, CW9 purportedly learned of the "results" of the ClinAdvisor marketing study from Align's Director of Marketing and VP of Marketing who told CW9 that Align's clinical education "was not having a positive impact on Align's revenue" and "would not contribute to Align's projected revenue."  ¶¶ 46, 104; *see also* ¶¶ 89, 90.  First, hearsay allegations are inherently unreliable and cannot form the basis

_____

(...continued from previous page)
the one hand, claiming ClinAdvisor was "flawed," on the other hand calling it a "successful product."  ¶ 123.

1   of a fraud claim.[7]  Second, CW9 never specifies what was in the purported "PowerPoint slides,"

2   how the slides convinced him that ClinAdvisor was a "major factor in Align's projections for new

3   case growth," why the minor Q3 guidance miss could be attributed to ClinAdvisor, and/or

4   whether the PowerPoint presentation relayed only internal growth projections.  ¶¶ 45. 110.

5   CW9's insinuation that Align included ClinAdvisor sales in its public projections even though it

6   was "not working" (¶¶ 104, 110), is contradicted by Align's revenue in 2007.  In fact, Align

7   actually met its revenue guidance for every quarter in the Class Period, supporting a contrary

8   inference that either ClinAdvisor was working (if in fact ClinAdvisor sales were included in

9   Align's projections), or ClinAdvisor sales were not actually included in the projections (which is

10  the more likely inference given that ClinAdvisor was still being tested throughout most of the

11  Class Period).[8]  There is no basis provided to support the probability that CW9, a clinical training

12  manager with no background in finance whatsoever, would possess the information ascribed to

13  him/her.[9]

14  **III.   PLAINTIFFS FAIL TO PLEAD WITH PARTICULARITY ANY FACTS
            CREATING A STRONG INFERENCE OF SCIENTER**

15

16          To plead scienter, "a plaintiff must plead with particularity facts that 'constitute strong

17  circumstantial evidence of deliberately reckless or conscious misconduct.'"  Order at 17 (citing

18  *DSAM Global Value Fund v. Altris Software, Inc.*. 288 F. 3d 385, 388-89 (9th Cir. 2002); 15

19  U.S.C. § 78u-4(b)(2)).  A *strong* inference of deliberate recklessness requires "'facts that come

20  closer to demonstrating intent, as opposed to mere motive and opportunity'" and "'must be more

21  than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing

22

23          [7] *Zucco Partners*, 552 F.3d at 996 (hearsay statements not reliable); *In re Portal Software
        Inc. Sec. Litig.,* No. C 03-5138 VRW, 2006 WL 2385250, at *8 (N.D. Cal. Aug. 17, 2006)

24      (testimony especially unreliable because based on second hand reports).

25          [8] Exs. 12, 13, 6 (indicating that Align surpassed or met its guidance with Q1 2007 revenues
        of $63.8 million, Q2 2007 revenues of $76.6 million, Q3 2007 revenues of $71 million, 30%,

26      44% and 46% year-over-year growth, respectively).

27          [9] Notably, none of the CWs in finance or business development positions (CWs 5, 6, 7, 8 or
        11) corroborate these allegations.  *Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW,

28      2005 WL 1787426, at *6 (N.D. Cal. July 27, 2005) (silence of CW on topic of which he should

                                                                                    (continued...)

1    inference of nonfraudulent intent.'"  Order at 17 (citing *In re Silicon Graphics, Inc. Sec. Litig.*,

2    183 F. 3d 970, 974 (9th Cir. 1999), *rev'd on other grounds by South Ferry LP No. 2 v. Killinger*,

3    542 F. 3d 776 (9th Cir. 2008); *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 314

4    (2007)).  Much like with their FAC, plaintiffs fail to allege any facts which "render[] an inference

5    of scienter *at least as likely* as any plausible opposing inference."  Order at 17 (citing *Tellabs,* 551

6    U.S. at 324, 326, 328).

7              **A.       Plaintiffs Offer No New Allegations**

8              Despite the Court's wholesale rejection of plaintiffs' scienter allegations in the FAC, the

9    SAC realleges scienter on the *exact same* grounds – (1) Defendants' knowledge of internal

10   reports and corporate meetings (*see* ¶¶ 123-139); (2) the core operations inference (*see* ¶ 142);

11   (3) purported "admissions" by Mr. Prescott (*see* ¶¶ 110-114, 125-126); and (4) insider sales by

12   Mr. Prescott and other non-defendant executives (*see* ¶¶ 144-149).  Again, plaintiffs rely heavily

13   on vague CW allegations and irrelevant CW opinions to bolster their claims.  Like before, these

14   generic allegations fail to assert sufficient facts to support an inference, much less a strong

15   inference, of Defendants' scienter.

