United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHARLES WOZNIAK, Individually and on
Behalf of All Others Similarly Situated,

             Plaintiff,

  v.

ALIGN TECHNOLOGY, INC., THOMAS M.
PRESCOTT,

             Defendants.
_____/

No. C 09-3671 MMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED COMPLAINT WITH
LEAVE TO AMEND**

      Before the Court is defendants Align Technology, Inc. ("Align") and Thomas

Prescott's ("Prescott") motion, filed September 7, 2011, to dismiss plaintiff's Second

Amended Complaint ("SAC"). Lead plaintiff Plumbers and Pipefitters National Pension

Fund, individually and on behalf of all others similarly situated, has filed opposition, to

which defendants have replied. Having read and considered the parties' respective written

submissions, the Court rules as follows.[1]

## BACKGROUND

      Plaintiff alleges that Align, a company that "designs, manufactures, and markets

Invisalign," a series of clear, removable teeth aligners, and Prescott, Align's Chief

Executive Officer, "violated the securities laws by disseminating materially false and

_____

      [1] On January 10, 2012, the Court took the matter under submission and vacated the
hearing scheduled for January 13, 2012.

1  misleading statements and concealing material adverse facts regarding Align's growth

2  prospects, business and ClinAdvisor product" between January 30, 2007 and October 24,

3  2007 (the "Class Period").  (See SAC ¶¶  1, 2.)

4      In the SAC, plaintiff reiterates its original theory of liability related to the Patients First

5  Program.  Specifically, plaintiff alleges that, as the result of a pre-Class Period settlement

6  with a competitor, OrthoClear, "Align agreed to make Invisalign treatment available to all

7  OrthoClear patients existing as of September 27, 2006 at no additional charge to the

8  patient, the doctor or OrthoClear under its 'Patients First Program'" (see SAC ¶ 66)

9  (emphasis omitted);[2] that Align "did not have enough trained ClinCheck technicians in place

10  during the Class Period to handle the new revenue cases and Patients First cases" (see

11  SAC ¶ 92); and that, as a result of the additional cases and staff shortage, "Align was

12  overwhelmed with thousands of free Patients First cases in the first two quarters of 2007,

13  creating a significant backlog of both Patients First cases and new revenue cases" (see

14  SAC ¶ 12).

15      Additionally, plaintiff alleges a new theory of liability.  Specifically, plaintiff alleges

16  that, "[i]n order to increase utilization[3] and, in turn, sales, in October 2006, Align announced

17  the launch of 'ClinAdvisor,' 'a new suite of software tools designed to make Invisalign case

18  selection, submission and review process more efficient for doctors'" (see SAC ¶ 4); that

19  "ClinAdvisor's underlying 'hypothesis' was based on a flawed concept" (see SAC ¶ 8); that

20  "ClinAdvisor was supposed to assist GPs [general practitioner dentists] in determining

21  whether or not a case was feasible for Invisalign use by providing comparable cases from

22  Align's extensive database . . . [but] the GPs' lack of experience in orthodontia made it

23  difficult for them to evaluate the complexity of a case, even with a comparable case model"

24  (see SAC ¶ 74); that "feedback [from a beta test] in January 2007 showed that ClinAdvisor

25

26      [2] Plaintiff emphasizes various allegations throughout the SAC by using bold and
27  italic type.  Such emphasis is omitted in all quotations from the SAC throughout this order.

28      [3] According to the SAC, "[u]tilization is the average number of cases submitted per
   doctor and was the main performance metric used at Align."  (See SAC ¶ 3.)

2

1    was not effective at helping GPs with case selection" (see SAC ¶¶ 10, 52); that "feedback

2    on a limited ClinAdvisor release in April/May 2007 was also negative and indicated that

3    ClinAdvisor would not positively contribute to Align's sales and revenues" (see SAC ¶ 10);

4    and that "an internal marketing study in June/July 2007 confirmed that ClinAdvisor was not

5    improving revenue or meeting projected sales" (see id.).

6         Plaintiff alleges Align's failure to disclose the significant backlog and problems with

7    ClinAdvisor rendered statements in three press releases and accompanying conference

8    calls, on January 30, 2007, April 26, 2007, and July 25, 2007, respectively, knowingly

9    misleading.  (See SAC ¶¶ 7, 9.)  Thereafter, according to the SAC, the truth about the

10   backlog and ClinAdvisor emerged by way of Align's October 24, 2007 announcement that it

11   expected to ship in 2007 approximately 4000 to 5000 cases fewer than its previous

12   expectation of 206,000 to 209,000 cases resulting in Align's stock price falling $9.63, or

13   approximately 34%. (See SAC ¶¶ 110, 117).

14        Based on said allegations, the SAC asserts three causes of action:  (1) violation of

15   § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5

16   promulgated thereunder, against both defendants; (2) insider trading violations of

17   § 10(b) and Rule 10b-5 against Prescott; and (3) violation of § 20(a) of the Exchange Act

18   against both defendants.  (See SAC ¶¶ 166-74.)

19                              **LEGAL STANDARD**

20        "Dismissal under Rule 12(b)(6) can be based on the lack of a cognizable legal theory

21   or the absence of sufficient facts alleged under a cognizable legal theory."  See Balistreri v.

22   Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  In analyzing a motion to dismiss,

23   a district court must accept as true all material allegations in the complaint, and construe

24   them in the light most favorable to the nonmoving party.  See NL Indus., Inc. v. Kaplan, 792

25   F.2d 896, 898 (9th Cir. 1986).  "To survive a motion to dismiss, a complaint must contain

26   sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its

27   face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v.

28   Twombly, 550 U.S. 544, 570 (2007)).  "Factual allegations must be enough to raise a right

                                            3

1   to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.  Courts "are not bound to

2   accept as true a legal conclusion couched as a factual allegation." <u>Iqbal</u>, 129 S. Ct. at

3   1950.

**DISCUSSION**

4

5   **I.      Section 10(b)**

6          To allege a § 10(b) and Rule 10b-5 claim, a plaintiff must allege "(1) a material

7   misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection

8   with the purchase or sale of a security; (4) reliance . . .  (5) economic loss; and (6) 'loss

9   causation,' i.e., a causal connection between the material misrepresentation and the loss."