16             **1.       Internal Reports and Sales Meetings**

17             The Court previously found plaintiffs' generic allegations as "to the existence of sales

18   and shipment data[,]" "sales conference calls, sales meetings, financial reviews, manufacturing

19   meetings, and executive management committee meetings[,]" insufficient to plead scienter under

20   the PSLRA because they lacked any "hard numbers or other specific information" that was

21   presented to Mr. Prescott, "let alone numbers that would serve to contradict Prescott's

22   statements."  Order at 18-20 (citing *Lipton v. Pathogenesis Corp.*, 284 F. 3d 1027, 1035-36 (9th

23   Cir. 2002) (plaintiffs failed to adequately allege scienter under the PSLRA where plaintiffs

24   alleged defendant corporation "could regularly track its sales data," but failed to "plead, in any

25   detail, the contents of such report or the purported data"); *In re Daou*, 411 F.3d at 1022 ("general

26   allegations of defendants' 'hands-on' management style, their interaction with other officers or

27   _____

28             (...continued from previous page)
     have been knowledgeable was "telling").

1    employees, their attendance at meetings, and their receipt of unspecified weekly and monthly

2    reports are insufficient")).  The SAC's allegations regarding internal reports and corporate

3    meetings – most of which are identical to the allegations already rejected – once again fail to

4    allege scienter for the same reason.

5         With respect to internal reports, plaintiffs again rely heavily on Align's purported use of

6    salesforce.com, but again offer "no hard numbers or other specific information."  Order at 19;

7    *compare* ¶¶ 127-128 *with* FAC ¶¶ 94-95.  In fact, plaintiffs simply reallege verbatim each CW

8    allegation previously identified as inadequate by the Court.  Order at 18; *compare* ¶ 128 *with*

9    FAC ¶ 95 ("CW3 indicated that [the salesforce.com report] was available to everyone within the

10   sales organization, to varying degrees, at all times") (emphasis omitted); *compare* ¶ 129 *with*

11   FAC ¶ 96 ("Align also created numerous other sales reports . . . to track data including the

12   number of new cases and revenue by geographic region"); *compare also* ¶ 130 *with* FAC ¶ 97.

13   The new information plaintiffs add to the SAC does not cure the deficiencies.  For instance,

14   plaintiffs add allegations about purported "run-rate" reports (¶ 131) and "PowerPoint slides"

15   which allegedly "showed that Align was overwhelmed with fulfilling Patients First orders and

16   had a backlog of new revenue orders."  ¶¶ 137-138.  As with the salesforce.com allegations,

17   however, plaintiffs do not provide any specific data or details from these reports which

18   contradict Defendants' public statements about Align's business at the time the statements were

19   made.

20        With respect to internal meetings, the SAC also reiterates precisely the same allegations

21   regarding the existence of meetings, but includes no new allegations of "hard numbers" or details

22   discussed with Mr. Prescott at any meeting which contradict the challenged statements.  Order at

23   20; *compare* ¶ 133 *with* FAC ¶ 99 ("according to CW1, CW2, CW3, and CW4, Territory

24   Account Managers submitted weekly field reports to their Regional Business Managers and

25   attended weekly conference calls" with them); *compare* ¶ 134 *with* FAC ¶ 100 ("[a]ccording to

26   CW5, the Regional Business Managers . . . held weekly conference calls, as well as monthly and

27   quarterly meetings . . . [and] VP of Sales Ellis – who reported directly to defendant Prescott and

28   was a member of Align's executive team – attended these monthly and quarterly meetings");

                              -21-

*compare also* ¶ 135 *with* FAC ¶ 101; ¶ 138 *with* FAC ¶ 103; and ¶ 139 *with* FAC ¶ 104.  CW9 and CW12's new allegations regarding discussion of "negative" ClinAdvisor feedback at marketing meetings do not provide the requisite detail to contradict any of Defendants' statements about ClinAdvisor, and thus, are not indicative of scienter either.  ¶ 124.