10  <u>See</u> <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005) (citations omitted).  Claims

11  brought under § 10(b) and Rule 10b-5 must meet the particularity requirements of Rule 9(b)

12  of the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ. P. 9(b) ("In alleging fraud . . . , a

13  party must state with particularity the circumstances constituting fraud."); <u>Semegen v.</u>

14  <u>Weidner</u>, 780 F.2d 727, 731 (9th Cir. 1985) (applying Rule 9(b) to § 10(b) and Rule 10b-5

15  claim).  "'In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies

16  the circumstances of the alleged fraud so that the defendant can prepare an adequate

17  answer.'" <u>Fecht v. Price Co.</u>, 70 F.3d 1078, 1082 (9th Cir. 1995) (quoting <u>Kaplan v. Rose</u>,

18  49 F.3d 1363, 1370 (9th Cir. 1994)).  To provide sufficient notice, a plaintiff, in addition to

19  alleging the "time, place and nature of the alleged fraudulent activities," must "plead

20  evidentiary facts" sufficient to establish any allegedly false statement "was untrue or

21  misleading when made."  <u>See</u> <u>id.</u>.

22          Further, such plaintiff must meet the heightened pleading requirements of the

23  Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, which

24  requires the plaintiff to "specify each statement alleged to have been misleading [and] the

25  reason or reasons why the statement is misleading."  <u>See</u> 15 U.S.C. § 78u-4(b)(1).

26  Additionally, the complaint must "state with particularity facts giving rise to a strong

27  inference that the defendant acted with the required state of mind." <u>See</u> <u>id.</u> § 78u-4(b)(2).

28  To the extent an allegation is based on information and belief, the plaintiff must allege "with

1   particularity all facts on which that belief is formed." See id. § 78u-4(b)(1).  In so doing, the

2   plaintiff must "reveal the sources of [his] information."  See In re Daou Sys., Inc., 411 F.3d

3   1006, 1015 (9th Cir. 2005) (internal quotation and citation omitted).

4       **A.     Allegations as to Patients First**

5       Plaintiff's allegations as to the Patients First program, and related allegations as to

6   Align's processing capacity, backlog and sales focus, remain essentially the same as the

7   allegations previously found deficient by the Court.  (See SAC ¶¶ 11-15, 71, 80-82, 85-86,

8   91-94, 98, 102, 106-109, 111-114, 122, 125-139.)

9       First, plaintiff relies on the same statements made by Prescott in January and April

10  2007, (compare SAC ¶¶ 71, 85-86 with FAC ¶¶ 49, 69-70), and, once again, argues the

11  statements are actionable because Prescott either was "aware of undisclosed facts tending

12  seriously to undermine the statements' accuracy" or there was "no reasonable basis for the

13  belief." (See Opp. at 13:8-11 (internal quotation, citation, and alterations omitted).)  In

14  support thereof, plaintiff relies primarily on the same allegations as made in the FAC.

15  (Compare SAC ¶ 81 with FAC ¶ 58; SAC ¶ 82 with FAC ¶ 62; SAC ¶ 91 with FAC ¶ 73;

16  SAC ¶ 92 with FAC ¶ 60; SAC ¶ 93 with FAC ¶ 61; SAC ¶ 94 with FAC ¶ 74; SAC ¶ 108

17  with FAC ¶ 65; SAC ¶ 109 with FAC ¶ 64; and SAC ¶ 113 with FAC ¶ 86).  Such

18  allegations were and remain insufficient to establish liability under Section 10(b).  (See

19  Order Granting Defendants' Motion to Dismiss Plaintiff's Amended Complaint with Leave to

20  Amend, filed June 8, 2011 ("Order") at 7:15-8:14, 14:15-15:12.)

21      The only new allegations relevant to the January and April 2007 statements are

22  based on information attributed to three newly alleged confidential witnesses, identified as

23  "CW9", "CW10" and "CW11."[4]  According to the SAC, CW9 reportedly witnessed a

24

_____

25      [4] In the SAC, CW9 is alleged to have been a Manager of Clinical Training at Align
    from 2005 until mid-August 2007 (see SAC ¶ 43), CW10 is alleged to have been a Director
26  of Engineering at Align from February 2004 until the end of 2008 and the Lead Engineer for
    ClinAdvisor (see SAC ¶ 47), CW11 is alleged to have been a Senior Business Intelligence
27  Analyst at Align from 2005 until August 2010 (see SAC ¶ 49), and CW12, discussed infra,
    is alleged to have been a Senior Director of Software Development at Align from
28  September 2006 to July 2008 (see SAC ¶ 50).

1    PowerPoint presentation comprised of slides with "high level numbers regarding various

2    key metrics for manufacturing, order backlog and order fulfillment . . . [which] showed that

3    Align was overwhelmed with fulfilling Patients First orders and had a backlog of new

4    revenue orders."  (See SAC ¶¶ 43, 137.)  Similarly, plaintiff alleges, "[a]ccording to CW9

5    and CW10, Align was overwhelmed with fulfilling Patients First cases, creating a significant

6    backlog for both Patients First cases and new revenue cases."  (See SAC ¶ 91.)  Plaintiff

7    alleges that CW11 put together daily "run-rate reports" showing "how close (or far) the

8    Company was from achieving its manufacturing goals for the period."  (See SAC ¶¶ 49,

9    131.)  These allegations suffer from the same deficiencies as allegations of a similar nature

10   contained in the FAC.  (See Order at 8:10-17.)  As before, the allegations attributed to the

11   CWs "do not contradict defendants' generalized statements as to Align's growth, progress,

12   consumer demand, or physician interest."  (See id.)

13        With respect to the July 2007 statements, plaintiff repeats its allegation that Align's

14   projection that "Align would increase its new revenue case shipments in Q3 and Q4" and

15   would increase its "2007 case shipment guidance" was false.  (Compare SAC ¶ 98 with

16   FAC ¶ 78.)  The Court previously held the PSLRA safe harbor, discussed in detail below,

17   applies to the July 2007 projection, both because it "qualifi[ed] as forward-looking" and

18   because it was "accompanied by meaningful cautionary statements."  (See Order at 9:10-

19   11:14.)  Plaintiff contends the Court erred in holding the "safe harbor" applicable to these

20   statements because, according to plaintiff, the Court did not consider whether the

21   cautionary statements themselves were misleading.  (See Opp. at 16:13-18.)  Contrary to

22   plaintiff's contention, the Court, as set forth in its prior order, considered all aspects of the

23   cautionary statements and found they "identified the risks plaintiff alleges ultimately

24   materialized, specifically, the risk of a backlog created by the OrthoClear settlement and

25   resulting effects on sales."  (See Order at 10:6-11:12.)  Plaintiff offers no new factual

26   allegations in the SAC, nor any other reason for the Court to reconsider its prior findings as

27   to the July 2007 statements.