Equally important, plaintiffs still fail to connect Mr. Prescott to any of the meetings or reports.  Allegations that CWs "understood" that information discussed at meetings was reported to Mr. Prescott, but which did not allege the information "actually was reported[,]" are insufficient.  Order at 20 (citing ¶¶ 101, 104).  Thus, CW9's conjectures regarding the substance of meetings he/she did not attend and/or that Mr. Prescott received unspecified "updates" are insufficient to repair plaintiffs' previously rejected claims.  ¶¶ 124, 136-138.[10]  In sum, plaintiffs' new allegations contain no specific details contradicting Defendants' Class Period statements and offer no links to Mr. Prescott.

### 2.  Core Operations

Plaintiffs again attempt to invoke the "core operations" inference.  *See* ¶ 142.  The SAC's allegations are virtually identical to those previously rejected by the Court.  Order at 21; *compare* ¶ 142 *with* FAC ¶ 107.  As with the FAC, "[w]here a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard."  *South Ferry*, 542 F.3d at 784.  Indeed, the core operations inference applies only in rare circumstances, which are not present here.  *Id.* at 784-85 (noting that the "core operations inference" will suffice in "some unusual circumstances" and citing as an example a case where defendant allegedly failed to disclose loss of two largest customers, comprising 80% of the company's revenue).  Other than general allegations about the existence of sales reports

---

[10] The only allegation connected directly to Mr. Prescott is plaintiffs' allegation that CW9 told Mr. Prescott that ClinAdvisor would not be developed without significant investment and even then could not be launched until June 2007.  ¶ 79.  Yet, that is precisely when ClinAdvisor was launched (¶ 95) and plaintiffs admit that Mr. Prescott approved the additional resources needed to develop ClinAdvisor (¶ 124).  Thus, this allegation simply does not demonstrate Mr. Prescott's knowledge of any fraud.

1   and corporate meetings (*see supra*), plaintiffs again "fail[] to allege any facts about Prescott's

2   actual exposure to 'adverse facts affecting [Align's] core business' . . . nor circumstances

3   cognizable as 'unusual' for purposes of the 'core operations inference.'" Order at 21 (citing

4   *South Ferry*, 542 F.3d at 784).

5               **3.      Admissions**

6               In spite of the Court's prior ruling, plaintiffs again point to Mr. Prescott's October 24,

7   2007 statements and claim they evince his scienter because they contradict his prior statements.

8   Order at 21-22; *compare* ¶¶ 110-111, 113-114 *with* FAC ¶¶ 84-87 and ¶¶ 112, 125-126 *with* FAC

9   ¶¶ 105-106. The Court has already ruled that "defendants *did not* make 'admissions' that were

10  contradictory to or necessarily inconsistent with any statements made in the January, April, and

11  July 2007 press releases and/or conference calls." Order at 21-22 (emphasis added). These

12  allegations thus fail once again to establish scienter.

13              Plaintiffs' newly found "admission" fares no better. They allege that Mr. Prescott

14  admitted that Align had "known for some time that there's a consistent theme out there with our

15  doctors . . . they need different features than we've given them [*i.e.*, ClinAdvisor]." ¶ 123

16  (emphasis omitted). First, despite plaintiffs' misleading parenthetical, this statement is taken out

17  of context and *did not* even refer to ClinAdvisor. Ex. 14 at 3. Second, even if plaintiffs could

18  show the excerpt referred to ClinAdvisor, which they cannot, "'it is clearly insufficient for

19  plaintiffs to say that a later sobering revelation makes an earlier, cheerier statement a

20  falsehood.'" *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846-47 (9th Cir. 2003), *abrogation*

21  *on other grounds recognized by South Ferry,* 542 F.3d 776 (citation omitted).

22              **4.      Stock Sales**

23              Plaintiffs ignore the Court's prior ruling and simply reiterate their stock sales allegations.

24  ¶¶ 146-48. The Court already evaluated the "'amount and percentage'" and "'timing'" of Mr.