28   //

1   **B.      Allegations as to ClinAdvisor**

2        **1.      Material Misrepresentations/Omissions**

3        Plaintiff alleges various statements about ClinAdvisor's prospects for increasing

4   utilization and revenue, made in Align's January, April, and July 2007 conference calls,

5   were misleading because ClinAdvisor "was based on a flawed concept" and was "not

6   effective."  (See SAC ¶¶ 10, 48.)  As discussed below, the SAC fails to provide a sufficient

7   factual basis to support plaintiff's allegations that the identified statements were false or

8   misleading.

9        **a.      Statements of Belief and Optimism**

10        "'[V]ague, generalized, and unspecific assertions' of corporate optimism or

11   statements of 'mere puffing' cannot state actionable material misstatements of fact under

12   federal securities laws."  In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F. Supp.

13   2d 1069, 1087 (N.D. Cal. 2005) (quoting Glen Holly Entm't v. Tektronix, Inc., 352 F.3d 367,

14   379 (9th Cir. 2003)).  "Although projections and general statements of optimism may trigger

15   liability under federal securities laws, statements that are so vague or amorphous that no

16   reasonable investor could rely on them are not actionable."  In re Syntex Corp. Sec. Litig.,

17   855 F. Supp. 1086, 1096 (N.D. Cal. 1994) (internal citation omitted), aff'd, 95 F.3d 922 (9th

18   Cir. 1996).  "When valuing corporations, . . . investors do not rely on vague statements of

19   optimism like 'good,' 'well-regarded,' or other feel good monikers."  In re Cutera Sec. Litig.,

20   610 F.3d 1103, 1111 (9th Cir. 2010).

21        The "mere puffery" rule has been interpreted to include "statements projecting

22   'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30%

23   growth rate over the next several years.'"  See Cornerstone, 355 F. Supp. 2d at 1087

24   (finding defendant's "claims of 'industry leading' growth, growth that 'positions us

25   beautifully,' 'measurable progress,' 'continuing improvements,' 'accomplishments we have

26   achieved,' expressions of pride in [our] staff, 'outstanding retail results,' and other similar

27   comments all constitute vague, unspecific assertions of corporate optimism"); Syntex Corp.,

28   855 F. Supp. at 1095 (holding as non-actionable puffery the phrases "'[w]e're doing well

7

1   and I think we have a great future,' '[b]usiness will be good this year . . . , [w]e expect the

2   second half of fiscal 1992 to be stronger than the first half, and the latter part of the second

3   half to be stronger than the first . . . ,' 'everything is clicking [for the 1990s] . . . , new

4   products are coming in a wave, not in a trickle . . . , old products are doing very well,' and

5   that 'I am optimistic about [our] performance during this decade'"")).

6        Here, a number of the statements identified by plaintiff constitute such puffery.

7   Specifically, plaintiff alleges that in the January 2007 conference call, defendant Prescott

8   stated, with respect to ClinAdvisor, "[w]e are very pleased with the learning from our pilot

9   launch" (see SAC ¶ 69) and "so far we're getting really great feedback" (see SAC ¶ 70).

10  Similarly, plaintiff alleges that in the April 2007 conference call, Prescott stated: "we are

11  very pleased with our progress to date on key strategic initiatives" (see SAC ¶ 83); "[w]e

12  are confident the improved features for Orthos [orthodontists] and GPs will increase and

13  sustain utilization" (see id.); "importantly, [ClinAdvisor is] a very good front-end" (see SAC ¶

14  84); and "ClinAdvisor is a first step for the GP towards being a trusted advisor" (see id.).

15  Plaintiff alleges that, in the July 2007 conference call, Prescott misled investors regarding

16  ClinAdvisor by stating, "ClinAdvisor . . . has now been launched nationally" and "will be

17  rolled out broadly as a key element of [Align's] customer utilization growth strategy." (See

18  SAC ¶ 95).

19       The above-quoted statements are generalized statements of optimism that

20  constitute "non-actionable puffing."  See Syntex Corp., 855 F. Supp. at 1095.  In particular,

21  "[w]e are very pleased with the learning from our pilot launch" (see SAC ¶ 69); "getting

22  really great feedback" (see SAC ¶ 70); "we are very pleased with our progress to date" (see

23  SAC ¶ 83); "[w]e are confident the improved features in user experience for Orthos and

24  GPs will increase and sustain utilization" (see id.); ClinAdvisor "is a very good front-end"

25  (see SAC ¶ 84); and ClinAdvisor will be "a key element of [Align's] customer utilization

26  growth strategy" (see SAC ¶ 95) are, in essence, "feel good" statements, i.e., statements

27  on which investors do not rely when valuing corporations.  See Cutera, 610 F.3d at 1111.

28  Accordingly, the above statements constitute puffery.

8

Under some circumstances, a projection of optimism, or puffery, may constitute a "'factual' misstatement actionable under § 10(b)," specifically, "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." See Kaplan v. Rose, 49 F.3d at 1375.

Here, relying on information alleged to have been provided by CW9, CW10, and CW12, plaintiff contends Prescott did not believe his optimistic statements regarding ClinAdvisor and/or was aware of undisclosed facts that would have undermined the statements' accuracy.

According to the SAC, CW9 states that "[t]he feedback Align received from its limited April/May launch indicated that ClinAdvisor would not positively contribute to sales and revenues, even if a final version was released" (see SAC ¶ 89), that a marketing study conducted in June and July 2007 "confirmed earlier indications that ClinAdvisor was not improving revenue or meeting its projected sales" (see SAC ¶ 104), and that he "personally informed defendant Prescott that [ClinAdvisor] could not be launched until June 2007" (see SAC ¶ 45); CW10 states that "ClinAdvisor was based on a flawed concept and, although it was ultimately released, Align knew that the product was ineffective and made no plans to improve or enhance it" and that "Prescott was aware that ClinAdvisor was ineffective both during its beta testing and after its commercial launch because there were no efforts to increase its functionality, continue development or release a version 2.0" (see SAC ¶ 48); CW12 states that "the feedback from beta users was poor and that ClinAdvisor was not effective in helping doctors choose even easy or medium-level cases" (see SAC ¶ 52).