25  Prescott's sales, as well as "'whether the sales were consistent with [his] prior trading history,'"

26  and found that Mr. Prescott's sales of "only 29% of his aggregate holdings" made well before the

27  purported disclosure of bad news in late October 2007 were insufficient to support scienter. Order

28  at 22 (citing *Silicon Graphics*, 183 F. 3d at 986). Plaintiffs offer no new allegations about Mr.

1   Prescott's stock sales.  *Compare* ¶¶ 146-148 *with* FAC ¶¶ 110-112; *also compare* ¶ 16 *with* FAC ¶

2   14; ¶ 88 *with* FAC ¶¶ 9, 72; and ¶ 101 *with* FAC ¶ 82.

3          Similarly, the Court dismissed plaintiff's allegations that the stock sales of other Align

4   executives were suspicious, ruling that "[s]ales by insiders not named as defendants . . . are

5   irrelevant to the determination of [Mr. Prescott's] scienter."  Order at 23 (citing *In re Splash*

6   *Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1081 n.22 (N.D. Cal. 2001); *Plevy v.*

7   *Haggerty*, 38 F. Supp. 2d 816, 834 (C.D. Cal. 1998)).  Again, plaintiffs offer nothing new here.

8   *Compare* ¶¶ 146-148 *with* FAC ¶¶ 110-112; *also compare* ¶ 16 *with* FAC ¶¶ 14, 88 *with* FAC ¶¶

9   9, 72 and ¶ 101 *with* FAC ¶ 82.

10          **B.      When Considered Holistically, the SAC Fails to Allege Scienter[11]**

11          Even when considered holistically, the SAC's allegations still fail to create the requisite

12   compelling inference of scienter required under the PSLRA.  The more compelling inference

13   from the Company's disclosures is that there was no intent to defraud; rather, the Company was

14   straightforward in its discussions regarding Patients First and ClinAdvisor, contemporaneously

15   disclosing issues as they were encountered, and that it simply failed to accurately predict a

16   modest decrease in case shipments and utilization rates in Q3 2007.[12]

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23

24          [11] The PSLRA permits a plaintiff to plead scienter with respect to a corporation only where
       the complaint adequately alleges scienter as to the individual speakers.  *Nordstrom, Inc. v. Chubb*
25   *& Son, Inc.*, 54 F. 3d 1424, 1435-36 (9th Cir. 1995).  Since plaintiffs fail to adequately allege
       Mr. Prescott acted with scienter, plaintiffs therefore fail to allege corporate defendant Align
26   acted with scienter.

27          [12] For the reasons set forth above, the SAC does not adequately allege a primary violation
       under Section 10(b); therefore, the claim for control person liability under Section 20(a) must be
28   dismissed.  Order at 24; *Lipton*, 284 F.3d at 1035 n.15.

1

## CONCLUSION

2      For the reasons set forth herein, Defendants respectfully request that the SAC be

3   dismissed in its entirety with prejudice.

4

5   Dated:  September 7, 2011                    Respectfully submitted,

6                                               WILSON SONSINI GOODRICH & ROSATI
                                                PROFESSIONAL CORPORATION
7                                               650 Page Mill Road
                                                Palo Alto, CA 94304
8                                               Telephone: (650) 493-9300
                                                Facsimile:  (650) 493-6811
9
                                                By:  _____/s/ Douglas J. Clark._____
10                                                         Douglas J. Clark

11                                              Attorneys for Defendants Align Technology, Inc. and
                                                Thomas Prescott
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**ATTESTATION PURSUANT TO GENERAL ORDER 45**

2      I, Katherine L. Henderson, attest that concurrence in the filing of this document has been

3 obtained from the signatory, Douglas J. Clark.  I declare under penalty of perjury under the laws

4 of the United States of America that the foregoing is true and correct.  Executed this 7th day of

5 September, 2011 at San Francisco, California.

6

7                                                              By:    /s/ Katherine L. Henderson
                                                                          Katherine L. Henderson
8
                                                              Counsel for Defendants Align Technology,
9                                                              Inc. and Thomas Prescott

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28