The above allegations, even assuming said confidential witnesses have sufficient knowledge upon which to base them,[5] do not suffice to demonstrate Prescott's lack of belief

---

[5] Confidential witnesses may be used to support allegations only if such "sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." See Daou, 411 F.3d at 1015 (internal quotation and citation omitted).

in or lack of a reasonable basis for what he was asserting, nor do they demonstrate

Prescott's knowledge of undisclosed facts seriously undermining the statements' accuracy.

In particular, the CWs' conclusory statements that initial feedback regarding ClinAdvisor

was negative, "poor," or that an unspecified number of users found it "ineffective," do not

contradict Prescott's optimistic statements.

Moreover, the above-referenced statements by CWs as to ClinAdvisor's

effectiveness concern a 2006 "pilot launch," an April 2007 "limited release" (see SAC ¶¶ 76,

89, 103) and a marketing study conducted in June and July 2007 (see SAC ¶ 104).  The

SAC contains no factual allegations regarding feedback on ClinAdvisor or its effect on

utilization after July 2007, the month in which ClinAdvisor is alleged to have launched

nationally.  (See SAC ¶ 95.)  Rather, the plaintiff's allegations concern limited releases of

ClinAdvisor, which resulted in some unspecified amount of negative feedback, to which

Align responded.  (See SAC ¶ 124 (alleging Prescott "personally authorized additional

resources for [ClinAdvisor's] development" prior to national launch).)  None of plaintiff's

allegations regarding the development phases of ClinAdvisor demonstrate Prescott did not

believe the general, optimistic statements he made at the time he made them or was

otherwise aware of undisclosed facts tending to undermine their accuracy.

Accordingly, plaintiff's allegations as to such statements fail to meet the pleading

requirements of Rule 9(b) and the PSLRA.

**b.    Forward-Looking Statements**

A forward-looking statement is "any statement regarding (1) financial projections,

(2) plans and objectives of management for future operations, (3) future economic

performance, or (4) the assumptions 'underlying or related to' any of these issues."  See

No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320

F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)).  Under the PSLRA, a person

may not be held liable for a forward-looking statement, provided the statement (1) is

"identified as a forward-looking statement, and is accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially

10

1    from those in the forward-looking statement" or (2) is "immaterial."  See 15 U.S.C. §

2    78u-5(c)(1)(A).  On the other hand, if such statement is not identified as forward-looking

3    and/or is unaccompanied by meaningful cautionary language, such statement falls outside

4    the safe harbor if the plaintiff can show it "was made with actual knowledge by [the

5    speaker] that the statement was false or misleading."  See id. at § 78u-5(c)(1)(B); Provenz

6    v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996) ("A projection is a factual misstatement if (1)

7    the statement is not actually believed, (2) there is no reasonably basis for the belief, or (3)

8    the speaker is aware of undisclosed facts tending seriously to undermine the statement's

9    accuracy.") (emphasis, internal quotation and citation omitted).

10        Here, plaintiff bases its claims on a number of forward looking statements regarding

11   Align's plans for ClinAdvisor.  In particular, the SAC alleges that during the January 30,

12   2007 conference call, Prescott stated: "[o]ur goals in 2007 are straightforward" and include

13   "extending the GP-focused ClinAdvisor product features and functionality" (see SAC ¶ 69),

14   and "[t]he goal here is that you play a turnkey system for the GP, making it easier to select

15   simple cases, simplify the diagnostic and setup process, and ensure great results" (see id.).

16   The SAC further alleges that, during the April 2007 call, Prescott stated: "ClinAdvisor will

17   help newly certified and less experienced doctors learn how to assess and select

18   appropriate cases" and "[t]his should boost the early confidence and clinical success of new

19   users" (see SAC ¶ 83).

20        The above-listed statements qualify as forward-looking.  See 15 U.S.C.

21   § 78u-5(i)(1)(A)-(F) (defining "forward-looking statement" as, inter alia, "a statement of the

22   plans and objectives of management for future operations," and "any statement of the

23   assumptions underlying or relating to any [such] statement").  Further, the statements,

24   when made, were (1) identified as forward-looking and (2) accompanied by meaningful

25   cautionary statements.  See 15 U.S.C. § 78u-5(c)(1)(A).  For example, in the January 2007

26   conference call, Align stated:

27        During this conference call, we may make forward-looking statements
          relating to Align's expectations about future events, products and future
28        results . . . .  Any forward-looking statements we make during the

conference call are based upon information available to Align, as of the date hereof.

Listeners are cautioned that these forward-looking statements are only predictions and are subject to risk, uncertainties, and assumptions that are difficult to predict.  As a result, actual results may differ materially and adversely from those expressed in any forward-looking statements.  Factors that might cause such a difference include, but are not limited to risks that are detailed from time-to-time in Align's periodic reports filed with the SEC, including but not limited to its Annual Report on Form 10-K for the fiscal year ended December 31, 2005, which was filed with Securities and Exchange Commission on March 1, 2006, and quarterly reports on form 10-Q.

(See Arico Decl. Ex. 8 at 1 (Jan. 2007 call tr.); see also id. Ex. 3 at 1 (Apr. 2007 call tr.), Ex. 5 at 1 (July 2007 call tr.).)[6]  The January 2007 conference call also incorporated by reference Align's Form 10-K for the period ending December 31, 2006, which filing cautioned:

We recently announced a phased rollout of ClinAdvisor, a new suite of software tools designed to make Invisalign case selection and submission processes more efficient for doctors.  In addition, we plan to introduce a further series of software enhancements that will evolve Invisalign into distinct suites of software tools for the orthodontist and GP.  There can be no assurance that we will be able to successfully develop, sell and achieve market acceptance of these and other new products and applications and enhanced versions of our existing products.  The extent of, and rate at which, market acceptance and penetration are achieved by future products is a function of many variables, which include, among other things, price, safety, efficacy, reliability, marketing and sales efforts, the availability of third-party reimbursement of procedures using our new products, the existence of competing products and general economic conditions affecting purchasing patterns. . . . Any failure in our ability to successfully develop and introduce new products or enhanced versions of existing products and achieve market acceptance of new products and new applications could have a material adverse effect on our operating results and could cause our revenues to decline.

---

[6]  Defendants request the Court take judicial notice of the above-referenced three exhibits to the Declaration of Molly Arico. Plaintiff does not argue said exhibits are not subject to judicial notice, see United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (holding court may consider "documents incorporated by reference in the complaint"); rather, plaintiff objects to the Court's taking judicial notice of certain "unreasonable inferences" defendants seek to draw therefrom.  (See Opp. to Request for Judicial Notice at 5:13-6:18, 10:1-13.)  The Court, however, has considered said exhibits solely for the limited purpose of determining the context in which the allegedly misleading statements were made.

1    (See Arico Decl. Ex. 9, at 26)[7]; In re Tibco Software, Inc., No. C 05-2146 SBA, 2006 WL

2    1469654, at *27 (N.D. Cal. May 25, 2006) (considering, as part of cautionary statements,

3    Form 10-Q incorporated by reference in conference call).  These cautionary statements

4    identified the risks plaintiff alleges ultimately materialized, specifically, the risk that

5    ClinAdvisor would not be widely accepted and used, and the risk that it would not increase

6    utilization and sales.

7         Moreover, plaintiff fails to allege facts showing the statements were made with actual

8    knowledge of falsity.  Forward-looking statements, even when unaccompanied by

9    meaningful cautionary statements, fall outside the safe harbor only if the plaintiff alleges

10   facts that would create a strong inference that the defendant made such statements with

11   actual knowledge of falsity.  See 15 U.S.C. § 78u-5(c)(1)(B); In re Cutera, 610 F.3d at

12   1112.  Here, plaintiff's general allegations that ClinAdvisor was "ineffective" in development

13   (see SAC § 48) and "based on a flawed concept" (see id.) do not demonstrate that Prescott

14   falsely stated Align's goals, either generally or as to ClinAdvisor specifically, at the time the

15   statements were made.

16        Consequently, defendants' stated objectives and other forward-looking statements

17   fall within the PSLRA's safe harbor.

18        **c.    Omissions**

19        Plaintiff alleges the remainder of the statements in the conference calls regarding

20   ClinAdvisor were misleading because defendants failed to disclose that ClinAdvisor was

21   based on a "flawed concept."  (See SAC ¶ 74.)  Plaintiff alleges: "according to CW9,

22   ClinAdvisor's software was complicated and time-consuming to use and required Align's

23   sales teams to spend a lot of time instructing GPs how to use it" (see SAC ¶ 75); "CW9

24   further reported that feedback on a limited ClinAdvisor release in April/May 2007 was also

25

26        _____

27        [7]  Defendants request the Court take judicial notice of Exhibit 9, and there is no
     objection thereto.  See Shurkin v, Golden State Vintners Inc., 471 F. Supp. 2d 998, 1011
     (N.D. Cal. 2006), aff'd, 303 F. App'x 431 (9th Cir. 2008) (holding Court may take judicial
28   notice of SEC filings "for the fact that these documents . . . were publicly-filed and for the
     fact that the statements made were made to the public on the dates specified").

negative and indicated that ClinAdvisor would not positively contribute to Align's sales and revenues" (see SAC ¶ 10); "[a]ccording to CW9, as of April 26, 2007, ClinAdvisor was still not fully developed and feedback from initial users was negative" (see SAC ¶¶ 89, 124); "CW9 reported that in June/July 2007, Align completed a marketing study to assess the effectiveness of its clinical education, including ClinAdvisor . . . [which] confirmed earlier indications that ClinAdvisor was not improving revenue or meeting its projected sales" (see SAC ¶ 104); "CW10 confirmed that Prescott was aware that ClinAdvisor was ineffective both during its beta testing and after its commercial launch because there were no efforts to increase its functionality, continue development or release a version 2.0" (see SAC ¶¶ 48, 90, 123); "CW12 reported that feedback [regarding ClinAdvisor] from early users in January 2007 was negative" (see SAC ¶ 8); and "according to CW12, dentists (and patients) did not like that, after taking a model of the patient's teeth, the patient had to come back two to three weeks later just to learn whether their case was easy, medium or difficult and whether the GP could assist them" (see SAC ¶ 74).

"To be actionable under the securities laws, an omission must be misleading." Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002). "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Id. "Silence, absent a duty to disclose, is not misleading." Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988).

Here, plaintiff alleges omission of the above-described circumstances rendered the following statements by Prescott in the January and April 2007 conference calls regarding ClinAdvisor's efficacy misleading: "we are finding that doctors are using [ClinAdvisor] for real-time as we had originally thought, for real-time discussions with patients at chair side and to improve their submissions" and "I think the jury is still out on this hundred [in the beta test], but the net is that they are more comfortable using it and more comfortable discussing it at chair side with patients, which has always been an issue for GPs" (see SAC ¶ 70); "ClinAdvisor starts to help [GPs] select the right cases and support them as they get going[,] [a]nd so, ClinAdvisor is a first step for the GP towards being a trusted advisor, a

14

clinical resource, and leading them more towards a turn-key solution" (see SAC ¶ 84); and

Prescott's response of "[t]hat is still right" to an analyst's inquiry whether the "ultimate

hypothesis, which was that [ClinAdvisor] would help get more GPs started more

confidently, seems to be holding" (see SAC ¶ 70).

Plaintiff further alleges omission of the above-described circumstances rendered

misleading the following statements by Prescott in the July 25, 2007 conference call

regarding ClinAdvisor's ability to increase utilization and sales: "[e]arly feedback [after

national launch] tells us it really helps newly certified and less experienced doctors select

appropriate cases based on their experience and skill set, which is exactly what we were

hoping to achieve" (see SAC ¶ 95); "[w]e continue to see expansion in our customer base,

both newly trained and repeat submitters, as well as progress in utilization growth for

orthos, GPs, and international, as well as solid demand at the consumer level" (see SAC ¶

97); and "[w]e are seeing newly certified doctors start their cases sooner"–"seeing the ramp

a little bit faster"–"[t]hese are all relative statements"–"[t]he ramp to adoption a little quicker

in those newer trained cohorts of doctors . . . but the bigger effect is more of a widespread

general slow but important increase in utilization growth across most cohorts of previously

trained docs" (see SAC ¶ 96).

Assuming, arguendo, a sufficient basis for the information provided by the CWs,

plaintiff fails to show how the above statements were misleading in light of the alleged

omissions.  See Fecht, 70 F.3d at 1083 (noting plaintiff must show "how and why the

statement was misleading when made").  No CW is alleged to have said doctors were not

using ClinAdvisor for real-time discussions with patients, nor is any CW alleged to have

said ClinAdvisor did not help doctors feel more comfortable.  CW9 and CW12's assertions

that an unspecified amount of early feedback on ClinAdvisor was "negative" (see SAC ¶¶ 8,

10) do not contradict Prescott's statement that ClinAdvisor helped some GPs select

appropriate cases, and, although plaintiff alleges in a conclusory manner that "ClinAdvisor

was based on a flawed concept and would not increase sales volumes or utilization rates"

(see, e.g., SAC ¶ 90), the SAC is devoid of facts showing how defendants knew

15

1  ClinAdvisor would not help to increase such rates, let alone facts showing such knowledge

2  at the early phases of its development.  Indeed, no CW provides facts sufficient to show

3  Prescott was incorrect when he stated that, as of July 25, 2007, Align was experiencing an

4  increase in utilization growth either generally or among doctors using ClinAdvisor in the

5  limited release.

6        In sum, plaintiff fails to show the alleged omissions "affirmatively create[d] an

7  impression of a state of affairs that differs in a material way from the one that actually

8  exist[ed]," see Brody, 280 F.3d at 1006, and, consequently, plaintiff fails to state a claim

9  under the PSLRA based on any such alleged omission.

10        **C.    Scienter**

11        In the SAC, plaintiff alleges scienter based on the same five grounds as alleged in

12  the FAC: (1) defendants' knowledge of internal reports (compare SAC ¶¶ 124, 126-32

13  with FAC ¶¶ 94-98); (2) management's attendance at and knowledge of corporate

14  meetings (compare SAC ¶¶ 124, 133-39 with FAC ¶¶ 99-104); (3) a presumption that, as

15  Align's CEO, Prescott had knowledge of adverse facts affecting Align's core business

16  (compare SAC ¶ 140-42 with FAC ¶ 107); (4) Prescott's "admissions" in press releases and

17  conference calls (compare SAC ¶¶ 110-14, 125-26 with FAC ¶¶ 84-87, 105-106); and (5)

18  "[i]nsider [s]ales" during the Class Period by Prescott and other executives (compare SAC

19  ¶¶ 144-49 with FAC ¶¶ 108-113).

20        To plead scienter under the PSLRA, a plaintiff must plead with particularity facts that

21  "constitute strong circumstantial evidence of deliberately reckless or conscious

22  misconduct."  See DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388-89

23  (9th Cir. 2002); 15 U.S.C. § 78u-4(b)(2).  For a plaintiff to allege a strong inference of

24  deliberate recklessness, such plaintiff "must state facts that come closer to demonstrating

25  intent, as opposed to mere motive and opportunity."  See In re Silicon Graphics, Inc. Sec.

26  Litig., 183 F.3d 970, 974 (9th Cir. 1999) (rev'd on other grounds, South Ferry LP No. 2 v.

27  Kinninger, 542 F.3d 776, 784 (9th Cir. 2008)).  "To qualify as 'strong' . . . an inference of

28  scienter must be more than merely plausible or reasonable–it must be cogent and at least

16

1   as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor

2   Issues & Rights, 551 U.S. 308, 314 (2007).  Although the plaintiff need not allege facts

3   giving rise to an "irrefutable" inference of scienter, and although the complaint must be

4   viewed "holistically," the plaintiff "must plead facts rendering an inference of scienter at

5   least as likely as any plausible opposing inference."  See id. at 324, 326, 328 (emphasis in

6   original).  For the reasons stated below, plaintiff fails to allege sufficient facts to support an

7   inference of scienter on the part of either Align or Prescott.

8                    **1.      Internal Reports**

9        The Court previously found plaintiff's allegations regarding internal reports

10  insufficient to plead scienter, because "[a]lthough plaintiff refer[red] to the existence of sales

11  and shipment data and ma[de] a general assertion about what the data showed, plaintiff

12  allege[d] no hard numbers or other specific information."  (See Order at 19:1-8 (citing Lipton

13  v. Pathogenesis Corp., 284 F.3d 1027, 1035-36 (9th Cir. 2002) (holding plaintiffs failed to

14  plead claim under PSLRA where plaintiffs alleged defendant pharmaceutical corporation

15  "could regularly track its sales data," which "indicated that test patient demand was flat," but

16  failed to "plead, in any detail, the contents of such report or the purported data")); see also

17  Nursing Home Pension Fund, Local 144 v. Oracle Corporation, 380 F.3d 1226, 1230-31

18  (9th Cir. 2004) (finding internal report allegations sufficient to support strong inference of

19  scienter where plaintiff alleged "hard numbers and ma[de] specific allegations regarding

20  large portions of [defendant's] sales data").

21       The great majority of plaintiff's allegations as to Align's internal reports are identical

22  to those the Court found inadequate in the FAC.  (Compare SAC ¶ 128 with FAC ¶ 95; SAC

23  ¶ 129 with FAC ¶ 96; SAC ¶ 130 with FAC ¶¶ 96, 97.)  Plaintiff's new allegations fail for the

24  same reason as the prior allegations, in that they include no "hard numbers" or other

25  specifics.  See Oracle, 380 F.3d at 1230-31.  Although the SAC alleges CW11 created and

26  Prescott received daily "run-rate" reports that tracked various manufacturing and shipping

27  data, such allegations are not significantly different from plaintiff's prior allegations and, as

28  with those prior allegations, do not include data or other detail.  (Compare SAC ¶ 131 with

1   FAC ¶¶ 95-97.)

2              **2.      Corporate Meetings**

3          Plaintiff next points to sales conference calls, sales meetings, financial reviews,

4   manufacturing meetings, and executive management committee meetings.  (Compare SAC

5   ¶¶ 124, 133-39 with FAC ¶¶ 99-104.)  The Court previously held such allegations

6   insufficient to establish a strong inference of scienter because, as with the internal reports,

7   the FAC contained "no allegation as to any 'hard numbers' . . . discussed with Prescott at

8   any meeting, let alone numbers that would serve to contradict Prescott's statements."  (See

9   Order at 20:9-11 (quoting Oracle, 380 F.3d at 1231).)  The new allegations fail to cure the

10  noted deficiencies.  The added allegation that CW9 attended a presentation with

11  "PowerPoint slides" that "contain[ed] key metrics" and "showed that Align was overwhelmed

12  with fulfilling Patients First orders and had a backlog of new revenue orders" provides no

13  detail as to the content of those slides, let alone data sufficient to contradict Prescott's

14  statements.  (See SAC ¶¶ 43, 137.)  Similarly, although CW12 is now alleged to have

15  attended a meeting at which Align's Product Manager reported that "early beta users did

16  not find ClinAdvisor to be helpful," the SAC provides no data or other detail to contradict

17  any of Prescott's statements.  (See SAC ¶ 124.)

18         Moreover, as with the FAC, the SAC's allegations are insufficient to connect

19  information allegedly discussed at meetings to Prescott.  CW9's speculation about what

20  was conveyed at meetings he did not attend, and about Prescott's receipt of unspecified

21  "updates" CW9 did not see, do not establish a strong inference of scienter.  (See SAC ¶¶

22  124, 136-38; see also Order at 20:18-24 (citing Zucco Partners, LLC v. Digimarc Corp., 552

23  F.3d 981, 994, 998 (9th Cir. 2009) (finding allegation CFO attended various meetings and

24  "had to have known what was going on with respect to the Company's inventory accounting

25  manipulation" insufficient to support strong inference of scienter).)  The only new allegation

26  regarding information actually conveyed to Prescott is plaintiff's allegation that CW9 told

27  Prescott "ClinAdvisor could not be developed and deployed without a significant investment

28  of time and money and, even then, could not be launched until June 2007."  (See SAC ¶

79.)  Such information is not inconsistent with any of Prescott's statements, and particularly in light of plaintiff's allegations that Prescott did in fact direct additional resources to ClinAdvisor's development (see SAC ¶ 124) and that ClinAdvisor was in fact launched in July 2007 (see SAC ¶ 95).

### 3.   Core Operations

Plaintiff again alleges that Prescott, as CEO of Align, "can be presumed to have knowledge of adverse facts affecting the Company's core business" which is "the sale and shipment of new revenue cases." (Compare SAC ¶ 142 with FAC ¶ 107.)

"Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." See South Ferry, 542 F.3d at 784.  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter–at least absent some additional allegations of specific information." Id. at 784-85 (noting, in "some unusual circumstances," "core operations inference" will suffice to raise requisite "strong inference"). The Court previously found plaintiff's reliance on the core operations inference unavailing, because "plaintiff fail[ed] to allege any facts about Prescott's actual exposure to 'adverse facts affecting [Align's] core business' (see FAC ¶ 107), nor circumstances cognizable as 'unusual' for purposes of the 'core operations inference.'" (See Order at 21:7-12 (quoting South Ferry, 542 F.3d at 784 (citing, as example of unusual circumstances, case where defendant allegedly failed to disclose loss of two largest customers, comprising 80% of company's revenue).)  As discussed above, plaintiff again fails to allege Prescott's actual exposure to information inconsistent with his statements; nor has plaintiff added allegations of circumstances sufficiently "unusual" as to give rise to the core operations inference.[8]

---

[8] Citing South Ferry LP No. 2 v. Kilinger, 687 F. Supp. 2d 1248 (W.D. Wash. 2009), plaintiff argues Prescott's public statements demonstrate scienter, because they "demonstrate his knowledge of the topics of which he speaks."  (See Opp. at 18:11-19:8.) Plaintiff's reliance on such authority is unavailing.  In South Ferry, the district court found scienter was adequately alleged where the defendants spoke "with a high degree of specificity"and represented to investors that they "had all of the information necessary to

### 4.    Later "Admissions"

Plaintiff again alleges, as in the FAC, that Prescott, in the October 24, 2007 conference call, "admitted" that "Align's sales force had 'moved their focus away from generating case growth' during the Class Period in order to focus on 'managing backlog and turnaround and expediting of cases'" and that "the sales teams 'weren't pushing as hard to get new case starts' and 'did not focus enough effort on filling the pipeline for new case starts.'"  (Compare SAC ¶¶ 112, 153 with FAC ¶ 116.)  As the Court previously noted, although "'[a] later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement . . . [i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.'"  (See Order at 21:21-25 (quoting In re Read-Rite Corp., 335 F.3d 843, 846 (9th Cir. 2003)).)  Plaintiff's unchanged allegations were and remain insufficient.

The SAC's allegation as to an additional "admission" likewise is insufficient.  Plaintiff now alleges Prescott, on January 9, 2008, stated Align had "known for some time that there's a consistent theme out there with our doctors. . . . they need different features than we've given them."  (See SAC ¶ 123 (ellipses in original).)  Although plaintiff alleges the reference is to ClinAdvisor, the statement, when read in full and in context, is more general in nature.  (See Arico Decl. Ex. 14 at 3 ("We've known for some time that there's a consistent theme out there with our doctors, whether they be GPs or orthos.  They want ease of use.  They need different features than we've given them.  They have a wide range of case complexity.  And they need much greater predictability.  We understand that.

_____

make accurate predictions."  See id. at 1259-60.  Here, as discussed above, Prescott's statements regarding both Patients First and ClinAdvisor are general, optimistic statements that do not purport to make detailed, accurate predictions supported by actual knowledge.

And now we understand that in detail.") (emphasis added).)[9]  Moreover, such statements, even if understood to refer specifically to ClinAdvisor, do not "directly contradict" Prescott's "earlier, cheerier" statements about ClinAdvisor.  See In re Read-Rite Corp., 335 F.3d at 846.

### 5.    Stock Sales

Plaintiff's allegations as to Prescott's stock sales are essentially identical to the allegations in the FAC, and remain insufficient to raise a strong inference of scienter.  (See Order at 22:3-23:1; compare SAC ¶¶ 144-49 with FAC ¶¶ 109-13.)  Likewise, plaintiff's allegations as to stock sales by other Align executives are essentially identical to those in the FAC (compare SAC ¶¶ 146-48 with FAC ¶¶ 110-12), and, as previously noted, "[s]ales by insiders not named as defendants . . . are irrelevant to the determination of the named defendant's scienter" (see Order at 23:3-10).[10]

Rather than offer new factual allegations, plaintiff argues the Court "misread" Metzler Inv. GMBH v. Corinthian Cools., Inc., 540 F.3d 1049 (9th Cir. 2008), as "creat[ing] a bright-line test" that "requir[es] sales amounts of more than 37% of a defendants' [sic] stock to support scienter."  (See Opp. at 22:1-3.)  Contrary to plaintiff's assertion, the Court considered the three relevant factors identified in Metzler, specifically, "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were

---

[9] Defendants request the Court take judicial notice of the above-referenced exhibit to the Declaration of Molly Arico.  Plaintiff does not argue the exhibit is not subject to judicial notice, see Ritchie, 342 F.3d at 908 (holding court may consider "documents incorporated by reference in the complaint"); rather, plaintiff objects to the Court's taking judicial notice "for the purposes defendants seek," namely, that the alleged statement "did not refer to ClinAdvisor."  (See Opp. to Request for Judicial Notice at 10:14-28.)  The Court, however, is entitled to consider said exhibit for the limited purpose of determining the context in which the alleged "admission" was made.

[10] Plaintiff argues "the Ninth Circuit has considered sales by other 'executives as well as [even] defendants' family members' as part of the mix 'sufficient to create a strong inference' of scienter."  (See Opp. at 23:6-9 (quoting In re Daou Sys., 411 F.3d at 1024.)  Contrary to plaintiff's argument, the Court in Daou, although noting the plaintiffs' allegations as to executives and family members' stock sales, analyzed only the defendants' sales as a basis for scienter.  See Daou, 411 F.3d at 1024 (holding "defendants' suspicious stock sales . . . plus the complaint's specific allegations of [their] deliberate accounting misfeasance create a strong inference of scienter").

consistent with the insider's trading history."  (See Order at 22:7-10; Metzler, 540 F.3d at 1067.)

### 6.  Plaintiff's Scienter Allegations as a Whole

Plaintiff argues the allegations in the SAC, taken as a whole, establish scienter.  In assessing a pleading, the Court must "consider the complaint in its entirety" to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter."  Tellabs, 551 U.S. at 322-23.  "Vague or ambiguous allegations are . . . properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter."  South Ferry, 542 F.3d at 784.  "When conducting this holistic review, however, [the court] must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter."  Zucco Partners, 552 F.3d at 1006 (quoting Tellabs, 551 U.S. at 323).

In its prior order, the Court found the FAC's allegations were "insufficient to raise an inference of scienter that is as 'cogent and at least as compelling as any opposing inference of nonfraudulent intent,'" (see Order at 23:20-22 (quoting Tellabs, 551 U.S. at 314)), and, in particular, that "the FAC fail[ed] to raise an inference that is as compelling as the opposing inference that Align, without any intent to defraud, simply failed to accurately predict the magnitude of the effect of the Patients First Program on Align's ability to produce new revenue cases, resulting in a modest, approximately 2%, reduction in Align's anticipated case shipments for 2007."  (See Order at 23:22-24:1.)  The Court's reasoning is equally applicable to the allegations in the SAC.  The more compelling inference is that Align, without any intent to defraud, simply failed to accurately predict the precise effects that either the Patients First Program or ClinAdvisor would have on new revenue cases.

In sum, the SAC fails to sufficiently allege scienter under the PSLRA.

### D. Loss Causation

To state a claim for securities fraud under the Exchange Act, a plaintiff must plead "loss causation," specifically, the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss."  Dura, 544 U.S. at 342.  To plead loss

causation, a plaintiff must allege (1) the fraudulent statement that caused the stock price to increase, (2) the disclosure that revealed the statement was fraudulent, and (3) the decline in stock price after the truth became known. See id. at 346-47. A plaintiff does not need to show, however, that the misrepresentation was the only reason for the decline in value. See In re Daou, 411 F.3d at 1025.

Here, with respect to loss causation, plaintiff alleges that Align, on October 24, 2007, announced that (1) utilization rates had decreased from 3.4 to 3.2 in the second quarter of 2007, (2) case shipments for the third quarter of 2007 were 52,000, which was below the prior guidance of 53,000 to 54,000 cases, (3) case shipment guidance for the fourth quarter of 2007 was being lowered to a range of 50,000 to 52,000 cases and (4) the case shipment guidance for fiscal year 2007 was being lowered from a range of 206,000 to 209,000 cases to a range of 202,000 to 204,000 cases. (See SAC ¶ 110.) Plaintiff further alleges that "[i]n response to defendants' October 24, 2007 disclosures, the price of Align common stock fell $9.63 per share, or approximately 34%." (See SAC ¶ 117.) Plaintiff pleads no facts connecting such drop in stock price to ClinAdvisor. Relying on comments by analysts, plaintiff argues that "the market linked defendants disclosures to the inability of the Company to increase utilization vis á vis ClinAdvisor" (see Opp. at 25:9-11); none of the alleged comments, however, mentions ClinAdvisor in any manner (see SAC ¶ 116). In the absence of any such allegation, or other allegation showing the market became aware of the alleged fraud, plaintiff has not adequately alleged loss causation. See, e.g., In re NVIDIA Corp. Sec. Litig., No. 08-CV-04260 RS, 2010 WL 4117561, at *12 (N.D. Cal. Oct. 19, 2010) (holding plaintiff failed to plead loss causation where "far more plausible" reason for "drop in [company's] stock price [was that] company failed to hit prior earnings estimates").

## II.    Insider Trading

The SAC alleges that Prescott engaged in insider trading, in violation of § 10(b) of the Exchange Act. (See SAC ¶¶ 171-72.) Plaintiff's insider trading allegations are duplicative of those described above, and, accordingly, likewise fail to state a claim. See

23

1  United States v. Smith, 155 F.3d 1051, 1063 (9th Cir. 1998) (noting plaintiff, in alleging

2  insider trading, must allege "a (1) misleading (2) statement or omission (3) of a 'material'

3  fact (4) made with scienter").

4  **III.     Section 20(a)**

5       Plaintiff alleges, as against all defendants, a violation of § 20(a) of the Exchange Act.

6  (See SAC ¶ 173-74.)  Under § 20(a) of the Exchange Act, any person who controls a

7  person liable for violating § 10(b) is jointly and severally liable for the violation.  See 15

8  U.S.C. § 78t(a).  "To establish 'controlling person' liability, the plaintiff must show that a

9  primary violation was committed and that the defendant 'directly or indirectly' controlled the

10  violator."  See Paracor Finance, Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th

11  Cir. 1996).  Here, plaintiff's failure to state a primary violation under § 10(b) precludes

12  plaintiff from stating a claim under § 20(a).

13                                    **CONCLUSION**

14       For the reasons set forth above, defendants' motion to dismiss the SAC is hereby

15  GRANTED, and the SAC is hereby DISMISSED with leave to amend.  The Third Amended

16  Complaint, if any, shall be filed no later than March 2, 2012.  The Case Management

17  Conference, currently set for April 13, 2012, is hereby CONTINUED to July 20, 2012.

18       **IT IS SO ORDERED.**

19  Dated:  February 3, 2012

   _____
   MAXINE M. CHESNEY
20   United States District Judge

21

22

23

24

25

26

27

28

24